# Exhibit 2

Plaintiffs' Motion for Class Certification and Supporting Brief

SARAH L. KOOGLE; March 15, 2013

1

```
 1              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
 2                      AT TACOMA

 3

   TROY SLACK, JACOB GRISMER,       )
 4 RICHARD ERICKSON, and            )
   SCOTT PRAYE, Individually, and   )
 5 as Putative Class                )
   Representatives,                 )
 6                                  )
          Plaintiffs,               ) No. 3:11-cv-05843-
 7                                  )       BHS
      v.                            )
 8                                  )
   SWIFT TRANSPORTATION CO. OF       )
 9 ARIZONA, LLC, and SWIFT          )
   TRANSPORTATION CORPORATION,       )
10 d/b/a SWIFT TRANSPORTATION,      )
   d/b/a SWIFT,                     )
11                                  )
          Defendants.               )
12 _____)

13

14

15       VIDEOTAPED DEPOSITION OF SARAH L. KOOGLE

16

17                  Phoenix, Arizona
                    March 15, 2013
18                    9:18 a.m.

19

20

21

22

23

   REPORTED BY:
24 Janice Harrington, RPR, CRR
   AZ Certified Court
25 Reporter No. 50844
```

SARAH L. KOOGLE; March 15, 2013

2

1          VIDEOTAPED DEPOSITION OF SARAH L. KOOGLE

2    commenced at 9:18 a.m. on March 15, 2013, at 3131 E.

3    Clarendon Avenue, Suite 108, Phoenix, Arizona, 85016,

4    before Janice Harrington, RPR, CRR, Arizona Certified

5    Court Reporter No. 50844.

6

7                              *  *  *

8

9    APPEARANCES:

10       For the Plaintiffs:

11            THE COCHRAN FIRM
              By: Joseph D. Lane, Esq.
12            163 West Main Street
              P.O. Box 927
13            Dothan, Alabama 36302
              (T) 334.793.1555 | (F) 334.793.8280
14            jlane@cochranfirm.com

15       For the Defendants:

16            SHEPPARD MULLIN RICHTER & HAMPTON, LLP
              By: Ellen Bronchetti, Esq.
17            Four Embarcadero Center, 17th Floor
              San Francisco, California 94111-4109
18            (T) 415.434.9100 | (F) 415.434.3947
              ebronchetti@sheppardmullin.com
19
         Also Present:
20
              Rachel Robertson, Swift Corporate Counsel
21            Justin Hart, Videographer

22

23

24

25

SARAH L. KOOGLE; March 15, 2013

3

1                          I N D E X

2      Name                 Examination By              Page

3      SARAH L. KOOGLE
                            MR. LANE                       6
4

5                          E X H I B I T S

6      Exhibit              Description                 Page

7      Exhibit 1            30(b)(6) Notice                6

8      Exhibit 2            Fifth Amended Notice          9
                            to Take the Videotaped
9                           Deposition of Sarah
                            Koogle
10

       Exhibit 3            Declaration of Sarah          9
11                          Koogle in Opposition
                            to Plaintiff's Motion
12                          to Remand to State
                            Court
13

       Exhibit 4            Declaration of Robin         40
14                          Rohwer in Support of
                            Defendant's Notice of
15                          Removal of Civil
                            Action
16

       Exhibit 5            Acknowledgement of           98
17                          Rate of Pay for
                            Washington Based
18                          Driving Employees

19     Exhibit 6            Swift Transportation        107
                            Driver Payroll Status
20                          Changes

21     Exhibit 7            Swift Transportation,       166
                            Driver Payroll Status
22                          Changes

23     Exhibit 8            Bates Nos.                  173
                            D010301-D010313
24

       Exhibit 9            Bates Nos.                  179
25                          D010188-D010193

SARAH L. KOOGLE; March 15, 2013

4

| | | | |
|---|---|---|---|
| 1 | Exhibit 10 | Bates Nos. D010213-D010217 | 181 |
| 2 | | | |
| 3 | Exhibit 11 | Bates Nos. D010314-D010319 | 182 |
| 4 | Exhibit 12 | Bates Nos. D010363-D010368 | 184 |
| 5 | | | |
| 6 | Exhibit 13 | Bates Nos. D010348-D010362 | 186 |
| 7 | Exhibit 14 | Bates Nos. D010372-D010379 | 190 |
| 8 | | | |
| 9 | Exhibit 15 | Bates Nos. D010320-D010327 | 194 |
| 10 | Exhibit 16 | Bates Nos. D010356-D010367 | 205 |
| 11 | | | |
| 12 | Exhibit 17 | Swift Position Request | 212 |
| 13 | Exhibit 18 | Package Details | 213 |
| 14 | Exhibit 19 | Linehaul Driver Pay Plan | 215 |
| 15 | Exhibit 20 | Linehaul Driver Pay Plan, Effective Date December 1, 2006 | 217 |
| 16 | | | |
| 17 | Exhibit 21 | Swift Transportation Linehaul Driver Pay Plan | 224 |
| 18 | | | |
| 19 | Exhibit 22 | Dispatch Length | 227 |
| 20 | Exhibit 23 | D010393-D010443 | 235 |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

5

1          THE VIDEOGRAPHER:  Here begins Volume 1,

2     Disk No. 1 in the deposition of Sarah Koogle in the

3     matter of Slack, et al. vs. Swift Transportation in

4     the United States District Court, Western District of

5     Washington at Tacoma, Case No. 3:11-cv-05843-BHS.

6     Today's date is March 15, 2013.  The time on the

7     video monitor is 9:18 a.m.  The video operator today

8     is Justin Hart contracted by Yamaguchi Obien Mangio

9     of Seattle, Washington.

10          This video deposition is taking place at

11     3131 East Clarendon Avenue, Suite 108, Phoenix,

12     Arizona, and was noticed by The Cochran Firm for

13     plaintiffs.

14          Counsel, please voice identify yourselves

15     and state whom you represent.

16          MR. LANE:  Joseph Lane for the

17     plaintiffs.

18          MS. BRONCHETTI:  Ellen Bronchetti on

19     behalf of Swift Transportation.

20          THE VIDEOGRAPHER:  Thank you.  The court

21     reporter today is Janice Harrington.  Will the

22     reporter please swear in the witness.

23

24          SARAH L. KOOGLE,

25     called as a witness herein, having been first duly

SARAH L. KOOGLE; March 15, 2013

6

1    sworn, was examined and testified as follows:

2                          EXAMINATION

3    BY MR. LANE:

4         Q.   Would you state your name, please.

5         A.   Sarah Lynn Koogle.

6         Q.   Okay.  Ms. Koogle -- Mrs. Koogle,

7    correct?

8         A.   Yes.

9         Q.   Okay.  Mrs. Koogle, we -- we just met

10   before the deposition -- before we started your

11   deposition, correct?

12        A.   Yes.

13        Q.   I understand that you are going to be

14   testifying today in your individual capacity, but

15   that you are also designated as a person most

16   knowledgeable about certain items that we have listed

17   in a special 30(b)(6) notice of the corporate

18   representative deposition.  Do you understand that?

19        A.   Yes.

20        Q.   And what I'd like to do, and if you want

21   to is, we can just go through the list.

22             MR. LANE:  For the record, I would like

23   to mark a copy of the 30(b)(6) notice as Exhibit 1 to

24   your deposition, Mrs. Koogle.

25        (Exhibit 1 was marked for identification.)

SARAH L. KOOGLE; March 15, 2013

7

1   BY MR. LANE:

2       Q.   And before we started your deposition,

3   your employer's counsel and I have discussed items

4   that you are expected to be able to provide testimony

5   on, on behalf of Swift.  Do you understand that?

6       A.   Yes.

7       Q.   Okay.  We've got 30 -- 35 items listed in

8   the notice, the amended notice.  What I'd like to do,

9   based on our conversation, and Ms. Bronchetti can

10  help me and correct me if I misstate areas that

11  you're going to testify about, but you're going to

12  testify as to Item No. 3 on behalf of Swift?

13          MS. BRONCHETTI:  Dating back to March

14  2006.

15  BY MR. LANE:

16      Q.   Dating back to March of 2006, and also

17  Item No. 4, dating back to March of 2006.  You will

18  also be testifying about Item No. 11, to some limited

19  capacity, dealing with the amount of overtime hours

20  worked.

21          MS. BRONCHETTI:  She'll be testifying as

22  to payroll communications only.  Not all

23  communications with any and/or all drivers.

24          MR. LANE:  Okay.  Payroll communications.

25  Got ya.

SARAH L. KOOGLE; March 15, 2013

8

1    BY MR. LANE:

2        Q.   You're going to be testifying about Item

3    No. 12 going back to 2006, correct?

4        A.   Yes.

5        Q.   Item No. 16, 17, and 18 going back to

6    2006.  Did I state that correctly?

7            MS. BRONCHETTI:  Yes.

8    BY MR. LANE:

9        Q.   Item No. 24 as to some of the items

10   listed, and those being hire date, compensation, rate

11   of pay, and I believe that's all in that one,

12   correct?

13           MS. BRONCHETTI:  Correct.

14   BY MR. LANE:

15       Q.   All right.  Item No. 30 and Item No. 32;

16   is that correct?

17           MS. BRONCHETTI:  Yes.

18   BY MR. LANE:

19       Q.   Okay.  We'll come back to that,

20   Mrs. Koogle.

21           MR. LANE:  Let me go ahead while we're

22   marking some things.  I think I only have one of

23   these, for some reason.  I've got an -- that's the

24   notice of your deposition in your individual

25   capacity.  We'll just mark that as Item No. 2 or

SARAH L. KOOGLE; March 15, 2013

9

1    Exhibit No. 2 to your deposition.

2              And I'm sorry, Ellen, for some reason, I

3    only have one of these.

4              MS. BRONCHETTI:  Oh, that's -- that's

5    okay.  I have it.  Yeah, sure.

6         (Exhibit 2 was marked for identification.)

7    BY MR. LANE:

8         Q.   Can you take a look at that and just tell

9    me, have you seen that before?

10        A.   Yes.

11        Q.   Okay.  I'm going to show you, again,

12   while we're marking things, we'll go ahead and show

13   you a -- what I believe is a declaration that you

14   executed in another case, and we've marked that as

15   Exhibit No. 3 to your deposition, and I think it may

16   provide us some background information that we can

17   just confirm.

18        (Exhibit 3 was marked for identification.)

19   BY MR. LANE:

20        Q.   Have you seen that before?

21             MS. BRONCHETTI:  Do you have copies, Joe?

22             MR. LANE:  I'm sorry.  That was your copy

23   I was writing on.  I'm sorry.

24             MS. BRONCHETTI:  This looks different.

25             MR. LANE:  Did I give you two different

SARAH L. KOOGLE; March 15, 2013

10

1    ones?

2              MS. BRONCHETTI:  Oh, let's --

3              MR. LANE:  Oh, it's -- oh, there's

4    something wrong with the printing on one of them.

5              MS. BRONCHETTI:  Yeah.  No, it's -- it's

6    just the first page.  It's fine.

7              MR. LANE:  I have no idea why that did

8    that.

9              MS. BRONCHETTI:  That's strange.

10   BY MR. LANE:

11        Q.   Have you seen that before, Mrs. Koogle?

12        A.   Yes.

13        Q.   Okay.  And that's a case entitled -- or

14   this was a declaration that you submitted in a case

15   entitled Montalvo versus Swift; is that correct,

16   Swift Transportation Corporation?

17        A.   That's correct.

18        Q.   Okay.  And it looks like that was done

19   back in -- sometime in November of 2011?

20             MS. BRONCHETTI:  It's October.

21             THE WITNESS:  October.

22   BY MR. LANE:

23        Q.   I'm sorry.  I was looking at the date it

24   was -- the hearing date, but assuming it would have

25   been close to that.  So it was in October of 2011?

SARAH L. KOOGLE; March 15, 2013

11

1          A.    Correct.

2          Q.    Okay.  In that declaration, again, you --

3     you stated that this information was true and

4     accurate to the best of your knowledge, correct?

5          A.    Correct.

6          Q.    Okay.  I just want to go over a couple

7     things on this.  We may revisit this, but as I

8     understand it, at this -- at that time, you were

9     employed with Swift Transportation Co. of Arizona,

10    correct?

11             MS. BRONCHETTI:  At the time she signed

12    the declaration?

13             MR. LANE:  Yes.

14             THE WITNESS:  That's correct.

15    BY MR. LANE:

16         Q.    And that hasn't changed, correct?  You're

17    still employed?

18         A.    I am still employed there.

19         Q.    With Swift Transportation?

20         A.    Yes.

21         Q.    Okay.  Been there for 10 years?

22         A.    It's 11 now.

23         Q.    Eleven years?  Okay.  And is it still

24    your duties to create reports for individual projects

25    as listed in Paragraph 1?

SARAH L. KOOGLE; March 15, 2013

12

1        A.    Yes, that's one of my job duties.

2        Q.    Okay.  Including the other things listed

3   there?

4        A.    Yes.

5        Q.    Okay.  Now, you compiled information or

6   data in that -- for purposes of that declaration and

7   provided information based on your review of the

8   corporate records, correct?

9        A.    Provided information in the Montalvo

10  case?

11       Q.    Yes.

12       A.    Yes, some information.

13       Q.    Okay.  We may revisit that, but has --

14  has anything changed in terms of your -- your ability

15  to review and compile data now as compared to when

16  you prepared this?

17            MS. BRONCHETTI:  Objection; vague.  What

18  kind of data?

19  BY MR. LANE:

20       Q.    Well, data that was used in this

21  declaration.  Could you still do that today in this

22  case?

23       A.    I -- I would need to --

24            MS. BRONCHETTI:  Objection; vague.  Go

25  ahead.

SARAH L. KOOGLE; March 15, 2013

13

1           THE WITNESS:  I would need to review what

2    all I provided in this -- for this declaration, what

3    type of data I provided.

4    BY MR. LANE:

5        Q.   Okay.  Has your access to information

6    or -- or files changed since October of 2011?

7        A.   No, it's not.

8        Q.   Okay.  Well, we'll come back to that.  I

9    don't want to get bogged down on that at this point.

10   Let's talk a little about your background.

11       A.   Okay.

12       Q.   First of all, you -- you've lived here in

13   Phoenix for how long?

14       A.   For 11 years.

15       Q.   Eleven years.  And you've worked with --

16   have you -- the entire time of your employment with

17   Swift, was that -- has that been since you've moved

18   here?  In other words, have you been employed -- were

19   you employed with Swift after you moved here?

20       A.   Yes.

21       Q.   Okay.  Where did you live before that?

22       A.   In Silver City, New Mexico.

23       Q.   Okay.  Can you tell me a little about

24   your education?  Do you have college degrees?

25       A.   No college degrees.  High school

SARAH L. KOOGLE; March 15, 2013

14

1    graduate.

2         Q.   High school.  Okay.  In your work at --

3    in the payroll department at Swift, do you

4    participate in any continuing education, things of

5    that nature, seminars?

6         A.   What do you mean?

7         Q.   Seminars, training programs, things of

8    that nature?

9         A.   Training programs that are pertaining to

10   Swift, not -- not to my job at Swift, so...

11        Q.   Okay.  Okay.  Tell me a little bit about

12   your employment history.  Now, I understand you work

13   in the payroll department now as a supervisor; is

14   that correct?

15        A.   Yes.

16        Q.   How long have you been in the supervisory

17   role?

18        A.   I don't know the exact year, but it was

19   between 2009, 2010.

20        Q.   And before that, what -- what was your

21   classification?

22        A.   I've had nine positions in payroll, so to

23   go backwards is kind of difficult for me.

24        Q.   Okay.  Well, let's go through -- let's go

25   forward, then.

SARAH L. KOOGLE; March 15, 2013

15

1      A.    Okay.

2      Q.    When you were hired 11 years ago, what

3  were you hired as?

4      A.    I was hired as a data entry person.

5      Q.    Okay.  Which involved -- what -- what

6  were you doing?

7      A.    I was just keying in numbers into the

8  system to process a reimbursement for a driver or to

9  process what the system was going to pay as mileage

10  pay for a driver.

11      Q.    Okay.  And how long did you do that?

12      A.    For approximately four months.

13      Q.    Then what did you do?

14      A.    I moved to the payroll customer service

15  help desk.

16      Q.    Payroll customer service.  And what did

17  you do there?

18      A.    We answered every aspect of a question a

19  driver would have.

20      Q.    Okay.  So let me make sure I'm clear.

21  The customer you're referring to are the drivers?

22      A.    Drivers and non-drivers and independent

23  contractors.

24      Q.    Drivers and non-drivers.  Who are the

25  non-drivers?

SARAH L. KOOGLE; March 15, 2013

16

1        A.    Office employees.

2        Q.    Okay.  But when -- but, again, just so

3   I'm clear, when you say customer service, you're

4   referring to the employees at Swift or -- and

5   independent contractors?

6        A.    Yes.

7        Q.    Okay.  How long did -- did you work in

8   that capacity?

9        A.    I was there for approximately four months

10  also.

11       Q.    Four months.  Okay.  Next?

12       A.    Next, I was in a position that was for

13  student salary pay calculations and driver vacation

14  pay processing.

15       Q.    Okay.  How long did you work there?

16       A.    I do not know for sure how long I was in

17  that position.

18       Q.    Now, when you're talking about student

19  salary pay, who is the students you're referring to?

20       A.    A student is a driver who's newly hired

21  with Swift that doesn't have any prior driving --

22  truck driving experience.

23       Q.    Okay.  Okay.  Is this still in -- this is

24  11 years ago.  It would be 2001 or '2?

25       A.    I started in December of 2001.

SARAH L. KOOGLE; March 15, 2013

17

1    Q.   Okay.  So this would have been in 2002

2    then?

3    A.   Yes.

4    Q.   All right.  Well, what was your next --

5    what was your next job --

6    A.   My next job --

7    Q.   -- position?

8    A.   -- was still in the payroll department.

9    I was Robin Rohwer's administrative assistant.

10   Q.   Okay.  All right.  Do you remember when

11   you filled that job?

12   A.   I do not remember.

13   Q.   Do you remember roughly how long?

14   A.   I was in that position for probably a

15   year and a half.

16   Q.   Okay.  All right.  That's -- looks like

17   that's No. 4.  Let's -- you're doing good, because I

18   don't know how you can remember all of that, but the

19   next -- next position?

20   A.   My next position was called a payroll

21   liaison position.

22   Q.   Payroll liaison.  Well, I didn't ask you

23   what you did for Robin Rohwer -- I mean, Rohwer.

24   What -- what was your job duties with Mrs. Rohwer?

25   A.   I've -- I've always worked with her, so

SARAH L. KOOGLE; March 15, 2013

18

1    are you talking about when I was her administrative

2    assistant?

3           Q.    Well, when you were administrative

4    assistant, yes.

5           A.    I answered all of her phone calls,

6    returned calls for her, helped with answering

7    e-mails.  I had job duties that were, like, handling

8    our bank account, payroll bank account information,

9    registering paychecks that have went out, the check

10   numbers and dollar amount.  Working on just

11   independent projects for her that would be like

12   employment verifications or just written

13   correspondence for her, letters that she's needing

14   done.  That's -- that's about it.

15          Q.    Okay.

16          A.    That I can recall.

17          Q.    And you did that for about a year and a

18   half?

19          A.    That's correct.

20          Q.    Okay.  What -- I didn't ask you this

21   before, but were these what you would consider

22   promotions when you were moving from one position to

23   the other or just horizontal?

24          A.    They're all promotions.

25          Q.    They're all promotions.  Okay.  So and we

SARAH L. KOOGLE; March 15, 2013

19

1    were up to payroll liaison.  That was a promotion

2    from the administrative assistant position?

3           A.    That's correct.

4           Q.    Okay.  And what -- what was your job

5    there?

6           A.    My job duties as a payroll liaison were

7    to do training for -- do payroll training for people

8    that were within the payroll department.

9           Q.    Okay.

10          A.    Payroll training for managers outside of

11   the payroll department, writing processes on how to

12   process a receipt to get processes documented, and I

13   still, like, assisted with some of Robin's

14   administrative duties.  I assisted with the payroll

15   customer service help desk still.  So I had, like, a

16   training position where I would train people, but I

17   also helped in areas that I had been trained in to

18   fill people who were absent due to sickness or just

19   weren't there that day.

20          Q.    Okay.  So and that was called payroll --

21   payroll liaison, right?

22          A.    That's correct.

23          Q.    Okay.  How long did you work in that

24   position?

25          A.    I was in that position for probably three

SARAH L. KOOGLE; March 15, 2013

20

1    years.

2           Q.    Do you remember roughly the years that

3    you worked in that position?

4           A.    It was probably more along the line of

5    two years.  So it would have been from between 2003

6    and 2005.

7           Q.    Okay.  All right.  And then what position

8    did you move to after that?

9           A.    After that position, I moved to the owner

10   operator, which is the independent contractors, just

11   a processor, an -- a payroll processor for

12   independent contractors.

13          Q.    Okay.  How long did you work in that

14   position?

15          A.    Probably only around eight months.

16          Q.    So it takes us sometime in 2006 or so?

17          A.    Yes.

18          Q.    All right.  And then what happened?

19          A.    Then I -- how many is that?  Six?  Okay.

20   Then I moved to a project specialist position.

21          Q.    All right.  And what did you do as a --

22   in -- in the project specialist position?

23          A.    In my project specialist position, I was

24   responsible for ident- -- identifying areas that are

25   related to payroll that could be streamlined,

SARAH L. KOOGLE; March 15, 2013

21

1   automated, better documented to make processes

2   function faster or more accurately.

3            I -- at -- in that position is when I

4   started working closely with IT to do the changes

5   that have -- had been designed, the payroll changes

6   that had been designed that would require programming

7   changes, and so I would work closely with IT to

8   identify what we were needing to have done and then

9   they would do the programming on it.

10        Q.   Okay.  How long did you work as a project

11   specialist?

12        A.   Probably a year and a half.

13        Q.   Okay.  So that gets us around 2007, 2008?

14        A.   That's '7?

15             MS. BRONCHETTI:  '7.

16             THE WITNESS:  Okay.  So then -- then I

17   became --

18   BY MR. LANE:

19        Q.   Wait.

20        A.   I'm sorry.

21        Q.   I wanted to get the right date.

22        A.   Sorry.

23        Q.   Can you give me your best guess on the --

24   the date range that you worked in that position?

25        A.   2007, and in that title -- I was in that

SARAH L. KOOGLE; March 15, 2013

22

1  title for about six months.

2        Q.   Okay.  Would that have been the first six

3  months or the second six months of 2000 --

4        A.   Of 2007?

5        Q.   Yeah.

6        A.   The beginning of 2007, the first six

7  months.

8        Q.   Okay.  All right.  That was No. 7, I

9  believe.  So what next?

10        A.   My next position was a -- the title was a

11  payroll supervisor.

12        Q.   Okay.  All right.  Is -- and that's

13  your -- is that your title today?

14        A.   Today, I'm a payroll project leader.

15        Q.   Okay.  Then --

16        A.   So that's my last position.

17        Q.   Okay.  So in 2000 -- the latter part of

18  2007, you became payroll supervisor?

19        A.   That's correct.

20        Q.   And you stayed in that position how long?

21        A.   I'm -- I'm still a supervisor.

22        Q.   Okay.

23        A.   It's just a different title now.

24        Q.   Okay.  What -- and your title changed

25  when then?

SARAH L. KOOGLE; March 15, 2013

23

1       A.    My title just changed in November of

2   2012.

3       Q.    Okay.  And it changed to?

4       A.    Payroll project leader.

5       Q.    Payroll.  Did your job duties change when

6   your title changed in 2012?

7       A.    No, my job duties didn't change, they

8   just changed my title.

9       Q.    I got you.  Okay.  I didn't ask you

10  before, but have you ever -- have you ever given a

11  deposition before?

12      A.    No, I have not.

13      Q.    Well, you're doing an excellent job in

14  the manner in which you're answering the questions.

15  And I have a habit of sometimes talking over you when

16  I think your question is over.  So I -- if you'll

17  help me, I'll help you, and we'll try not to talk

18  over each other.  And you've been doing a very good

19  job of -- of providing verbal answers as opposed to

20  shaking the head, nodding the head, and that's --

21  that's good for the court reporter.

22            I'll probably ask you questions that you

23  cannot be absolutely sure of the answer, but to the

24  extent that you have experience in these areas and

25  knowledge in those areas, I would ask that you

SARAH L. KOOGLE; March 15, 2013

24

1    provide me with your best -- your best educated

2    guess, for the lack of a better term.  And you can

3    qualify that to the extent you need to, but I need

4    your best -- your best -- the best you can give me in

5    terms of the knowledge that you have; is that fair?

6            A.   Yes.

7            Q.   Okay.  Now, I know you're -- you're -- as

8    we've talked about earlier, you are testifying to --

9    in some capacity as a representative of the company

10   on certain issues, correct?

11           A.   That's correct.

12           Q.   Did you -- did you review any documents

13   in preparation to testify in those areas that we at

14   least identified by number from the notice earlier?

15           A.   Yes.

16           Q.   Okay.  What I'd like to do, if we can

17   just refer back, I believe -- was that Exhibit No. 1?

18   Looking at Paragraph No. 3 of Exhibit No. 1, just

19   the -- the 30(b)(6) notice, can you tell me, and if

20   you need to, review the wording there a little bit,

21   can you tell me what documents you reviewed in order

22   to prepare to testify in that area?

23           MS. BRONCHETTI:  Objection; work product.

24   Don't answer that.

25   BY MR. LANE:

SARAH L. KOOGLE; March 15, 2013

25

1      Q.   Did you review any company documents,

2   documents kept in the ordinary course of business at

3   Swift?

4           MS. BRONCHETTI:  Objection.  You can

5   answer that question to the extent that there are any

6   documents that I didn't tell you to review.  Anything

7   that you independently did without my direction, you

8   can testify to.  Do you understand?

9           THE WITNESS:  Uh-huh.

10          MS. BRONCHETTI:  Okay.

11          THE WITNESS:  I did not review any

12   documents outside of legal review.

13   BY MR. LANE:

14      Q.   Okay.  I'm sorry, tell me your answer one

15   more time.

16      A.   I did not review any documents outside of

17   legal review.

18      Q.   Okay.

19          MR. LANE:  And as I understand your --

20   your instructions to the witness, you're telling her

21   that she is not to tell me the documents -- the

22   corporate company documents that she reviewed in

23   preparation for her deposition?

24          MS. BRONCHETTI:  Correct.  Correct.  She

25   can testify to anything that I didn't show her that

SARAH L. KOOGLE; March 15, 2013

26

1    we didn't discuss -- what I'm saying is anything

2    independent of what I selected to show her that's

3    privileged and work product.

4              MR. LANE:  Okay.

5              MS. BRONCHETTI:  Anything outside of

6    that, she can testify to.

7              MR. LANE:  All right.  Well, I disagree

8    with that, but that's something we can address at a

9    later time.  Just for the record, though, I feel like

10   I'm entitled to know what documents, company

11   documents she reviewed regardless of -- of who

12   provided you those documents for purposes of your

13   preparation to testify on behalf of the corporation.

14   BY MR. LANE:

15        Q.   The same question for Item No. 11.

16             MS. BRONCHETTI:  I'm going to object to

17   all of those questions, and I'll just state my

18   objection.  Anything that I selected to show you to

19   prepare for this deposition is -- is work-product

20   privilege.  Anything outside of that, if you, on your

21   own, went and did some work, looked up documents,

22   looked at documents, said, hey, I want to prepare on

23   my own, you can testify to that.  Do you understand?

24             THE WITNESS:  Yes.

25             MS. BRONCHETTI:  Okay.  So I'll just

SARAH L. KOOGLE; March 15, 2013

27

1    state my objection, and I guess we can just go

2    through.

3            MR. LANE:  Yeah, and we'll -- we'll have

4    to address that later.  But let me just give a global

5    question, then.

6    BY MR. LANE:

7        Q.   Are there any documents that you reviewed

8    on your own that your company's lawyer did not

9    provide to you or even -- well, did not provide to

10   you to review?

11       A.   In preparation for the deposition?

12       Q.   Yes.

13       A.   No, there are not.

14       Q.   Okay.  And I'm going to be asking you

15   questions about a lot of documents that have been

16   produced to us today, that have been produced before,

17   which certainly have -- are not work product in terms

18   of the documents themselves because they've actually

19   been disclosed to us for purposes of -- of discovery,

20   and I would ask you -- I'm going to be asking you

21   questions about whether or not you've ever seen those

22   documents before or reviewed those documents in

23   preparation for your deposition.  Can you answer

24   those questions for me?

25       A.   I'm sorry, I don't --

SARAH L. KOOGLE; March 15, 2013

28

1     Q.   If you're presented with specific

2  documents that have been disclosed in this case.  We

3  can use one, if you want to pull one out.

4          MS. BRONCHETTI:  But, Joe, here's the

5  problem.

6          MR. LANE:  I just need to know if she's

7  looked at the documents before.  I can know if she's

8  ever seen the documents.

9          MS. BRONCHETTI:  Well, that's a different

10  question.  I don't know why you're getting upset, but

11  that's a completely different question.  You're

12  asking her a very specific question.  What did you do

13  to prepare for your deposition?  That's what you're

14  asking her.  That includes what documents did she

15  review in preparation.  She's answered that outside

16  of what I showed her, there's nothing else that she

17  reviewed in preparation for her deposition.  If you

18  give her a document and say, Have you seen this

19  before?  Do you actually think I'm going to object on

20  privilege?

21          MR. LANE:  And that's what I wanted to

22  clear up.  I -- I couldn't tell from your objection

23  whether or not that was the case.

24          MS. BRONCHETTI:  Well, then, you're not

25  listening to my objection.

SARAH L. KOOGLE; March 15, 2013

29

1          MR. LANE:  I'm listening to your

2     objection.

3          MS. BRONCHETTI:  Okay.  But what -- if

4     you show her a document, have you seen this before?

5          MR. LANE:  That's why I wanted -- that's

6     what I was trying to determine.  So how far are you

7     taking that?

8          MS. BRONCHETTI:  What's your question,

9     though?  You're not asking her a question.  Why don't

10    you show --

11         MR. LANE:  I'm going to.  I'm going to,

12    Ellen.

13         MS. BRONCHETTI:  Okay.

14         MR. LANE:  I -- I was just seeing what --

15    to the extent that she's going to be able to answer

16    questions just because you've handed her the same

17    document at some point that she has looked at and

18    you're telling her she can't respond that she's seen

19    that document.  I just want to make sure that I'm not

20    going to be wasting my time trying to ask her

21    questions --

22         MS. BRONCHETTI:  Okay.

23         MR. LANE:  -- based upon the -- the

24    extent of your objection.

25         MS. BRONCHETTI:  I assure you, I assure

SARAH L. KOOGLE; March 15, 2013

30

1   you, you will not be wasting your time and I will

2   only make necessary and proper objections.

3               MR. LANE:  Okay.

4               MS. BRONCHETTI:  Promise.

5               MR. LANE:  I understand what you're

6   saying.

7               MS. BRONCHETTI:  Okay.

8               MR. LANE:  That's a judgment call,

9   though.  You understand that?

10              MS. BRONCHETTI:  Fair enough.

11              MR. LANE:  Okay.

12  BY MR. LANE:

13       Q.   Let's -- let's -- let's -- let's just get

14  into some -- some documents, if we can.  Well, before

15  we do that, now, you mentioned this -- that you

16  worked -- let me find my notes -- as the student

17  salary pay -- in a student salary pay position.  I

18  don't know what that was called, though.  What was

19  your title?

20       A.   It was pay -- it was just a payroll

21  processor title, but my job duties were to process

22  student salary pay and driver vacation.

23       Q.   Okay.  And I -- I didn't get the date

24  range that you worked in that capacity.  Do you -- do

25  you recall roughly the -- the years?

SARAH L. KOOGLE; March 15, 2013

31

1         A.   No, I don't recall.

2         Q.   Okay.  Who -- who is filling that role

3  today?

4         A.   The -- the role has -- the role has

5  changed since I've been in that role.

6         Q.   Okay.

7         A.   So --

8         Q.   Tell me how it's changed.

9         A.   The -- the role has changed because the

10  process has been ultimately automated so it's not

11  something a person has to manually process anymore.

12         Q.   Okay.

13         A.   My -- my job function was very manual.

14         Q.   Okay.  When did it change?

15         A.   That was early 2004.

16         Q.   So you would have been working in that

17  position prior to, or at the very latest, very early

18  in 2004?

19         A.   Yes.

20         Q.   Okay.  It -- it -- did it change while

21  you were working in that position or was that a

22  change --

23         A.   It --

24         Q.   -- that occurred after you moved to a

25  different position?

SARAH L. KOOGLE; March 15, 2013

32

1      A.   It -- it changed after I moved from that

2  position.   It was part of the documentation and

3  development of process changes that could be enhanced

4  or improved.   So then programming was done to help

5  automate parts of the process so it was not so

6  manual.

7      Q.   Okay.   And that occurred in early 2004?

8      A.   Yes.

9      Q.   Is that the system that's in place today?

10      A.   The pay system or processing system?

11      Q.   The -- the processing of -- of student

12  pay.

13      A.   No.

14      Q.   It isn't.   Tell me about the changes that

15  have occurred since -- since 2004.

16      A.   Are you -- are you talking about changes

17  in the process?

18      Q.   Yes.

19      A.   The process today is com- -- is

20  completely automated.   It's not -- it's not touched

21  by payroll other than to run a batch program to pull

22  the payroll into the pay cycle.

23      Q.   When did -- when did that change occur?

24      A.   November 12, 2012.

25      Q.   Okay.   So between early 2004 and November

SARAH L. KOOGLE; March 15, 2013

33

1    12 of 2012, was -- was there -- was the process

2    itself changed during that period?

3         A.   Other than the original change from being

4    completely manual to having it automated, some

5    automation to it, no, that's -- that's the only

6    changes that have been done up until November 12,

7    2012.

8         Q.   Okay.  In that -- in that process, that

9    student pay process, after the 2004 auto --

10   semi-automation, I guess is a way to describe it, was

11   there any distinction in the system in the way that

12   the process worked between drivers who held

13   Washington positions and drivers who held positions

14   outside of Washington in terms of the way student pay

15   was processed?

16        A.   Can you repeat your question?

17        Q.   Yes.  The way in which student pay was

18   processed after the 2004 semi-automation that

19   occurred, and I'm going up to November 12th of 2012.

20        A.   Okay.

21        Q.   Was there any distinction or in the

22   process itself between -- in the way that the pay is

23   processed between Swift drivers who held positions in

24   Washington versus Swift drivers elsewhere?

25             MS. BRONCHETTI:  I'm -- I'm going to

SARAH L. KOOGLE; March 15, 2013

34

1  object to the term "drivers" -- I'm just going to

2  object that it's vague in several respects, Joe.  And

3  I know that I don't want to get involved, but I think

4  you have to explain what process means, and I also

5  think you need to explain what you mean by

6  Washington, Washington drivers.  I think that's --

7  BY MR. LANE:

8        Q.   Well, Washington, holding Washington

9  positions, and we can do that.  I -- I was hoping

10 that that was a fairly common term based on the

11 testimony yesterday, but if it's not, then I'll tell

12 you my understanding.  It's based on Mrs. Rohwer's

13 testimony.

14            It was my understanding that Washington

15 drivers are designated as Washington drivers, at

16 least in terms of whether or not they hold Washington

17 driving positions.  Do you know what I'm -- what I'm

18 talking about when I say a Washington driving

19 position -- a Washington driver position?

20        A.   The position code that they're assigned

21 to --

22        Q.   Yes.

23        A.   -- from the -- the personnel system?

24        Q.   Yes.

25        A.   Yes, they're in a Washington student

SARAH L. KOOGLE; March 15, 2013

35

1    position code.

2         Q.   Okay.  And -- okay.  And that would be

3    the students, correct?

4         A.   Yes.

5         Q.   And is that the same way it works for

6    drivers after they finish their training and become

7    solo drivers or whatever, are they -- are they then

8    assigned a Washington driving position for those

9    drivers who are going to be working out of

10   Washington?

11        A.   Depending -- depending on the type of

12   work that they're going to do, yes.

13        Q.   Okay.

14        A.   If they decide to change terminals, then

15   it would be another position that would be used.

16        Q.   Okay.  All right.  And the positions, as

17   I understand it, that designate -- does that

18   designate the home terminal for the driver?

19        A.   It --

20        Q.   Is that what the position --

21        A.   It designates the location, the building

22   or on-site location is located -- located in, the

23   state that the location is located in that they're

24   managed out of.

25        Q.   Okay.  All right.  And do you consider

36

1    that -- I've heard the term "home terminal" used in

2    various circumstances.  Is that basically

3    establishing what the home terminal would be for the

4    driver?

5          A.    Yes.

6          Q.    Okay.  Now, we were talking about the

7    student salary pay process, and that's where I was

8    using the term "position."  For those, is there in

9    the system itself, from 2004 up until November of

10   2012, was there any in the semi-automated system, was

11   there any distinction made between drivers working in

12   a Washington position, student drivers working in a

13   Washington student position versus drivers working

14   outside of Washington in a -- in a different

15   position?

16         A.    It's -- what do you mean by distinction,

17   though?

18         Q.    A distinction that says, okay, if you're

19   working in a Washington student position, your pay is

20   going to be calculated differently than drivers

21   outside of Washington?

22         A.    So you're asking about the pay now or --

23         Q.    I'm asking about the process that

24   would -- that would result in a different pay for

25   Washington drivers versus drivers outside of

SARAH L. KOOGLE; March 15, 2013

37

1   Washington.

2        A.   The -- the pay is -- the pay is dependent

3   upon the -- the management of the student, not

4   anything that we -- that we have designated.

5        Q.   Okay.  Are you aware of any -- any

6   component of the system that existed between 2004 and

7   November 2012 that -- for student pay that either

8   automated or manually accounted for overtime pay for

9   hours worked over 40?

10            MS. BRONCHETTI:  Objection.

11   BY MR. LANE:

12        Q.   During the training process?

13            MS. BRONCHETTI:  Vague and ambiguous.

14   You can answer, if you understand his question.

15            THE WITNESS:  Can you repeat your

16   question again?

17   BY MR. LANE:

18        Q.   Yeah.  And I'm asking about anything in

19   the system that either automatically or manually

20   accounted for overtime pay for student drivers during

21   the training period, regardless of how long it was,

22   for Washington student drivers.

23        A.   I'm not aware of anything that would --

24   that was flagged that way.

25        Q.   Okay.  Was that something that would

SARAH L. KOOGLE; March 15, 2013

38

1    typically be -- is it -- was it common for -- well,

2    have you ever during the time you were working --

3    working in that position, did you make entries into

4    the system manually to pay student drivers who worked

5    over 40 hours in a week overtime at -- at time and a

6    half for Washington drivers?

7         A.    No, because we don't control the entry of

8    the pay.  All we do is process it.

9         Q.    I understand.

10        A.    That pay is entered by a manager and we

11   run a batch process that just pulls it into the

12   payroll cycle.

13        Q.    Okay.

14        A.    The dollar -- the dollar amounts are not

15   determined by payroll.

16        Q.    Okay.  Well -- well, the hours are not

17   determined by payroll, correct?

18        A.    The hours or the dollar amounts.  The

19   manager is responsible for entering the dollar

20   amounts also.

21        Q.    Okay.  Are you aware of any instances

22   where the managers would send in pay data that --

23   that you recognized as being time and a half for any

24   hours worked over 40 for Washington trainees?

25               MS. BRONCHETTI:  Objection; overbroad as

SARAH L. KOOGLE; March 15, 2013

39

1    to time.

2    BY MR. LANE:

3         Q.    During the time that you were working?

4              MS. BRONCHETTI:  Over 11 years?

5              MR. LANE:  Well -- well, in the -- in

6    the -- well, I was talking about when she was working

7    in the student salary pay position.

8              THE WITNESS:  Can you repeat your

9    question again?

10   BY MR. LANE:

11        Q.    Well, you said it's the manager's job to

12   send in the pay data, correct?

13        A.    Uh-huh.

14        Q.    Does the manager calculate -- are you

15   aware at any time when a manager sent you information

16   and said, here's the pay for 40 hours, here's the

17   time and a half pay for the 15 hours this student

18   worked overtime?  Have you ever had any data that

19   came to you that you then entered into the system

20   when you were working in that position?

21        A.    I didn't enter -- I didn't enter pay into

22   the system.  They entered the pay into the system,

23   the manager did.

24        Q.    Okay.  All right.  Well, are you aware in

25   the -- at any time when you worked in this

SARAH L. KOOGLE; March 15, 2013

40

1    department, the student salary pay or training anyone

2    or -- or otherwise where you recognize amounts being

3    put in to account for overtime for student drivers in

4    the Washington position?

5         A.   As a separate dollar amount?  I'm not

6    aware of that, no.

7         Q.   Okay.

8              THE WITNESS:  Can we take a break real

9    quick?

10             MR. LANE:  Yeah, sure.

11             THE WITNESS:  Okay.

12             THE VIDEOGRAPHER:  Off record at 10:03

13   a.m.

14        (Recessed from 10:03 a.m. to 10:17 a.m.)

15             THE VIDEOGRAPHER:  Back on record at

16   10:17 a.m.

17   BY MR. LANE:

18        Q.   Mrs. Koogle, I'm going to show you

19   what -- what I've marked as Exhibit No. 4 to your

20   deposition, and...

21        A.   Thank you.

22             MS. BRONCHETTI:  Thank you.

23        (Exhibit 4 was marked for identification.)

24   BY MR. LANE:

25        Q.   Can you tell me if you've -- if you've

SARAH L. KOOGLE; March 15, 2013

41

1    seen that before?  Do you know what that is?

2         A.   It looks like Robin's declaration.

3         Q.   Yes.  And it's -- it was submitted in

4    this case.  So did you have -- did you play any role

5    in -- in developing or gathering the information that

6    was used to prepare this declaration?

7         A.   I believe I provided the information in

8    No. 9.

9         Q.   Paragraph No. 9 of the -- of Exhibit No.

10   4?  Okay.

11             MS. BRONCHETTI:  You believe you did or

12   you did?

13             THE WITNESS:  I did.

14   BY MR. LANE:

15        Q.   Anything else?

16        A.   I do not think so.  I think that is the

17   only one.

18        Q.   Okay.  Now, let me ask you about --

19   because you prepared -- we marked, I think earlier,

20   one of your exhibits there on the Mon- -- Montalvo

21   case where you submitted a declaration.  And that --

22   what exhibit number was that again?

23             MS. BRONCHETTI:  Three.

24             MR. LANE:  Three?  Okay.  I forgot to

25   mark mine.

SARAH L. KOOGLE; March 15, 2013

42

1    BY MR. LANE:

2        Q.   And you submitted very similar

3    information in that case that Mrs. Rohwer talked

4    about in her declaration, correct?

5             MS. BRONCHETTI:  Objection; vague and

6    ambiguous.

7    BY MR. LANE:

8        Q.   In other words, you submitted information

9    describing the orientation process, correct?

10            MS. BRONCHETTI:  Objection; misstates the

11   witness' testimony.

12            MR. LANE:  Well, I'm -- I'm looking at

13   her -- I'm looking at Exhibit 3.

14   BY MR. LANE:

15       Q.   I'm not referring to what you testified

16   to, but what you actually stated in your declaration.

17   Does your declaration contain a description of the

18   orientation process as you understand it?

19            Okay.  Let me -- let me just do this:

20   Let me ask you about the -- about some of the facts

21   that Mrs. Rohwer provided.  You said you provided the

22   information in Paragraph No. 9.

23            MS. BRONCHETTI:  Are you back to Exhibit

24   4 now, Joe?

25            MR. LANE:  Yeah, I am back to Exhibit No.

SARAH L. KOOGLE; March 15, 2013

43

1    4.

2    BY MR. LANE:

3        Q.   I'm -- I'm just -- I'm going to read part

4    of it so I can just ask you questions about it.

5    Okay?

6        A.   Okay.

7        Q.   Paragraph 9 starts with, "Based on a

8    compilation of corporate data and records available

9    at this time, which I obtained and reviewed, and

10   which is located in Phoenix, Arizona, I estimate that

11   there are approximately 1,319 employee drivers who

12   have worked for Swift in Washington in the four years

13   prior to the filing of the Amended Complaint."  And

14   we're talking about this, the Complaint in this case,

15   correct?

16       A.   Correct.

17           MS. BRONCHETTI:  Objection.  This is not

18   her declaration.

19           MR.  LANE:  No, I understand that.

20           MS. BRONCHETTI:  She cannot testify as to

21   what Robin said.  You can ask her about a content.

22           MR. LANE:  I'm going to ask her.

23           MS. BRONCHETTI:  Okay.

24           MR. LANE:  I was just reading the

25   sentence so I could ask her about items in there that

SARAH L. KOOGLE; March 15, 2013

44

1    she said she provided data for.

2            MS. BRONCHETTI:   Okay.

3    BY MR. LANE:

4        Q.   All right.   Now, are you the one who

5    compiled the corporate data and records that she

6    mentions in there?   Is that what you're referring to?

7        A.   That she mentions in No. 9?

8        Q.   Yes.

9        A.   Yes.

10       Q.   Okay.   What -- what records did you go

11   to, to arrive at -- well, let me just ask you, did

12   you -- are you the one that gave her the number that

13   said there were 1319 employee drivers who work for

14   Swift in the four years prior to filing the Amended

15   Complaint in the state of Washington?

16       A.   I -- I prepared the reporting, yes.

17       Q.   Okay.   And what data did you rely on to

18   come up with it?   How did you come up with the

19   number?

20       A.   Which number are you talking about?

21       Q.   1319 employee drivers.

22       A.   Without looking at my notes, I can't be

23   absolutely sure.

24       Q.   Okay.   What -- what records would you go

25   to in order to arrive at those -- those -- how would

SARAH L. KOOGLE; March 15, 2013

45

1    you go about getting that information?

2         A.    For the 1319 employee drivers, I would

3    identify for the time frame of what's requested.   I

4    would identify which payroll records processed during

5    that time frame and had a payment record, a payroll

6    record to a driver that was assigned to a Washington

7    terminal location or on-site location.

8         Q.    And that assignment is what we were

9    talking about earlier when you were talking about

10   they're assigned to a particular position, which

11   represents a particular home terminal for that

12   driver; is that correct?

13        A.    That's correct.   They don't tech- --

14   technically work out of that location.   They are just

15   assigned to the location.

16        Q.    Okay.   And typically -- well, we'll --

17   we'll -- we'll talk about that in a minute.   But so

18   this 1319 represents all drivers who were assigned,

19   during the four-year period who were assigned to a

20   position in a Washington terminal, correct?

21        A.    That were -- yes, that were -- had a

22   payment record, a payroll record during the time

23   frame that was requested where, like, the GL account

24   information is tied to a Washington terminal

25   information.

SARAH L. KOOGLE; March 15, 2013

46

1    Q.   Okay.  Now, the next sentence talks about

2  323 drivers in Washington that work in Washington

3  during -- during any given week.  Did you provide

4  that information?

5    A.   I didn't provide information of who

6  worked in Washington.  I provided information of who

7  was assigned to a Washington location.

8    Q.   Okay.  Let's break it down.  "I further

9  estimate that on average" -- again, this is not your

10  words, but Ms. Rohwer's words -- Mrs. Rohwer.  It

11  says, "I further estimate that, on average, Swift

12  employed approximately 323 drivers in Washington

13  during any given week during the three years prior to

14  the filing of the Amended Complaint."

15         Now, just so I'm clear, did you provide

16  the -- based on that complete statement, did you

17  provide that information that there were 323 drivers

18  employed by Swift in Washington during any given week

19  during those three years?

20    A.   An average of Washington drivers that

21  were assigned to a Washington location over the three

22  years, there was approximately 323 drivers during a

23  week.

24    Q.   Okay.  And what is your understanding of

25  the -- when she says, "Swift employed," what is your

SARAH L. KOOGLE; March 15, 2013

47

1    understanding of that?  How do you define Swift

2    employed in Washington?  In other words, what

3    classifies them as being employed in Washington?

4              MS. BRONCHETTI:  Objection; asked and

5    answered.

6    BY MR. LANE:

7         Q.    Is that the same thing that they have a

8    position code, a Washington position code?

9         A.    Yes.

10        Q.    So that -- and that would mean they were

11   employed in Washington?

12        A.    They were employed in a position that was

13   based out of Washington.

14        Q.    Right.  Okay.  Now, the next paragraph

15   says, "I also estimate that approximately 787

16   employee drivers have left their employment with

17   Swift during the three years prior to the filing of

18   the Amended Complaint."  Did you provide that

19   information?

20        A.    Yes, I did.

21        Q.    And how did you arrive at that?

22        A.    Using the same information -- the same

23   selection criteria of identifying drivers who were --

24   work -- or based out of a Washington location.  I

25   didn't use -- the first ent- -- entry said, for the

SARAH L. KOOGLE; March 15, 2013

48

1   last four years, the prior four years.

2        Q.   Right.

3        A.   So the second part of it was within the

4   last three years.

5        Q.   Right.

6        A.   So it was out of the employees that were

7   within the last three years, paid out of a Washington

8   location, who had a termination date at the time I

9   did this information.

10       Q.   Okay.

11       A.   So they had left the company for whatever

12   reason.

13       Q.   Moving on to the next page, which is

14   still part of Paragraph No. 9.  It says,

15   "Furthermore, I estimate that approximately 1,120

16   individuals attended orientation for the position of

17   driver with Swift in Washington during the class

18   period."  Did you provide that information?

19       A.   Yes, I believe I did.

20       Q.   Okay.  How did you derive that -- that

21   number?  What -- what did you do to come up with that

22   number?

23       A.   I would not know without going back to my

24   notes.  I don't have my notes with me.

25       Q.   Okay.  All right.  But you -- you

SARAH L. KOOGLE; March 15, 2013

49

1   reviewed records and -- and did a search through your

2   data to come up with that information?

3           A.   Yes.

4           Q.   Okay.  To what extent are you familiar --

5   familiar with the orientation process?

6           A.   I am not familiar with orientation at

7   all.  I'm not part of it.

8           Q.   Do you -- do you know if it is required

9   of every new hire to go through orientation?  Do you

10  have any knowledge about the requirements or whether

11  or not every driver has to go through that or is that

12  somebody else's?

13          A.   That's somebody else's area.

14          Q.   Okay.  Have you ever provided a -- a

15  declaration -- I know you've provided a declaration

16  in a couple of cases.  We've talked about that.  But

17  I believe you've done one in this case as well

18  recently, correct?

19          A.   I -- I -- possibly.  I don't -- I don't

20  remember.

21          Q.   Okay.  How -- how many times would you

22  say you've provided declarations such as the -- the

23  one that we marked earlier, I think Exhibit 3?  That

24  was one you did.  Have you provided declarations in

25  other matters?

50

1      A.    For other cases?

2      Q.    Yes.

3      A.    Yes.

4      Q.    Okay.  How many times have you done that?

5      A.    I would say probably four to six times.

6      Q.    Okay.  When was -- roughly, when was the

7    first time you submitted a declaration in a matter

8    involving Swift?

9      A.    In any matter involving Swift, just

10   within the last two years was my first time.

11     Q.    Okay.  Have you ever in any of those

12   declarations, have you ever provided information

13   describing the orientation process such as what we

14   see in Paragraph 10 of Exhibit No. 4?

15     A.    Have I ever provided information that

16   explains the orientation process?

17     Q.    Have you ever submitted a -- a

18   declaration where you provided information describing

19   the orientation process similar to what we see in

20   Paragraph No. 10?

21     A.    I don't believe so.

22     Q.    Okay.

23     A.    I don't know what the orientation process

24   is.

25     Q.    All right.  Paragraph 11, did you -- did

SARAH L. KOOGLE; March 15, 2013

51

1    you do any reporting or research to develop the

2    information that's contained in Paragraph 11?

3         A.   I am not sure if I provided that

4    information.  Robin has the same ability to get the

5    information, so I'm not sure if I provided it or if

6    she did.

7         Q.   Okay.  Just one second.  I'm sorry.

8    Who's the -- who's the heading (sic) -- the head of

9    the marketing department?  Do you know who the head

10   of -- do you have a marketing department at Swift?

11        A.   I honestly don't know.

12        Q.   Okay.  So you don't know who the head is,

13   then, if they do, right?

14        A.   No.

15        Q.   I -- I just noticed in Paragraph 5,

16   there's a -- there's a notation of there being a

17   marketing office or department, or something of that

18   nature.  You're not familiar with that?

19        A.   On --

20             MS. BRONCHETTI:  Objection; asked and

21   answered.  Go ahead.

22             THE WITNESS:  On Item No. 5, is that what

23   you --

24   BY MR. LANE:

25        Q.   In Paragraph 5.  I'll just read the

SARAH L. KOOGLE; March 15, 2013

52

1   sentence.  It's the third sentence, I believe.  It

2   says, "The majority of the company's administrative

3   functions (including that of legal, payroll, human

4   resources, marketing, operations and planning) are

5   conducted in Phoenix, Arizona."  I assume there's a

6   marketing department based on that statement.

7        A.   I'm --

8             MS. BRONCHETTI:  Objection; asked and

9   answered.  She said she had no idea.  And you're

10  asking --

11            MR. LANE:  I'm really not asking a

12  question.  I was just pointing out where I was

13  getting it from for her information.

14  BY MR. LANE:

15       Q.   Are you aware of -- of what is -- what

16  Mrs. Rohwer's talking about when she says, operations

17  and planning?

18       A.   Yes.

19       Q.   Okay.  Who's the head of -- is that one

20  entity or is that separate?  Is there an operations

21  department and a planning department or is that one

22  entity?

23       A.   There are two different departments.

24       Q.   Okay.  Who's the head of operations?

25       A.   I'm -- what time frame are you asking

53

1    about?

2         Q.    Currently.

3         A.    Currently today, head of operations as in

4    a certain location or regional location or the VP?

5         Q.    Well, the one that she's referring to

6    that's in Phoenix.

7         A.    The terminal leader would be Kevin Vadnal

8    in Phoenix.

9         Q.    Well, make sure I'm -- I'm clear, though.

10   She's referring to the company's administrative

11   functions, not the individual terminal.  Are you

12   talking about a particular terminal or the overall

13   company?

14        A.    I'm -- I'm -- I truly don't know exactly

15   what this was in reference to.

16        Q.    Okay.  How about the planning department?

17        A.    I'm not sure who the head of planning is.

18        Q.    Okay.

19        A.    Or even if it's centralized.

20        Q.    All right.  The information that you

21   utilized to come up with the data that you provided

22   in Paragraph 9, or the conclusions in Paragraph 9, is

23   that information that is still available today that

24   you could retrieve?  In other words, has anything

25   changed that would -- that would not allow you to do

SARAH L. KOOGLE; March 15, 2013

54

1   the same type of analysis today?

2           A.   No.

3           Q.   Okay.  Were the -- were the numbers that

4   we reviewed in Paragraph 9, were those accurate at

5   the time that you provided that information to

6   Mrs. Rohwer?

7           A.   Were they accurate at the time I provided

8   this?  Yes.

9           Q.   Yes.  Yes.  Do you have any reason to

10  suggest that they're not accurate today for that same

11  time period?

12          A.   For the same time frame?

13          Q.   Yes.

14          A.   No.

15          Q.   What is your understanding of Washington

16  State's requirements with regards to overtime pay for

17  truck drivers?

18          A.   Understanding of the law or --

19          Q.   Yes.  What -- what's required to be paid

20  to truck drivers in Washington state with regards to

21  overtime pay?

22          A.   In excess of 40 hours, overtime would be

23  required based on what their state law is.

24          Q.   Okay.  At any time that you -- when

25  you've been employed with Swift, are you aware of any

SARAH L. KOOGLE; March 15, 2013

55

1    overtime pay that has been paid to -- not hourly

2    employees, but truck drivers who are typically paid

3    by the -- by the mile?

4            MS. BRONCHETTI:  Objection; vague and

5    ambiguous, calls for a legal conclusion.  Do you

6    understand his question?

7            THE WITNESS:  No.

8    BY MR. LANE:

9        Q.   Okay.  At any time since you've been

10   employed with Swift working in the payroll

11   department, have you -- do you have a specific

12   recollection of any documents which indicated that

13   Swift was paying their truck drivers overtime for

14   hours driven over 40 hours for the mileage-based

15   drivers?

16       A.   For what time frame are you asking?

17       Q.   Well, let's -- for any time frame and

18   then we can break it down.  From -- from 2006 to the

19   present?

20       A.   And the question was, am I aware of any

21   documents?

22       Q.   Yes.  That would indicate that Swift was

23   paying their mileage-based -- and by that, I mean,

24   truck drivers who were typically paid by the mile,

25   mileage rate.  Are you aware of any documentation

SARAH L. KOOGLE; March 15, 2013

56

1    from 2006 to the present which would indicate that

2    Swift was paying those drivers, as a part of their

3    mileage rate, a component that accounted for overtime

4    for hours worked over 40?

5              MS. BRONCHETTI:  And hold on.  I'm going

6    to object to the extent it calls for attorney-client.

7    But you can answer to the extent you have independent

8    understanding.

9              THE WITNESS:  The only -- I know there's

10   a document that was -- is -- I remember seeing a

11   form, an acknowledgment form, or something that would

12   talk about that, but I'm not aware of anything else.

13   BY MR. LANE:

14        Q.   Okay.  Prior to you being aware of or

15   reviewing the acknowledgment form, and I don't mean

16   that -- prior to your awareness of the acknowledgment

17   form, do you recall any conversations or any --

18   any -- any type of communication where you were a

19   party to it or that you heard where the issue of

20   paying mileage-based truck drivers overtime for hours

21   worked over 40 hours in a week in the state of

22   Washington?

23             MS. BRONCHETTI:  Objection; compound.

24   BY MR. LANE:

25        Q.   In your capacity in -- working in the

1  payroll department?

2            MS. BRONCHETTI:  Also I'm going to object

3  based on attorney-client privilege, so don't disclose

4  any conversations that you had with counsel.

5            THE WITNESS:  Okay.

6            MS. BRONCHETTI:  Do you understand his

7  question?  Do you need to read it back?

8            THE WITNESS:  No, he needs to answer --

9  ask it again.

10           MR. LANE:  Okay.

11           MS. BRONCHETTI:  It was a long question.

12  BY MR. LANE:

13       Q.   I'll -- and we're going to look at the

14  acknowledgment form in a minute.  But other -- aside

15  from the acknowledgment form, is there any other

16  communication, non-attorney communication where you

17  were made aware of, or even when you became aware

18  that there was an issue with regards to payment of

19  overtime to Washington-based or Washington-assigned

20  truck drivers for -- who were paid by the mile for

21  hours worked over 40 in the state of Washington?

22       A.   I'm not aware of written communications,

23  just verbally have heard through the years that the

24  overtime rate for mileage -- drivers who work out of

25  the state of Washington that are assigned to a

SARAH L. KOOGLE; March 15, 2013

58

1    Washington location, that the -- the rate per mile

2    was inclusive of the overtime rate.

3         Q.   Okay.  And I -- and I need you to be as

4    specific as you can about where you heard that and

5    who you heard that from.

6         A.   I remember hearing it from managers

7    that -- that had worked at Swift through the years,

8    but it was not a conversation that was directly told

9    towards me.  It is just what I have heard.

10        Q.   Well, can you be any more specific?  What

11   were -- what was the context?  What were the

12   circumstances where you were privy to those

13   communications?

14        A.   I don't remember.  It has been a long

15   time ago.

16        Q.   Was there -- were there any situations

17   where the issue was being raised by a driver and

18   the -- the question was being addressed because of

19   some driver inquiries?  Do you -- as you --

20        A.    As I don't remember this, what the

21   situation was, I wouldn't know whether it was a

22   complaint from a driver.

23        Q.   Okay.  Well, when you're talking about

24   managers, who are you referring to?  What -- what

25   managers?

SARAH L. KOOGLE; March 15, 2013

59

1      A.   I can't even recall what the lady's name

2  is.  She is no longer with Swift.

3      Q.   Okay.  It was a lady that you referred

4  to?

5      A.   Yes.

6      Q.   Okay.  Do you remember -- well, she's no

7  longer with Swift.  When was she with Swift?

8      A.   It was in my early, early employment, so

9  I am not sure.

10      Q.   So this would have been somewhere back

11  well in advance of -- or before 2006?

12      A.   Yes.

13      Q.   You started in 2000 and --

14      A.   '1.

15      Q.   '1.  Would it have been in 2001 or --

16      A.   I'm not sure.

17      Q.   Okay.  This lady, do you have a

18  recollection of the lady, whether you recall her name

19  or not, do you have --

20      A.   No.  As I said, it was in passing.  It

21  was not in -- it was not a conversation directed

22  towards me.

23      Q.   Okay.  Do you remember who the

24  conversation was -- was directed at?

25      A.   No, I don't.

SARAH L. KOOGLE; March 15, 2013

60

1    Q.    Do you remember where it took place?

2    A.    In our building on the third floor.

3    Q.    In payroll?

4    A.    Yes.

5    Q.    Do you know what this lady, what her --

6    what department she was a manager in?

7    A.    She was a payroll employee.

8    Q.    Payroll employee.  Was she a manager?

9    You said manager.

10   A.    I believe so.

11   Q.    Okay.  Do you know if Ms. Rohwer was

12   present during this conversation?

13   A.    I don't think so.

14   Q.    Okay.  Other than that conversation, do

15   you have any recollection at any other time prior to

16   this acknowledgment you referenced earlier where

17   the -- where the -- the subject was even discussed in

18   your presence?

19   A.    The subject of?

20   Q.    Paying overtime to mileage pay

21   Washington-positioned drivers.

22   A.    No.

23   Q.    Okay.  Have you ever seen any notation on

24   the -- the system, the payroll system, the entire

25   time you've been at Swift which defined or delineated

SARAH L. KOOGLE; March 15, 2013

61

1    a portion of the mileage pay for

2    Washington-positioned drivers to account for overtime

3    pay?

4            A.    What do you mean by notation?

5            Q.    Well, any -- any -- well, I guess I'm

6    not -- I don't have your system in front of me, but

7    is there -- in your system, is there any component

8    that applies to Washington-positioned drivers that

9    describes or serves to somehow establish what part of

10   the mileage pay is intended to account for overtime?

11           A.    You asked if there was a flag, right?

12           Q.    Well, not necessarily a flag, but any --

13   well, whatever.  Anything that you say is -- is

14   intended to designate a component of the mileage rate

15   as overtime pay?

16           A.    No.

17           Q.    Okay.  Have you ever seen in the payroll

18   department, have you ever seen any calculations,

19   documents that -- that show any calculations for the

20   purpose of establishing a -- a component in the

21   mileage pay to drivers in Washington, as we've

22   defined that, to account for or to arrive at a factor

23   to account for overtime for those drivers?

24           MS. BRONCHETTI:  Objection to the extent

25   it's calling for privileged information, and I'm also

SARAH L. KOOGLE; March 15, 2013

62

 1    objecting that it's vague and ambiguous.

 2    BY MR. LANE:

 3         Q.   Let me -- let me put a time frame on it.

 4    Prior to this, to your knowledge of this

 5    acknowledgment form, have you ever seen any documents

 6    which show calculations intended to -- to determine

 7    what factor, what component of the mileage rate of

 8    pay paid to Washington drivers to account for

 9    overtime?

10         MS. BRONCHETTI:  Same objections.  But

11    you can answer, to the extent you're not divulging

12    work product.

13         THE WITNESS:  I am not sure.

14    BY MR. LANE:

15         Q.   Let me ask you this way:  Have you ever

16    participated in or done any calculations to arrive at

17    a factor in the mileage rate, an amount that in the

18    mileage rate is set aside to account for overtime for

19    drivers working out of Washington?

20         A.   Yes.

21         Q.   You have?

22         A.   We do periodic audits for states.  For

23    different states, we do audits to determine if a pay

24    rate is within the rate it needs to be.  And there

25    has been a review of Washington mileage drivers that

SARAH L. KOOGLE; March 15, 2013

63

1    are paid a mileage rate to ensure that overtime was

2    built into the rate.

3         Q.   Okay.  Do you have any documentation of

4    that process?

5         A.   No, I don't.

6         Q.   Where would that be?

7              MS. BRONCHETTI:  Objection.

8    BY MR. LANE:

9         Q.   Where would that documentation be?  Where

10   did it go?

11             MS. BRONCHETTI:  You asked her --

12   BY MR. LANE:

13        Q.   You said that -- that you participated in

14   doing those audits to determine --

15        A.   We reviewed the system.

16        Q.   Okay.  Well, I guess what I need to know

17   is, when you said you -- you looked to see if -- if

18   the rates were competitive.

19        A.   No, that's not what I said.

20        Q.   Well, okay.  Tell me again what you said.

21             MS. BRONCHETTI:  Objection.  You can --

22   no, you need to ask her a question.  If you want to

23   review the transcript, you can do that, but she's not

24   here to repeat answers.

25             MR. LANE:  All right.  That -- that's

SARAH L. KOOGLE; March 15, 2013

64

1    fair enough.  I'm not -- I'm not trying to make her

2    repeat verbatim what you said.

3    BY MR. LANE:

4         Q.   I understood that you've said you did an

5    audit to determine how -- how -- how the rates

6    compared -- Swift's rates compared to other drivers

7    in -- with working with other companies?

8         A.   That is not what I said.

9         Q.   Okay.  Well, you -- you mentioned

10   overtime, but I misunderstood how that was -- what

11   calculations were done as part of this audit to

12   address whether or not overtime was being paid in the

13   mileage rate?  How did you -- how did you make a

14   determination that -- that overtime was being

15   accounted for in your mileage calculations, your

16   mileage rate calculations?

17        MS. BRONCHETTI:  Objection.  Which

18   question would you like her to answer?  You just

19   asked her two.

20   BY MR. LANE:

21        Q.   Well, answer the last one.

22        A.   What was the last one?

23        Q.   What calculations did you do as a part of

24   your audit to determine -- to determine what part of

25   the mileage rate that Swift was paying these

SARAH L. KOOGLE; March 15, 2013

65

1    Washington drivers included overtime?

2         A.   Our review included identifying who is a

3    mileage -- a mileage-paid driver that worked in the

4    state of Washington that assigned -- was assigned to

5    a location in Washington.  So that gets us our

6    drivers.  We -- I don't remember the time frame that

7    was used.  We pulled the pay information that was

8    paid during the time frame by pay period, the number

9    of miles driven by the driver, and then hours that

10   were logged on the driver's DOT log.

11            And using his work hours, which would be

12   on-duty driving hours and on-duty not driving hours,

13   so it's on-duty hours, did a calculation to determine

14   if the number of hours he was working divided by the

15   pay that he was paid for that pay week, what it did

16   include -- based on what the rate ended up being, did

17   it include the -- include an overtime rate.

18        Q.   Well, how would you know if it included

19   an overtime -- aren't you just arriving at a -- a --

20   a -- an average pay per hour when you do that?  You

21   said you take the total pay, divide it by the hours,

22   and that gives you a -- an average rate per hour,

23   correct?

24        A.   Yes.

25        Q.   Dollars per hour?

SARAH L. KOOGLE; March 15, 2013

66

1      A.   I don't remember the exact formula, but

2   then that's why I pulled the miles, because we -- we

3   ended up being down to the rate per mile that ended

4   up being.

5      Q.   Right.  I guess what I'm trying to say

6   is, how are you determining whether or not -- what --

7   what is supposed to be overtime?  How does that -- no

8   matter what number you come up with, how do you

9   determine whether or not it includes overtime?

10      Let's say -- let's say the number comes

11   up to be $10 an hour for a driver.  When you divide

12   the total pay by the number of hours -- and you could

13   arrive at the hours by taking, roughly taking the

14   number of miles driven in a week and divide that by

15   the average speed would give you the driving miles,

16   correct?

17      MS. BRONCHETTI:  Objection;

18   argumentative.

19   BY MR. LANE:

20      Q.   Per driving hours.

21      MS. BRONCHETTI:  What is your question,

22   Joe?  I mean, you're arguing with her and you're not

23   asking her a question.

24      MR. LANE:  I'm -- I'm -- I'm trying to

25   get to a question.  Thank you.

SARAH L. KOOGLE; March 15, 2013

67

1    BY MR. LANE:

2         Q.   I'm trying to give you a situation.   If

3    you arrive at $10 an hour, how does that tell you

4    whether or not that includes overtime?

5              MS. BRONCHETTI:   Objection; incomplete

6    hypothetical, vague and ambiguous, calls for a legal

7    conclusion.

8    BY MR. LANE:

9         Q.   All I'm saying is this:   You said you

10   take the pay and you divide it by the hours, and that

11   gives you the average pay per hour, correct?

12        A.   I don't have the exact formula of what I

13   did.   I don't have any of my documents here.   There's

14   nothing I have that can tell you exactly what I did

15   that came up with the rate.   I don't have any of that

16   information here.   You just said to give you the

17   answer based on what I remember.   That is what I

18   remember.

19        Q.   And I -- I'm asking you based on what you

20   remember.   If -- if you come up with $15 an hour,

21   what -- is that a pay that, in your mind, says

22   there's -- there's overtime being paid?

23             MS. BRONCHETTI:   Objection; calls for an

24   incomplete hypothetical, calls for a legal

25   conclusion.

SARAH L. KOOGLE; March 15, 2013

68

1    BY MR. LANE:

2         Q.   What is it about the pay per hour that

3    tells you anything about the overtime component?

4         A.   Your questions are very confusing, how

5    you're wording them.

6         Q.   Well, I -- it's very important to me to

7    understand the process that you say you went through

8    to do this audit to determine whether or not overtime

9    was being accounted for.

10        A.   I don't have my information with me.  I

11   know we did an audit.  We reviewed it because we do

12   periodic audits.  I don't have my information with me

13   to know exactly what I did.

14        Q.   How many times have you done --

15        A.   You asked what I pulled, what information

16   I pulled.

17        Q.   How many times have you done an audit

18   such as the one you just described?

19             MS. BRONCHETTI:  Objection; vague and

20   ambiguous.

21   BY MR. LANE:

22        Q.   The one you just described to me that you

23   said was done for the purpose of determining whether

24   or not the mileage rate includes overtime, how many

25   times have you done an audit such as that?

SARAH L. KOOGLE; March 15, 2013

69

1       A.   For a specific state?  A specific group

2   of drivers, like --

3       Q.   Okay.  Let's -- let's break it down since

4   you've asked that, that clarification.  For

5   Washington drivers, Washington assigned drivers.

6       A.   Me personally?

7       Q.   You or anyone in your department.

8       A.   I have only personally done a Washington

9   review for Washington drivers one time during my

10  employment at Swift.

11      Q.   And when was that?

12      A.   Approximately July or August of 2011.

13      Q.   Do you know of anyone else who has done

14  that review that you described for me, to the extent

15  you described it, other than yourself for the purpose

16  of determining whether or not the Washington mileage

17  rates accounted for overtime?

18          MS. BRONCHETTI:  Objection to the extent

19  it calls for attorney-client privilege information.

20  BY MR. LANE:

21      Q.   In your department, is what I'm talking

22  about.

23          MS. BRONCHETTI:  Same objection.

24  BY MR. LANE:

25      Q.   Are you aware of anyone else in your

SARAH L. KOOGLE; March 15, 2013

70

1    department who has done that audit?

2         A.   I'm not aware of anyone else.

3         Q.   Okay.

4         A.   I don't know what other people do.

5         Q.   Okay.  Have you done an audit to

6    determine if your -- if Swift's mileage rate includes

7    a -- an overtime component for any other state other

8    than Washington?

9         A.   My understanding is there isn't another

10   state that requires Washington to be -- or overtime

11   to be included.

12        Q.   Okay.  So is the answer then, no, you

13   have not?

14        A.   No, I have not.

15        Q.   And are you aware of anyone else in your

16   department who has done that?

17        A.   I wouldn't know that.  Not that I'm aware

18   of.

19        Q.   Okay.  Did you generate a report as a

20   part of this audit that you conducted in July of

21   2011?

22             MS. BRONCHETTI:  Objection to the extent

23   it calls for attorney-client privileged information.

24   You can answer to the extent you are not --

25   BY MR. LANE:

SARAH L. KOOGLE; March 15, 2013

71

1          Q.   I'm not asking what would be in the

2     report or what you did with the report, I'm just

3     asking if you generated a report?

4          A.   If I generated a report?

5          Q.   Yes.

6          A.   I don't remember if there was a report or

7     if it was reviewed on screens.  I don't remember.

8          Q.   Okay.

9               MS. BRONCHETTI:  Joe, can we go off the

10    record for a minute?

11              MR. LANE:  I beg your pardon?

12              MS. BRONCHETTI:  Can we go off the record

13    for a minute?

14              MR. LANE:  Yeah.

15              THE VIDEOGRAPHER:  This marks the end of

16    Disk 1.  Off record at 10:59 a.m.

17        (Recessed from 10:59 a.m. to 11:12 a.m.)

18              THE VIDEOGRAPHER:  This is the start of

19    Disk 2 in the deposition of Sarah Koogle.  Back on

20    record at 11:12 a.m.

21              MR. LANE:  What were we talking about?  I

22    forgot where I was.  Sorry.  Okay.

23              THE REPORTER:  Oh, here, you can...

24              MR. LANE:  Okay.

25              THE REPORTER:  Generating a report, and

SARAH L. KOOGLE; March 15, 2013

72

1    before that...

2              MR. LANE:  Okay.

3              THE REPORTER:  This is her last answer.

4    BY MR. LANE:

5        Q.   Okay.  Mrs. Koogle, we were talking about

6    your -- your audit before we took a break.

7        A.   Uh-huh.

8        Q.   And you've indicated you're not aware of

9    any other audit that has been done in your department

10   for any other state, excluding Washington, correct, a

11   similar audit to determine whether or not your

12   mileage rates includes overtime?

13       A.   I'm not aware of anything, no.

14       Q.   Okay.  And -- and you -- and the audit

15   that you mentioned, did you make any comparison

16   between mileage rates paid by Swift to their drivers

17   who were assigned to Washington positions versus

18   mileage rates paid to Swift drivers who were assigned

19   positions in any other state?

20       A.   No.

21       Q.   Okay.  Are you aware of anyone who

22   performed such an analysis in the payroll department

23   for the purpose of addressing the overtime issue in

24   Washington?

25              MS. BRONCHETTI:  Objection; vague, calls

SARAH L. KOOGLE; March 15, 2013

73

1    for a legal conclusion.  You can answer to the extent

2    it does not include attorney-client communications.

3                THE WITNESS:  Can you repeat -- repeat

4    what your question was?

5    BY MR. LANE:

6        Q.   Yes.  I was just asking you if you're

7    aware of anyone else in your department who conducted

8    an audit comparing Swift's mileage rates paid to

9    Washington positions versus Swift's mileage rate paid

10   to non-Washington positions in addressing the issue

11   of whether or not Washington mileage rates include a

12   component for overtime?

13       A.   You're asking if I'm aware of a similar

14   audit that compares the two?

15       Q.   Any other audit comparing rates, yes.

16       A.   Somebody from -- no.

17       Q.   Okay.  Earlier, you were testifying about

18   this conversation that you -- where you overheard

19   this lady who you believe was a manager in the

20   payroll department mentioned something about the

21   mileage rates in Washington including overtime,

22   correct?

23       A.   Yes.

24       Q.   Prior to that time, did you have any

25   understanding or had you ever heard anything about

SARAH L. KOOGLE; March 15, 2013

74

1    whether or not Washington state mileage rates paid by

2    Swift to their Washington drivers included a

3    component for overtime?

4         A.   No.

5         Q.   Okay.  Have you ever heard anything --

6    again, between the time that you heard this statement

7    made by this lady in the payroll department and the

8    acknowledgment form we're talking about, have you

9    heard any other conversations in the payroll

10   department, again, excluding communications with your

11   attorneys or your company's attorneys, where the --

12   the issue was raised concerning whether or not there

13   is overtime components in the mileage rates paid to

14   Washington drivers?  And I'm excluding from that the

15   audit discussions that you had.

16        A.   Not that I recall.

17        Q.   Okay.  Who instructed you to perform the

18   audit that you've -- that you've told us about?

19        A.   I don't believe it was under instruction.

20   We just periodically do audits.

21        Q.   Okay.

22        A.   For different drivers and pay scales.

23        Q.   All right.  Let me make sure I understand

24   your testimony.  You -- you -- did you tell me

25   earlier that you had never done an audit such as that

75

1    for the purpose of determining whether or not the

2    mileage rate includes a component for overtime?

3         A.    What was your question?

4         Q.    Well, I understood that this was the only

5    audit that you had ever done for the purpose of

6    determining whether or not the mileage rate in

7    Washington state that -- paid by Swift to

8    Washington-positioned drivers includes a component

9    for overtime; is that your -- was that your statement

10   earlier?

11        A.    Yes.

12        Q.    Okay.  And you're not aware of anyone

13   else who has done a similar audit before or since in

14   your department, correct?

15        A.    That's correct.

16        Q.    And so my question is:  Why did you

17   conduct the audit for this purpose when you had never

18   done it before or since?

19             MS. BRONCHETTI:  Objection; asked and

20   answered.  You can answer.  You've already answered

21   it, but you can answer it again.

22             THE WITNESS:  It was just a review of

23   what the -- what the pay rate was to determine --

24   just we do periodic reviews based on state laws

25   changing and minimum wage rates changing at different

SARAH L. KOOGLE; March 15, 2013

76

1    times.

2    BY MR. LANE:

3        Q.    Was there any --

4        A.    It wasn't under direction.

5        Q.    Okay.  Was there any laws that changed,

6    that you're aware of, in, was it July of 2011, did

7    you tell me --

8        A.    I'm not aware --

9        Q.    -- when you did this audit?

10       A.    -- of any, of laws that changed at that

11   time, no.

12       Q.    Okay.  Well, how was this audit any

13   different than the audits you mentioned that you

14   periodically do that weren't for the purpose of

15   evaluating overtime pay?

16           MS. BRONCHETTI:  Objection; vague and

17   ambiguous.

18           THE WITNESS:  That -- that's a very vague

19   question.

20   BY MR. LANE:

21       Q.    Well, I'm trying to understand how this

22   audit was any different than the other audits that

23   you -- you say that you periodically do.  How was

24   this audit different as far as the process is

25   concerned?  How was the audit that you conducted in

SARAH L. KOOGLE; March 15, 2013

77

1   July of 2011 where you reached the conclusion that

2   the overtime -- that the mileage rates includes --

3   includes a component for overtime?  How was that

4   different than the audits you did for any other state

5   at any other time?

6                MS. BRONCHETTI:  Objection; vague.

7                THE WITNESS:  It is.  It's very vague.

8   BY MR. LANE:

9        Q.   Well, was the process any different that

10  you used in the July of 2011 audit versus the -- the

11  other audits you said you periodically do?

12       A.   It's -- it's different because we were

13  making sure that our mileage rate of pay was

14  inclusive of overtime.

15       Q.   Okay.

16       A.   So as I stated before, I'm not aware of

17  any other state that requires you to pay a

18  mileage-based employee overtime if they're paid by

19  the mile.

20       Q.   Right.

21       A.   So as I stated, I wouldn't have done that

22  same review in another state if the law does not

23  require it.

24       Q.   Okay.  Were you doing this because the

25  law required it, this audit you did in July of 2011?

SARAH L. KOOGLE; March 15, 2013

78

1          MS. BRONCHETTI:  Objection; vague and

2    ambiguous.

3    BY MR. LANE:

4          Q.   Was that your understanding?

5          MS. BRONCHETTI:  Asked and answered.

6          THE WITNESS:  It -- it was -- it was just

7    a review, an audit.  A periodic review.

8    BY MR. LANE:

9          Q.   Well, had you done periodic reviews --

10   and I know you've -- you've indicated this was the

11   only time you've ever done one for the purpose of

12   addressing the overtime question, correct?

13         MS. BRONCHETTI:  Objection; asked and

14   answered eight times now.

15         MR. LANE:  But that's the foundation for

16   my question.

17   BY MR. LANE:

18         Q.   Was that a correct statement of your

19   testimony?

20         A.   I've said that, like, three times.

21         Q.   Okay.  So have you ever done any reviews

22   in -- for Washington rates prior to this July 2011

23   one?

24         A.   In regards to what?  For overtime?

25         Q.   Yeah -- no, not for overtime.  For the

SARAH L. KOOGLE; March 15, 2013

79

1    same purpose that you testified you do it for other

2    states?

3         A.   I don't remember if it was for Washington

4    or what other state.

5         Q.   Okay.

6              MS. BRONCHETTI:  Can we take a break for

7    a second?

8              THE VIDEOGRAPHER:  Off record at 11:22

9    a.m.

10        (Recessed from 11:22 a.m. to 11:24 a.m.)

11             THE VIDEOGRAPHER:  Back on record at

12   11:24 a.m.

13   BY MR. LANE:

14        Q.   Mrs. Koogle, before you -- you took a

15   break, we were -- we were talking about the audits.

16   I -- I want to move on to a different subject, at

17   least for now.  We may -- we may stumble back into

18   that again, but I want to ask you about, we were

19   talking about these positions earlier, Washington

20   positions.  I just want to make sure I understand the

21   process.  Is -- is there a specific position for each

22   terminal that Swift operates out of in Washington

23   state?  Is there a specific code for that position?

24        A.   A -- a position code, yes.

25        Q.   Yes.  Are there multiple positions for

SARAH L. KOOGLE; March 15, 2013

80

1    one terminal?

2         A.    Absolutely.

3         Q.    Okay.  How many terminals are you aware

4    of that are assigned position codes in the state of

5    Washington?

6         A.    Terminals, Grandview and Sumner.  Sumner,

7    Seattle.

8         Q.    Grandview, Sumner?

9         A.    It's -- it -- during the time frame of

10   the case --

11        Q.    Yes.

12        A.    -- there was Seattle and now it's Sumner.

13        Q.    Okay.

14        A.    So it's --

15        Q.    Okay.  Let me -- let me back up, then,

16   because I do want to put it in -- in time frames.

17   From July of 2008, what were -- at that point in

18   time, what were the terminals that Swift operated out

19   of in Washington state?

20        A.    During 2000 -- July of 2008 through

21   present?

22        Q.    Well, at -- at that time, how many were

23   there?

24        A.    I don't know for sure if Sumner and

25   Seattle were at the same time, during -- at that --

SARAH L. KOOGLE; March 15, 2013

81

1    at that time.

2         Q.   Okay.  So it would have been Grandview

3    for sure?

4         A.   Yes.

5         Q.   And Sumner and/or Seattle?

6         A.   Yes.

7         Q.   Okay.  Was there a time when both Seattle

8    and Sumner were both terminals being operated out of?

9         A.   I -- I believe so.

10        Q.   Okay.  Do you know when Seattle ceased

11   being a terminal that -- well, I take it from your --

12   your statement, that Seattle is -- is no longer a

13   terminal that Swift operates out of?

14        A.   It's no longer an active terminal in our

15   system.

16        Q.   Okay.  Meaning there aren't any drivers

17   assigned to that --

18        A.   That's correct.

19        Q.   -- terminal, correct?

20        A.   That's correct.

21        Q.   Okay.  How long has that been the case?

22        A.   I'm not real sure.

23        Q.   Okay.  Well, can -- best -- it's been

24   over a year?

25        A.   I don't know because I don't move the

82

1    drivers out of -- I'm not responsible for making sure

2    the driver's assigned to the right location.

3         Q.   Okay.

4         A.   So I don't do a review of whether or not

5    they're still assigned to Seattle.

6         Q.   Okay.  And I was going to get to these

7    questions later, but since you mentioned it, the

8    assignment of a home terminal or -- or a position,

9    Washington position, who does that?

10        A.   Terminal leaders, driver leaders, fleet

11   leaders.  I'm not real sure of all areas that have

12   direction in that.  I'm -- I'm not sure in the

13   beginning when they're oriented or they go through

14   orientation where they're -- how it's determined

15   where they're -- where they'll be assigned.

16        Q.   Okay.  And that's what I wanted to ask

17   you.  Is -- is there any relationship, that you're

18   aware of, between the location for the orientation

19   and the terminals that the drivers are assigned to?

20        A.   I wouldn't be aware of that.  I wouldn't

21   know.

22        Q.   Okay.  Now, currently, have there been

23   any other terminals, that you're aware of, going back

24   to July of 2008 in Washington that had Swift drivers

25   assigned to them other than Grandview, Sumner, and

SARAH L. KOOGLE; March 15, 2013

83

1   Seattle?

2        A.   They -- there very well could have been.

3   Those are the only three that I'm aware of.

4        Q.   Okay.  Now, do you know -- well, we're

5   going to look at some documents.  I'm not sure if --

6   if -- if they'll be all-inclusive, but do you know

7   how many positions existed at the Grandview terminal

8   going back to July of 2008?

9        A.   I don't know.

10       Q.   Okay.  How about Sumner?

11       A.   I would not know.

12       Q.   Okay.  Do you know where the orientation

13  sites are in Washington?

14       A.   I do not.

15       Q.   Okay.  And just so I'm clear, you know

16  nothing about the orientation process?

17       A.   I do not.

18       Q.   Okay.  All right.  Before we start

19  looking at some of these payroll documents that are

20  confusing to me, I want to just cover the issue of --

21  if I can find my documents.  Hang on.  Sorry.

22       A.   I'm going to -- can I grab my jacket

23  while he does that?

24       Q.   Sure.  Well -- oh, here we go.

25            You understand the -- the claims in

SARAH L. KOOGLE; March 15, 2013

84

1    this -- in this case involve claims associated with

2    the per diem program?

3            A.   I've -- yeah, I read that in the

4    document.

5            Q.   Okay.  And also claims associated with

6    the orientation program, correct?

7            A.   Yes.

8            Q.   Okay.

9            A.   They were also in the document.

10           Q.   On-the-job training pay issues as well?

11           A.   Uh-huh.

12           Q.   And also the overtime associated with the

13   mileage, right?  Correct?

14           A.   Yes.

15           Q.   All right.  I just want to cover some

16   things and see what the extent of your knowledge is.

17   Do you have -- do you have any involvement in the

18   development of the per diem program from a policy

19   standpoint?  Did you have any input in that?

20           A.   No, I did not.

21           Q.   Are you familiar with that process?

22           A.   I know how the process works.  Sorry.  I

23   know how the process works.  That is all I know.

24           Q.   Okay.  Are you aware that there was a

25   modification of the -- of the policy back in May of

SARAH L. KOOGLE; March 15, 2013

85

1   2012?

2        A.   No.  May of 2012?

3        Q.   Yes.

4        A.   No.

5        Q.   Well, we marked this yesterday, but I'm

6   just -- just so you -- you know where I'm coming

7   from, I just want to show you this, and we can mark

8   it, if you -- if we need to, but just take a look at

9   that.  You see the revised date down at the bottom?

10            MS. BRONCHETTI:  Do you have a copy?

11            MR. LANE:  I do.

12            MS. BRONCHETTI:  Thank you.

13            MR. LANE:  Sorry.

14            MS. BRONCHETTI:  That's okay.

15   BY MR. LANE:

16        Q.   Do you -- do you see where I'm talking

17   about?

18        A.   I see --

19        Q.   Just the revised date.  Do you know

20   anything about that?

21        A.   No.

22        Q.   Okay.

23        A.   I wouldn't know what was changed on it.

24        Q.   Okay.  Did -- do you know of any changes

25   to the -- to the policies since July of 2008 in the

SARAH L. KOOGLE; March 15, 2013

86

1   per diem policy?

2          A.   No.   Changes to the policy?

3          Q.   Yeah.

4          A.   No.

5          Q.   Who -- what depart- --

6               MS. BRONCHETTI:   Do you -- I'm sorry.

7               MR. LANE:   That's fine.   I didn't mark

8   it.   We marked it yesterday.

9               MS. BRONCHETTI:   Okay.

10  BY MR. LANE:

11         Q.   In your -- in your job, in payroll, have

12  you had to ask -- answer questions to any drivers

13  about the per diem program?

14         A.   No.

15         Q.   Okay.   Who would -- who would be -- well,

16  what department would be in charge of answering

17  questions about the per diem program?

18         A.   It depends on what the questions would

19  be, but our payroll customer service area would

20  answer questions, and possibly our payroll tax people

21  would answer questions.   I'm not real sure of any

22  questions we get.

23         Q.   Okay.   Do you know what percentage of

24  drivers, going back to July of 2008, who were

25  assigned to Washington positions, participated in the

SARAH L. KOOGLE; March 15, 2013

87

1   per diem program?

2          A.    At any one time or in total?

3          Q.    Well, however you can provide it to me.

4   Total number or -- or a percentage of the total

5   number of Washington assigned drivers.  Whatever way

6   you -- you've got the information is fine with me.

7          A.    Approximately 30 at any one time.

8          Q.    Thirty?

9          A.    Thirty employees.

10         Q.    Thirty employees at any given time?

11         A.    Well, 30 -- 30 driving employees,

12  approximately.

13         Q.    Thirty driving employees in the entire

14  state of Washington going back to -- well, I'm going

15  to break it down.  Just at any given time, going back

16  to July 18th or July of 2008, approximately 30

17  employees would be participating in the program out

18  of Washington?

19         A.    For -- for mileage-paid drivers assigned

20  to Washington.

21         Q.    Right.  And the -- and the program is

22  only available to mileage-paid drivers, correct?

23         A.    That's correct.

24         Q.    Now, how often -- what is the rate of

25  turnover of employees going back to July of 2008?

SARAH L. KOOGLE; March 15, 2013

88

1     A.    I have no idea.

2     Q.    Okay.  Going back to July of 2008, were

3  drivers -- new employees coming on who were paid by

4  the mile, were they automatically entered into the

5  per diem program going back to July of 2008?

6     A.    Not that I'm aware of.

7     Q.    Okay.  Do you know one way or the other?

8     A.    No.

9     Q.    You don't?  Okay.  So as new -- as new

10  drivers -- well, I believe I read something earlier

11  about the number of -- of drivers who left from

12  Mrs. Rohwer's declaration.  700 and something drivers

13  left over the three years preceding the -- the filing

14  of this Complaint.  Do you remember that?

15     A.    I don't remember what the number was.

16     Q.    Assuming it's 700 -- well, we can look at

17  it, if we need to.  But assuming it's 700 and

18  something, does that tell you anything about the rate

19  of turnover of drivers in --

20     A.    No.

21     Q.    In Washington?

22     A.    No.

23     Q.    Okay.  Do you have an understanding as to

24  the average length of time that drivers -- and I know

25  there's going to be outliers either way, but the

SARAH L. KOOGLE; March 15, 2013

89

1    average length of time that drivers working out of

2    the Washington positions stay -- or stay with Swift,

3    drive for Swift?

4            A.   No.

5            Q.   Have you ever been asked to prep- -- to

6    do analysis of that to determine what your turnover

7    rate is?

8            A.   No.

9            Q.   You have not?

10           A.   No.

11           Q.   Do you know of anyone in payroll who does

12   do that?

13           A.   Not in payroll.

14           Q.   Okay.  Would that be someone in human

15   resources or personnel?

16           A.   They -- they may.

17           Q.   Okay.  I'm sorry.  I'm just ruling out

18   some things here.  Just bear with me.

19           A.   Okay.

20           Q.   Sorry.

21               What is your understanding of the way in

22   which the per diem program works?

23               MS. BRONCHETTI:  Objection; asked and

24   answered.

25   BY MR. LANE:

SARAH L. KOOGLE; March 15, 2013

90

1      Q.   The actual -- the actual way that the --

2   the -- the -- the payments are made and what's --

3   what happens to the mileage rate for -- for

4   individuals who participate in the per diem pro- --

5   program?

6      A.   They're -- it -- it varies based on the

7   type of driver that they are.

8      Q.   How does it vary?

9      A.   If you're a team driver, I know the rates

10   vary, if you're teaming with another mileage driver.

11      Q.   Uh-huh.

12      A.   Or the -- the -- or if you're a solo

13   driver.

14      Q.   Okay.  Between those two categories, how

15   does it work for a solo driver?

16      A.   For a solo driver, the rate -- the rate

17   per mile is reduced 10 cents per mile, and then

18   there's a reimbursable pretax amount that they're not

19   taxed on at 8 and a half cents.

20      Q.   Okay.  Do you know what happens to the

21   other cent and a half?

22      A.   No, I didn't write the policy.

23      Q.   Okay.  Well, is it -- and for the team,

24   how does it work for the team drivers?

25      A.   I don't know the exact figures, but I

SARAH L. KOOGLE; March 15, 2013

91

1     believe it reduces it -- it reduces it at five cents

2     taxable and reimburses at four and a quarter, I

3     think, nontaxable.

4           Q.   Okay.  Basically just halves everything,

5     correct?

6           A.   Yes.

7           Q.   Okay.  Does your system, your -- your

8     payroll system keep up with the per diem

9     disbursements?

10          A.   What do you mean by disbursements?

11          Q.   Is there a record of -- for any driver

12    participating in the per diem program, is there a

13    record going back to July of 2008 that would reflect

14    payments for -- as a part of the per diem program, as

15    well as other payroll payments?

16          A.   Yes.

17          Q.   Okay.  And that -- that applies to all

18    the Washington drivers going back to July of 2008?

19          A.   If they were enrolled, yes.

20          Q.   Okay.  Do you know if that program is

21    still offered to the Washington drivers, drivers who

22    were positioned in Washington?

23          A.   No, it's not.

24          Q.   It is not.  When did that change?

25          A.   I don't remember the exact date.  It was

SARAH L. KOOGLE; March 15, 2013

92

1      in 2011.

2           Q.    Okay.   Do -- do you --

3           A.    The end -- end of 2011.

4           Q.    And do you know why that changed?

5           A.    I don't know why.   I wasn't part of the

6      decision.

7           Q.    All right.   Do you know of any other

8      state where that program is no longer offered to

9      drivers positioned in those states?

10          A.    If the per diem is offered?

11          Q.    Yes.   Do you know of any other state

12     where it's no longer offered as a -- a -- an option

13     to Swift employee drivers assigned to those states?

14          A.    No.

15          Q.    So to your knowledge, is it -- is it

16     still offered in every other state?

17          A.    Yes.

18          Q.    Okay.   Was there any changes to the

19     system that had to be made -- and by the system, I

20     mean your payroll system -- to adjust for that change

21     in the policy, the per diem policy?

22          A.    On who's eligible or what?

23          Q.    On -- just was there anything that had to

24     be programmed into the system to account for the fact

25     that the policy or the -- the program is no longer

SARAH L. KOOGLE; March 15, 2013

93

1    offered to Washington assigned drivers?

2         A.    Yes.

3         Q.    Okay.   How was that done?   I mean,

4    what -- what was done?

5         A.    There was a program that was put in place

6    that based on the driver's terminal code that they're

7    assigned to that we talked about earlier, if it's

8    those three terminal codes, Grandview, Sumner,

9    Seattle, that they're automatically excluded.   They

10   can't opt in.   They're just not part of the program

11   anymore.

12        Q.    Okay.   Okay.   Did notice go out to all of

13   the drivers advising them of the change in the

14   policy?

15        A.    I'm not sure.

16        Q.    You don't know?

17        A.    I wouldn't have been involved in that.

18        Q.    You wouldn't have been involved in that?

19        A.    No.

20        Q.    Okay.   Let's do this, let's see.   Okay.

21   We're about to dig into some of these payroll

22   documents, and I was trying to clear out some stuff

23   before we got to that because I know that's going to

24   get bogged down, so bear with me.

25             MR. LANE:   Tell you what, before we get

SARAH L. KOOGLE; March 15, 2013

94

1    bogged down in this, let's talk -- let's go off the

2    record.

3                   THE VIDEOGRAPHER:  Off -- off record at

4    11:46 a.m.

5                   (Discussion off the record.)

6                   THE VIDEOGRAPHER:  Back on record at

7    12:28.

8    BY MR. LANE:

9            Q.   Mrs. Koogle, I want to go back to a

10   previous topic just to clarify a couple things.  I

11   was asking you earlier about the number of Washington

12   assigned drivers participating in the per diem

13   program going back to July of 2008 to the present,

14   correct?

15           A.   Yes.

16           Q.   And I believe, and this is just for

17   foundational purposes, correct me if I'm wrong,

18   you -- you indicated that at any given time, there

19   were about 30 of those drivers who were part- -- were

20   participating in the program?

21           A.   Yes, at any given time.

22           Q.   At any given time.  My -- my follow-up

23   question to that is:  Over that whole period of time,

24   from July of 2008 to the -- to the present,

25   approximately how many different drivers assigned to

SARAH L. KOOGLE; March 15, 2013

95

1    Washington positions participated in the per diem

2    program?

3         A.   I've never looked.  I wouldn't know.

4         Q.   Okay.  Is that something you could search

5    for in your system to determine that?

6         A.   Yes.

7         Q.   Okay.  Do you know of anyone else in the

8    payroll department who has actually done a -- a

9    search to arrive at that information?

10        A.   To identify who all has been --

11        Q.   Participate in the per diem program that

12   were Washington assigned drivers going back to July

13   of 2008?

14        A.   Not that I'm aware of, no.

15        Q.   Okay.  Another follow-up question to that

16   per diem program, you describe the per diem program

17   to me and distinguish between team drivers and solo

18   drivers, correct?

19        A.   That's correct.

20        Q.   Other than that distinction, is the

21   program implemented the same for each of those two

22   categories?  In other words, if you're a solo driver,

23   if you're participating in the program, is it 10

24   cents deducted from your mileage rate, 8 and a half

25   cents paid back, or are there -- or is there any

SARAH L. KOOGLE; March 15, 2013

96

1   variance, that you're aware of, for solo drivers if

2   you're participating in the per diem program?

3        A.   No, there's no variance.

4        Q.   No variance.  Treated -- everybody's

5   treated the same if you're participating, correct?

6        A.   For the per diem rates, yes.

7        Q.   Yes.  Yes.  In other words, the mileage

8   rates may be different, but the -- but the 10 cent

9   deduction is the same for every driver, the 8 and a

10  half cents paid back is the same for each solo

11  driver, correct?

12       A.   That's correct.

13       Q.   And for the team driver, it would be

14  exactly same, just halved, correct?

15       A.   That's correct.

16       Q.   All right.  I also want to clarify, or at

17  least ask a follow-up question concerning the -- the

18  Paragraph 9 of Exhibit 4 to your deposition.  And

19  I -- I think I forgot to ask you, so I thought I'd

20  ask you now, and it may be repetitive, and I

21  apologize if I -- if I already asked this question,

22  but in that first sentence of Paragraph 9, and,

23  again, just for foundation, I'll read it.

24            "Based on a compilation of corporate data

25  and records available at this time, which I obtained

SARAH L. KOOGLE; March 15, 2013

97

1    and reviewed, and which is located in Phoenix,

2    Arizona, I estimate that there are approximately 1319

3    employee drivers who have worked for Swift in

4    Washington in the four years prior to the filing of

5    the Amended Complaint."  Now, that's Ms. Rohwer's

6    statement, of course, but you provided the

7    information, correct?

8          A.    I believe I did, yes.

9          Q.    Okay.  Now, is it your understanding,

10   based on the research you did, were all of those 1319

11   employee drivers, drivers who were assigned

12   Washington positions?

13         A.    Who at some point during the time frame

14   that it was requested from me was assigned to a

15   Washington position.

16         Q.    Okay.  And as a Washington -- a

17   Washington position assigned driver, is it your

18   understanding that it's Swift's policy that those

19   drivers would be entitled to that component in the

20   mileage rate to account for overtime; is that your

21   understanding?

22         A.    For mileage-paid drivers?

23         Q.    Yes.

24         A.    And, yes.

25         Q.    Okay.  Okay.  Again, I may have covered

SARAH L. KOOGLE; March 15, 2013

98

1    that.  I just wasn't sure, so I wanted to clarify

2    that.

3         (Exhibit 5 was marked for identification.)

4              MR. LANE:  We've marked this a number of

5    times in previous depositions, but I want to give you

6    your own copy here, so...

7              THE WITNESS:  Okay.

8              MR. LANE:  Do you need another copy of

9    this?

10             MS. BRONCHETTI:  Uh-huh.

11             MR. LANE:  Okay.

12             MS. BRONCHETTI:  Please.

13             MR. LANE:  You can certainly have one,

14   but...

15   BY MR. LANE:

16        Q.   Let me show you what I've marked as

17   Exhibit No. 7 (sic), Mrs. Koogle, and ask you to tell

18   me if you recognize what that document is.

19        A.   Yes, I've seen this before.

20        Q.   Okay.  Did you review that in preparation

21   for your deposition?

22             MS. BRONCHETTI:  Objection; asked and

23   answered.  She said she didn't review no documents in

24   preparation on her own.  So what you're asking her is

25   to disclose attorney work product, and I will not

SARAH L. KOOGLE; March 15, 2013

99

1    allow her to do that.

2    BY MR. LANE:

3         Q.    Okay.  Well, when have you seen this

4    document?

5         A.    When have I seen the document?

6         Q.    Yes.

7         A.    When it --

8         Q.    You said you -- you recognize the

9    document.  How do you recognize the document?

10        A.    I saw the document when it was originally

11   sent out sometime in 2011.  I'm not sure when it was.

12        Q.    Okay.  Do you see down in the bottom

13   left-hand corner where it says, "Rate Acknowledgment

14   Form 09/01/11"?

15        A.    Yes.

16        Q.    Okay.  Is that about the time that you

17   recall this document, give or take, when that

18   document was sent out, as you put it?

19        A.    I'm not real sure, but, yes, it was in

20   2011.

21        Q.    Okay.

22        A.    In the end of 2011.

23        Q.    Okay.  Is -- is it your understanding,

24   and I'm asking -- well, I'm asking individually right

25   now, is it your understanding that this is the Swift

SARAH L. KOOGLE; March 15, 2013

100

1    policy with regards to overtime payments to

2    Washington assigned drivers who were paid by the

3    mile?

4                MS. BRONCHETTI:  Objection; vague and

5    ambiguous.

6                THE WITNESS:  I mean, it's not a -- it's

7    not a policy.  It says it's an acknowledgment form.

8    BY MR. LANE:

9         Q.   Okay.  Well, what is -- well, if you

10   don't like what's here, tell me what your

11   understanding of Washington -- of Swift's policy with

12   regards to payment of overtime for Washington

13   assigned attorneys (sic) who are paid by the mile.

14        A.   The -- the -- my understanding is the

15   overtime rate is included in -- it's inclusive in

16   their rate per mile for Washington employees.

17        Q.   Okay.

18        A.   Washington driving employees.

19        Q.   Let me read the -- the acknowledgment

20   that -- that I've handed you.  Starting from the top,

21   this is on Swift letterhead, correct?

22        A.   Yes.

23        Q.   Okay.  And it's entitled, "Acknowledgment

24   of Rate of Pay for Washington Based Driving

25   Employees."  Do you see that?

SARAH L. KOOGLE; March 15, 2013

101

1      A.    Yes, I do.

2      Q.    All right.  Do you -- well, what is your

3  understanding of what is meant by Washington-based

4  driving employees in that statement?

5          MS. BRONCHETTI:  Objection.  She can't

6  answer that question.  It's -- she lacks -- it lacks

7  foundation.  She already testified that she didn't

8  write it, so you're calling -- you're asking her to

9  speculate as to what the -- the drafter of this

10 document intended.  So she can't answer that

11 question.

12 BY MR. LANE:

13     Q.    Okay.  Item No. 3 of the 30(b)(5) --

14 30(b)(6) notice says that you will provide testimony

15 and documents pertaining to, describing, and/or

16 evidencing all mileage rates paid by Swift to

17 Washington-based drivers, and all documents

18 evidencing all mileage rates paid by Swift to its

19 drivers elsewhere as those terms are intended in the

20 acknowledgment attached as Exhibit 8 going back to

21 March of 2006.  Do you -- do you remember reviewing

22 that?

23          MS. BRONCHETTI:  Right, Joe.  And what we

24 identified her to, what we specifically identified

25 her to is that she cannot testify as to the intention

SARAH L. KOOGLE; March 15, 2013

102

1    of this document.  She is here today to talk about

2    mileage rates paid by Wash- -- Swift to

3    Washington-based drivers and mileage rates paid to

4    Swift drivers elsewhere.  Her designation has nothing

5    to do with this acknowledgment form.  She didn't

6    create it.

7              MR. LANE:  Well, I'm asking for whoever

8    is going to be put up -- well, who's going to be put

9    up to address what's on this acknowledgment?

10             MS. BRONCHETTI:  I can talk to you after

11   the deposition.

12             MR. LANE:  Okay.

13             MS. BRONCHETTI:  I'll be happy to.

14   BY MR. LANE:

15        Q.   So when you reviewed this before, when

16   you -- when you reviewed this, when you said you saw

17   it around sometime in 2011, when it was being sent

18   out, did you read it at that time?

19        A.   Yes.

20        Q.   Did you have any disagreement yourself

21   individually as you understood how the -- as you've

22   described the policy for Swift for overtime for

23   mileage-paid drivers assigned to Washington, did you

24   have any objection to what you read as far as the

25   acknowledgment?

SARAH L. KOOGLE; March 15, 2013

103

1      A.   No.

2      Q.   Okay.  And as you sit here today, do you

3  have any disagreement with the acknowledgment as it's

4  drafted, and as -- as far as your understanding of

5  how the overtime works?

6      A.   Do I have a disagreement on that?

7      Q.   Yeah, do you disagree with anything that

8  is stated here, as you understand it?

9      A.   As I understand it, no.

10     Q.   Okay.  In your work in payroll, when this

11  thing was being distributed, did you have an

12  understanding of to who this was to be distributed

13  to?

14     A.   No.

15     Q.   You did not?  Okay.  Since this document

16  has gone out sometime in 2011, I assume after

17  September 1st, have you been aware of these

18  acknowledgement forms being returned to the payroll

19  department from drivers?

20     A.   I have no idea where they were returned

21  to --

22     Q.   You do not?

23     A.   -- or what the direction was.

24     Q.   Okay.  You're not aware of them being

25  accumulated and stored in the payroll department?

SARAH L. KOOGLE; March 15, 2013

104

1      A.   I -- well, I wouldn't know.  I wouldn't

2   know whether or not they are in our payroll

3   department.

4      Q.   I'm sorry, you would or would not?

5      A.   I would not know.

6      Q.   Okay.  Do you know of anyone at Swift who

7   participated in, and I'm using the -- a version of

8   the word in the acknowledgment, built overtime into

9   the mileage rates paid to Washington assigned

10  drivers?

11     A.   What was your question?

12     Q.   Are you aware of anyone at Swift who

13  participated in the process of building overtime into

14  the rates, the mileage rates paid to the Washington

15  assigned attorneys (sic)?

16     A.   Washington assigned drivers?

17     Q.   I'm sorry.  Yes, drivers.

18     A.   No.

19     Q.   Okay.  Now, we talked about -- well, do

20  you have an understanding as to what is meant by

21  Washington-based drivers as it is -- as it's shown in

22  this document?  In other words, is it -- is that --

23  is it your understanding that is -- that would be the

24  Washington-assigned drivers?

25          MS. BRONCHETTI:  Objection; calls for

SARAH L. KOOGLE; March 15, 2013

105

1    speculation, lacks foundation.  She didn't write the

2    document.

3              MR. LANE:  No, I understand.

4    BY MR. LANE:

5        Q.   I'm asking specifically, do you

6    understand -- what is your understanding as a payroll

7    person at Swift of the term "Washington-based

8    driver"?

9              MS. BRONCHETTI:  Objection; asked and

10   answered.  Joe, she -- she testified to this at the

11   beginning of her deposition, and she -- she testified

12   very clearly of what her understanding is.

13             MR. LANE:  I'm -- look, I'm just trying

14   to get to -- I want to understand whether or not you

15   distinguish between this term "Washington-based

16   drivers" and "Washington-assigned drivers"?

17             MS. BRONCHETTI:  But -- but she didn't

18   write the document.

19             MR. LANE:  I'm not asking if she wrote

20   the document.  I'm asking what does the term

21   "Washington-based" -- forget about the document.

22   BY MR. LANE:

23       Q.   Washington-based drivers, as you

24   understand that, as an employee at Swift working as a

25   supervisor in the payroll department, is that -- is

SARAH L. KOOGLE; March 15, 2013

106

1    your understanding that that is a Washington-assigned

2    attorney (sic)?

3          A.    Driver?

4          Q.    I'm sorry, driver.  I don't know why I

5    keep saying that.

6                MS. BRONCHETTI:  Answer again.  Just

7    answer again.

8                THE WITNESS:  My understanding is

9    Washington-assigned drivers, Washington-based drivers

10    are drivers who are in a position that is assigned to

11    a Washington terminal location or on-site location.

12    BY MR. LANE:

13          Q.    Okay.  That's all I'm asking.  And -- and

14    what I want to know, is there -- is there any other

15    driver outside of that category you just listed that

16    you would consider a Washington-based driver?

17          A.    Outside of what I listed, no.

18          Q.    No.  Okay.  All right.  I just want to

19    make sure that we're not leaving anybody out in

20    the -- in the term that we're talking about.

21          A.    Okay.

22          Q.    Okay.  And you've already stated that

23    you -- you don't know how these drivers were assigned

24    those positions, correct?

25          A.    I am not involved in that.

SARAH L. KOOGLE; March 15, 2013

107

1    Q.   Okay.  I tell you what I'm going to do,

2    try to pull out an example here to start with.

3         MR. LANE:  That copy looks a little

4    blurry.  Was the last one four?

5         MS. BRONCHETTI:  Seven.

6         MR. LANE:  I marked it wrong.

7         MS. BRONCHETTI:  I know.  I was wondering

8    why you marked it seven, but, hey.

9         MR. LANE:  I pulled this sticker off the

10   wrong spot.

11        THE REPORTER:  Oh, we can make a new one.

12   Do you want to make that one five?

13        MR. LANE:  Yeah, make that one five.

14   Well, here you go.  Yeah, there you go.  Put five on

15   that one.

16        MS. BRONCHETTI:  We'll make this seven?

17        MR. LANE:  Yeah, and we'll clarify it on

18   the record.  Thank you.

19        For the record, we mislabeled the

20   acknowledgment form as Exhibit No. 7.  We've

21   relabeled that Exhibit No. 5.  Now we'll get back on

22   track.

23      (Exhibit 6 was marked for identification.)

24   BY MR. LANE:

25        Q.   Let me show you what I've marked as

SARAH L. KOOGLE; March 15, 2013

108

1    Exhibit No. 6, Mrs. Koogle, to your deposition.

2              MS. BRONCHETTI:  Thank you.

3              THE WITNESS:  Okay.  Thanks.

4    BY MR. LANE:

5         Q.   And that's a collective document.  It's

6    got probably a grouping that may -- may not be

7    logical, but we'll -- we'll go through it as

8    documents reflecting payroll information about

9    Mr. Troy Slack.  Can you confirm that for me?

10        A.   Yes.

11        Q.   Okay.  Now, Mr. Slack is a plaintiff in

12   this case.  Are you aware of that?

13        A.   Yes, I am.

14        Q.   Okay.  Have you researched all of the --

15   the plaintiffs in this case for the purposes of

16   providing payroll information about them?

17             MS. BRONCHETTI:  Objection; vague.

18   BY MR. LANE:

19        Q.   Did you participate in that?  In other

20   words, did you participate in generating these

21   documents?

22        A.   Yes, I participated in generating.

23        Q.   Okay.  That's -- now, the -- the first

24   page, at least, and these are sequentially numbered.

25   Let's make sure it's sequential.  I believe they're

SARAH L. KOOGLE; March 15, 2013

109

1    sequentially numbered D010194 through D010201; is

2    that correct?

3          A.    That's correct.

4          Q.    Okay.  What I'm going to do -- now, I

5    tried to get in my head a way of organizing it so I

6    can understand how the structure works in Washington.

7    As I understand it, you've got a position that

8    drivers can be assigned to in Washington, correct?

9          A.    Yes, that's correct.

10         Q.    All right.  And there are multiple

11   positions that they can be assigned to, correct?

12         A.    Numerous, yes.

13         Q.    Okay.  And within that assignment, a

14   driver can be assigned a pay matrix as well, correct?

15         A.    That's correct.

16         Q.    Okay.  Do I -- I have at least that part

17   of the understanding down?

18         A.    Yes.

19         Q.    Okay.  And then what comes after --

20   what -- is -- is there differences, then, within

21   those pay matrices for each driver?

22         A.    Differences being?

23         Q.    Differences in if they're assigned a

24   particular position in Washington and then they're

25   assigned a particular pay matrix for any given

SARAH L. KOOGLE; March 15, 2013

110

1   experience level, are there differences in the pay

2   between drivers?  Or if they're all -- if they have

3   the same experience level and the same pay matrix,

4   are they basically paid the same for any given

5   position?

6          A.   No, there -- there is numerous

7   combinations.

8          Q.   Okay.  And hopefully we can get

9   through -- through that.  But the -- but the -- where

10  we start is the assignment and then below that, the

11  pay matrix?

12         A.   In regards to pay, yes.

13         Q.   Yes.  Okay.  Looking at Exhibit No. 6, I

14  want to just go through some of this and get the

15  terminology down.  What is this first page we're

16  looking at, D010194?

17         A.   This is -- this is what we refer to as a

18  rate history screen.  It shows -- I'm sorry, a rate

19  history screen.

20         Q.   Rate history screen.  Okay.  And this is

21  a screen that was printed off your payroll system?

22         A.   Yes.

23         Q.   How long has this payroll system existed?

24         A.   I've only been there since 2001, but it

25  was there when I was --

SARAH L. KOOGLE; March 15, 2013

111

1    Q.   Okay.

2    A.   When I was hired.

3    Q.   All right.  So at least going back to

4    July of 2008, correct?

5    A.   Yes.

6    Q.   All right.  Now, we've got a number of

7    fields here, and I want to see if we can identify

8    what these are.  And on the top left-hand corner,

9    there's an "ROSAVA."  What is that?

10   A.   That's a user I.D. of a user, like, I

11   have my own specific user I.D.

12   Q.   That's somewhere in the payroll

13   department?

14   A.   Yes.

15   Q.   Okay.  And -- and what would result in

16   that appearing in the top left-hand corner?

17   A.   She's the one that printed this page.

18   Q.   Okay.  And beside that to the right of

19   that user code -- well, there actually appears to be

20   two lines there.  There's a Rosa -- "ROSAVA" and a

21   "ROSAV," just to be -- what -- why are there two?

22   A.   It's -- it's her user I.D. and you can

23   have multiple sessions up on the screen, so there's a

24   Session A, a Session B, a Session C.  So it just puts

25   your user I.D. and then the session number of which

SARAH L. KOOGLE; March 15, 2013

112

1   one she printed it off of on this day --

2        Q.   Okay.

3        A.   -- when she printed the document.

4        Q.   All right.  Right next to that, there's

5   a -- another set of letters, "DPSTAT."  What is that?

6        A.   That's the program that holds this data.

7        Q.   Okay.

8        A.   That's the name of the program.

9        Q.   Okay.  Do you know what that stands for?

10       A.   No, I don't.

11       Q.   Okay.  Well, I've heard the description

12  "driver payroll status," and actually, I see a -- a

13  line there, it says, "Driver payroll status changes."

14  Is it -- would that -- would that possibly be an

15  explanation for that acronym, DPSTAT?

16       A.   I'm -- I guess.

17       Q.   You -- you just don't know?

18       A.   I don't know.

19       Q.   You didn't -- you didn't -- has anyone

20  in -- in the office said that or is that something

21  that's done by IT?

22       A.   That's IT.

23       Q.   Okay.  And we just read that the title of

24  the -- of the page, "Swift Transportation Driver

25  Payroll Status Changes."  And you -- you described

SARAH L. KOOGLE; March 15, 2013

113

1    that earlier, correct?

2          A.   Yes.

3          Q.   Now, to the right, there's a date,

4    "6/20/2012."  What does that date represent?

5          A.   The date she printed it.

6          Q.   Okay.  And --

7          A.   And time.

8          Q.   And the time right below it, correct?

9          A.   Correct.

10         Q.   Then we've got a driver code, "144250,"

11   and that's Mr. Slack's employee code --

12         A.   Yes.

13         Q.   -- or driver code?

14         A.   Yes.

15         Q.   Okay.  And his name?

16         A.   And his name.

17         Q.   All right.  Now, below that we have two

18   lines.  The first line has a field that apparently is

19   labeled "S."  What does that stand for?

20         A.   I don't know what it stands for.

21         Q.   Okay.  Below that, it has "No" and

22   "Trne."  Do you know what those stand for?

23         A.   I believe it's saying sequence number,

24   that's what the "S" is for --

25         Q.   Okay.

SARAH L. KOOGLE; March 15, 2013

114

1    A.    -- because they're in order by number.

2    Q.    I got you.

3    A.    And then Tre- -- ne is whether or not he

4  was a trainee or student.

5    Q.    Okay.

6    A.    They mean the same thing --

7    Q.    Okay.

8    A.    -- at the time this record was recorded

9  on here.

10   Q.    Okay.  Keep going to the right.  "Class."

11 What is that?

12   A.    It's a -- a pay classification in the

13 system that tells us whether or not he's hourly,

14 salary, or mileage.

15   Q.    Okay.  So the -- the word on the first

16 line is, "Pay," and then below that, do the -- does

17 Class and Rate modify pay?  I mean, in other words,

18 are those underneath the -- I'm trying to understand

19 how that works.  What's the relationship between the

20 Pay field and the Class and Rate?

21   A.    I'm not sure.

22   Q.    Okay.  But you got -- okay.  Below that,

23 where it says, "Class," first two lines say, "SAL."

24 Does that stand for salary?

25   A.    Yes.

SARAH L. KOOGLE; March 15, 2013

115

1      Q.   All right.  And to the right of that, at

2  the Rate, it's got "SL350" and "SL350" for line 1 and

3  2.  What does that mean?

4      A.   That was just a rate code assigned to the

5  position that he was in at that time.

6      Q.   Okay.  Does that --

7      A.   It -- it doesn't mean anything in the

8  system --

9      Q.   Okay.

10      A.   -- for salary student.

11      Q.   Doesn't -- doesn't tell you what he's

12  making?

13      A.   No.

14      Q.   All right.  Then to the right of that,

15  "Singl Dr rt," I'm assuming?

16      A.   That's correct.

17      Q.   And he -- when he was a student, he had

18  no single driver rate, correct?

19      A.   That's correct.

20      Q.   To the right of that, "1st St Dr rt,"

21  there's nothing listed there.  Is that -- is that an

22  error or is that -- should there be anything listed

23  there?

24      A.   No, there shouldn't be anything there.

25      Q.   Okay.  "2nd St Dr rt"; is that what that

SARAH L. KOOGLE; March 15, 2013

116

1    stands for?

2         A.    Yes.

3         Q.    Let's just go across the line here.

4    "Single Per-Dim" -- well, what is that next one?  It

5    says, "Single Per-Dim, Type Cd."  What does that

6    stand for?

7         A.    I have -- I'm assuming it says per diem,

8    but none of these cat- -- none of these three columns

9    are used in our system at the time frame I worked at

10   Swift.

11        Q.    Okay.

12        A.    This was created before I ever started at

13   Swift.

14        Q.    Okay.  And are you aware of those ever

15   being used to the present time?

16        A.    Not that I'm aware of.

17        Q.    All right.  And then to the right,

18   there's what apparently is a field for "Effec.

19   Date."

20        A.    Yes.

21        Q.    How does that work?  Like, on the first

22   line, it says, "Effec. Date 00/00/00."  I'm assuming

23   that's not a true effective date.  What -- what --

24   how does -- how does a date re- -- how does a date

25   apply to the line that the date is on?

SARAH L. KOOGLE; March 15, 2013

117

1          A.   The dates on the side here are when a
2     transaction is entered by our HR department.  When
3     they enter a transaction for this person, it will
4     write a history record out here.
5          Q.   Okay.
6          A.   To show the effective date of what that
7     record was for.
8          Q.   Okay.  So --
9          A.   So when it's in zeros like that, that's
10    his original hire entry.
11         Q.   Okay.
12         A.   Where he had no date.  The system didn't
13    have a date on it.
14         Q.   Okay.
15         A.   And then when he was hired -- I'd have to
16    look at him specifically, but it looks to me as if
17    it's May 16th of '05.
18         Q.   Okay.
19         A.   I -- I don't know that for sure, though.
20         Q.   Okay.  Lost my train of thought.  Sorry.
21    Line 2, there is a -- there -- it's identical to line
22    1 except for the effective date, correct?
23         A.   That's correct.
24         Q.   Is that -- do you have an explanation for
25    that line?

SARAH L. KOOGLE; March 15, 2013

118

1        A.    No.

2        Q.    Okay.

3        A.    There's -- it looks as if there's
4   numerous records on here that are the same and I
5   would literally have to look at every HR transaction
6   that was done --

7        Q.    Okay.

8        A.    -- to see what type of a transaction it
9   was.

10        Q.    Are these changes in the driver payroll
11   status, are those entered by payroll or are they
12   entered by human resources?

13        A.    Human resources.

14        Q.    Is -- is that the way it always works?

15        A.    Yes.

16        Q.    Does human resources always do that?

17        A.    Yeah.

18        Q.    Okay.  So none of these changes that
19   occurred where we see these new effective dates were
20   entered by people in payroll?

21        A.    No.

22        Q.    Line 3, there's a change, and so I want
23   to address that, if I could.  Let's talk about what
24   we've got.  He's no longer a trainee, correct?

25        A.    That's correct.

SARAH L. KOOGLE; March 15, 2013

119

1      Q.    What does "QTY" class mean?

2      A.    That means he moved to mileage.

3      Q.    Okay.  Do you know what --

4      A.    It means quantity.

5      Q.    Quantity of miles; is that where that

6  comes from?

7      A.    Yes.

8      Q.    Okay.  What -- and where it says "Rate,"

9  it's got "QTY8." What does that stand for?

10      A.    It's just a coding in the system.  It's

11  our -- it's our required field in the payroll system.

12  It doesn't -- the rate is all tied to the matrix.

13      Q.    Okay.

14      A.    Not to the quantity.  Not what those

15  quantity codes are.

16      Q.    Okay.

17      A.    It's on a matrix system.

18      Q.    And it tells you nothing about what the

19  mileage rate is, correct?

20      A.    That's correct.  It doesn't.

21      Q.    Just says that he's on a mileage rate?

22      A.    Yes.

23      Q.    All right.  Single driver rate column,

24  line number 3, says "3E."  What is 3E?

25      A.    That's a pay matrix.

120

1      Q.    That is a pay matrix.  Okay.

2      A.    And if I could just clarify, as I said

3   before, I didn't create this.

4      Q.    Right.

5      A.    The headings are -- this is a custom

6   program that was created by IT.

7      Q.    Right.

8      A.    And the headings are not a true

9   reflection of what the information is.  So if I could

10   just clarify, the single driver rate column --

11      Q.    Uh-huh.

12      A.    -- is what we -- what in the system when

13   it controls all of the pay, this is what his loaded

14   matrix is.

15      Q.    Right.

16      A.    And then the first seat driver rate is

17   his empty matrix.

18      Q.    His?

19      A.    Empty matrix.

20      Q.    Okay.

21      A.    So when there is loaded --

22      Q.    When his truck is loaded or unloaded?

23      A.    Yes, that's correct.

24      Q.    I got you.  And in this case, there

25   doesn't appear to be any difference.

SARAH L. KOOGLE; March 15, 2013

121

1    A.    Not on that record, no.

2    Q.    Not on that record.  And that goes all

3  the way through to line 6, which has an effective

4  date of June 26, '06, correct?

5    A.    That's correct.

6    Q.    Do you know what happened between '06 and

7  line 7 where, apparently, he goes back on salary?  Do

8  you have any way of knowing that?

9    A.    I -- I can -- I am pretty sure I know

10  why, so I don't -- I don't know if it's called a

11  speculation or what I have seen.  I haven't looked at

12  his, Troy Slack specifically.

13    Q.    Right.

14    A.    But it looks as if he was mileage and

15  then they decided he needed more training, so they

16  put him back into a student trainee position for a

17  period of time.

18    Q.    Okay.  All right.  Now, line 9, again,

19  we've talked about the first few fields.  He's no

20  longer a trainee again, and he has a -- a matrix

21  under single driver rate and first seat driver rate

22  of 3EW2, correct?

23    A.    That's correct.

24    Q.    Are these, the ones that we've talked

25  about so far, the 3E and the 3EW2, what we've

SARAH L. KOOGLE; March 15, 2013

122

1   mentioned, are those matrices that are specific for

2   Washington state?  Well, let's break it down.  Is 3E

3   specific for Washington state?

4       A.   No.

5       Q.   It is not.  Okay.  That same matrix may

6   apply to any other state?

7       A.   Yes.

8       Q.   All right.

9       A.   That's a linehaul rate.  That's a

10  linehaul matrix.

11      Q.   Okay.  3EW2, is that specific for

12  Washington?

13      A.   Yes.

14      Q.   All right.

15      A.   That's specific for Grandview Wal-Mart.

16      Q.   Grandview Wal-Mart.  All right.

17           MR. LANE:  I hate to do this, y'all, but

18  Coke is killing me.

19           THE WITNESS:  Okay.

20           MR. LANE:  I've got to take a break real

21  quick.

22           MS. BRONCHETTI:  Take a break?  Sure.

23           THE VIDEOGRAPHER:  This marks the end of

24  Disk 2.  Off record at 1:01 p.m.

25           (Recessed from 1:01 p.m. to 1:08 p.m.)

SARAH L. KOOGLE; March 15, 2013

123

1           THE VIDEOGRAPHER:  This is the start of

2  Disk 3 in the deposition of Sarah Koogle.  We're back

3  on record at 1:08 p.m.

4  BY MR. LANE:

5       Q.   Mrs. Koogle, we were talking about

6  Mr. Slack's payroll status changes, the screen that

7  was printed out showing those changes, and I wanted

8  to go back to that Exhibit 6.  Looking at line 6,

9  the -- it's a mileage rate, and he was being paid as

10 single driver rate and first seat rate based upon the

11 3E matrix, correct?

12      A.   Yes.

13      Q.   All right.  Do you know by looking at

14 this page right here, does it indicate the --

15 anywhere on here the position that Mr. Slack was

16 assigned?

17      A.   No, you have to do F11 to see the

18 additional information, which is page 2.

19      Q.   Okay.  Now, continuing on, on this page

20 so I can make sure I've gotten as much knowledge as I

21 can from you, looking down, we talked about the

22 matrix -- the matrix called 3EW2, correct?

23      A.   Yeah.

24      Q.   You said that's a -- that's a Wal-Mart

25 specific -- a Grandview Wal-Mart specific matrix,

124

1    correct?

2          A.    Yes.

3          Q.    And then I think we were down to the --

4    the next one I see is different, is 3EEM, which is a

5    first seat driver rate.  What matrix is that?

6          A.    That's linehaul also.  So the reason it's

7    got 3E in the single driver rate --

8          Q.    Uh-huh.

9          A.    -- which is the loaded rate and 3EEM, the

10   3E is the loaded rate and 3EEM is an empty pay

11   matrix.

12         Q.    Okay.  All right.  Is it your

13   understanding at the time that this was implemented

14   that there was a difference in the mileage rate

15   between the 3E and the 3EEM or do you know?

16         A.    Yes, the rate varies.

17         Q.    The mileage rate?

18         A.    Yes.

19         Q.    Okay.  Now, just to continue on

20   identifying these matrices, the -- the next one down

21   on line 12 for single driver rate is WA3E.  What does

22   that stand for?

23         A.    That is Washington linehaul loaded.

24         Q.    Washington linehaul load -- loaded.

25   Okay.  And beside that first seat driver rate, and I

SARAH L. KOOGLE; March 15, 2013

125

1   believe you told me that would be an unloaded,

2   correct?

3          A.    That says empty.

4          Q.    Empty.  Okay.  So that's the same thing

5   with the E on the end standing for empty?

6          A.    Yes.

7          Q.    Okay.  Washington linehaul empty?

8          A.    That's correct.

9          Q.    Okay.  Looking over on the right-hand

10  column under the effective date, I want to make sure

11  I've got the dates lined up with the right rows.  In

12  -- on line 9 where he came off of training status

13  again, the effective date for that line says December

14  the 15th, 2008.  What does that date mean in terms of

15  him coming -- being reassigned to a 3EW2 matrix?

16             I may have used the wrong terminology,

17  but I don't know if you assign him a -- a matrix, but

18  I know we assign positions.  What do we do when we

19  give them a matrix; is that an assignment as well?

20         A.    Yes.

21         Q.    Okay.

22         A.    So my understanding of how to read this

23  screen --

24         Q.    Right.

25         A.    -- because remember, I didn't -- I didn't

SARAH L. KOOGLE; March 15, 2013

126

1   create this screen.

2         Q.   Right.

3         A.   The dates that are on the line item.  So

4   if you could start with line 12, if you go to line

5   12, there's no date there.

6         Q.   Right.

7         A.   The date that goes with those data, those

8   pay matrix data, is the date that's above, on the

9   line above.  So I don't -- I -- I don't remember

10  whether or not Troy Slack is still employed with

11  Swift, but at the -- at the point in time when we

12  printed this page on June 20th of 2012 --

13        Q.   Right.

14        A.   -- the very last line item, the reason

15  the date's blank there is because that's his existing

16  -- what the system showed on that date as his

17  existing setup.  And so the WA3E was entered or the

18  change was made on 9/1 of 2011.

19        Q.   Okay.

20        A.   Effective 9/1/11.

21        Q.   Okay.  So he's -- he would be paid under

22  the WA3E either loaded or unloaded or empty starting

23  September 1, 2011?

24        A.   That's correct.

25        Q.   Okay.  All right.  And hopefully that's

SARAH L. KOOGLE; March 15, 2013

127

1    correct, but that's -- that's your understanding of

2    the way you read it, correct?

3           A.    Right.

4           Q.    Okay.

5           A.    I would have to have all the HR

6    information.

7           Q.    Okay.  And you said that you do an F --

8    to -- to find out about the position, you would do

9    the F what?

10          A.    F -- F11.

11          Q.    F11.

12          A.    From that --

13          Q.    F11 for additional information?

14          A.    Yes.

15          Q.    All right.  And that's where we are on

16   page D010195?

17          A.    That's correct.

18          Q.    All right.  So on this page, then,

19   what -- what all is additional information to what we

20   saw on the previous page?

21          A.    This would show the --

22          Q.    I -- I notice, by the way, that -- that

23   this one starts, as far as the number is concerned,

24   it starts at number 6 and goes through 10.

25          A.    Can I explain why?

SARAH L. KOOGLE; March 15, 2013

128

1          Q.    Yes.  And that -- that was my question.

2          A.    Okay.  So when we were requested to

3    provide the information, the case -- I don't remember

4    the exact date, but it was for 2008.

5          Q.    Uh-huh.

6          A.    So we -- 2008 is on this first page.

7    It's also got 2005, 2006.

8          Q.    Right.

9          A.    We provided this first page because it

10   provides the date that we were requested to provide.

11         Q.    Right.

12         A.    But when you do F11 and it breaks it all

13   out, the 2008, everything prior to number 6 on the --

14   on page -- the second page --

15         Q.    Uh-huh.

16         A.    -- is for the date that isn't applicable

17   to this case.

18         Q.    That wasn't part of the -- the --

19         A.    They were all --

20         Q.    -- requested time frame --

21         A.    That's correct.

22         Q.    -- that you were asked to provide?

23         A.    That's correct.

24         Q.    Okay.  It's not that that information's

25   not available, it just wasn't part of the -- within

SARAH L. KOOGLE; March 15, 2013

129

1    the range that you were asked to provide, correct?

2         A.    That's correct.

3         Q.    Okay.  Well, just to be clear, the

4    data -- the data is available that would be

5    reflective of lines 1 through 5 on the previous page?

6         A.    If requested, yeah.

7         Q.    If it was requested.  Okay.  Now, we

8    covered that issue about why it starts at line 6.

9    What is the additional information that is provided

10   on this page?

11        A.    The additional information that's

12   provided is a stop pay matrix.  If you --

13        Q.    I'm sorry.  Tell me that again, what you

14   call it?

15        A.    It's a stop pay matrix.  So if --

16        Q.    Stop pay matrix?

17        A.    If you look at line 8 -- well, line 7 has

18   it also.  Over on the left side, there's ST00, ST00.

19        Q.    Yes.

20        A.    Or if you get down a little bit further,

21   it says, "ST10, ST10."

22        Q.    Right.

23        A.    Those -- that shows what the stop rates

24   were, so this screen will show the stop rates.

25        Q.    Oh, you're talking about additional pay

SARAH L. KOOGLE; March 15, 2013

130

1    for stops?

2         A.   Yes.

3         Q.   Okay.  I'm sorry.  Let's talk about some

4    other additional information that I don't think is on

5    the previous page.  We've got -- again, at the top,

6    we've still got his identification code, his driver

7    code, and his name, and the date this was printed,

8    correct?

9         A.   Yes.

10        Q.   All right.  And on line 6, though, we

11   have the same information on the beginning, the first

12   page, but we also have below that under the rate

13   column, something called "H DT"?

14        A.   Yes.

15        Q.   Is that the date of hire?

16        A.   Yes, it is.

17        Q.   Okay.  So that -- and this looks like he

18   was hired, I guess, at least at this time on June the

19   26th, 2006, correct?

20        A.   That's correct.

21        Q.   Okay.  Do you -- well, looking at the

22   previous page, it looks like he's got a new hire

23   date.  Did -- was he rehired, to your knowledge,

24   based on this information?

25        A.   I believe he is a new hire -- a rehire.

SARAH L. KOOGLE; March 15, 2013

131

1    Q.    Rehire.

2    A.    This would only show -- I actually don't

3    know if it shows the original hire date or adjusted

4    date of hire.

5    Q.    Okay.  All right.  But in this case, it

6    shows a hire date of June 26, 2006?

7    A.    That's correct.

8    Q.    All right.  And then down on the last

9    line, we see in addition to -- well, it's actually on

10   every column.  There's also a termination date field,

11   correct?

12   A.    I am not positive it's termination date.

13   Q.    Okay.

14   A.    That would be an assumption.

15   Q.    T -- "T Dt," you don't know what that

16   means?

17   A.    No.

18   Q.    Okay.  The pay matrices reflected here,

19   though, are the same as what's reflected on the

20   previous page, correct?

21   A.    Yes, it is.

22   Q.    Okay.  Now, to the right over there

23   under -- I don't know if they're under those columns.

24   Well, they are under them, but I don't know if those

25   columns have any relationship to the information.  Do

SARAH L. KOOGLE; March 15, 2013

132

1    you know?  Like, where it says, "1st Seat Per-Dim,"

2    Type Code -- or "Type Cd," do those items below that

3    have any relationship to those headings?

4          A.   I am not sure.

5          Q.   Okay.  In any event, looking at line 6,

6    what does the term -- what does the letters "Emp/Sts"

7    stand for?

8          A.   I am again assuming it's employee status.

9          Q.   Okay.

10         A.   Terminated or active.

11         Q.   Okay.  And right beside that, it has a

12   "T" on line 6.  Do you know what that stands for?

13         A.   It's an assumption again.  It's --

14              MS. BRONCHETTI:  Don't assume, like, if

15   you don't know.

16              THE WITNESS:  Sorry.

17              MS. BRONCHETTI:  No, that's okay.  But we

18   just want to know what you know.

19              THE WITNESS:  I don't know then.

20   BY MR. LANE:

21         Q.   Okay.  But you mentioned that typically

22   it would either -- it would either be -- his status

23   would either be terminated or active, correct?

24         A.   Terminated, active, or leave of absence.

25         Q.   Okay.  And then below that, just so we

SARAH L. KOOGLE; March 15, 2013

133

1   can -- I'm not asking you to confirm definitely, but

2   would that be consistent with him being in an active

3   status where it says, "Emp/Sts A"?

4          A.   I wouldn't know.

5          Q.   Okay.  Looking back at line 6, right

6   beside the T, to the right of the T, it's got a

7   "Pos:".  What does that stand for?

8          A.   Position code.

9          Q.   Okay.  And you're sure about that?

10         A.   Yes.

11         Q.   Okay.  And then beside that, we've got

12   a -- an acronym, what appears to be an acronym.

13   "TRTEVN."

14         A.   Yes, that's the position code.

15         Q.   What does that stand for?

16         A.   Troutdale trainee van.

17         Q.   Troutdale?

18         A.   Trainee.

19         Q.   Trainee?

20         A.   Van.

21         Q.   Van.  Okay.  And where is Troutdale?

22         A.   Oregon.

23         Q.   Oregon.  All right.  Down below that,

24   we've got Troutdale trainee again, correct?

25         A.   That's correct.

SARAH L. KOOGLE; March 15, 2013

134

1      Q.    On line 7.  And then below that, we

2   have -- and -- and during that, he was getting

3   linehaul -- he was being paid under a linehaul matrix

4   on line 6, correct?  I mean, it says, "3E" out there.

5   I'm just trying to --

6      A.    I'm not sure -- I'm not sure why it looks

7   like that because he -- he wouldn't be paid mileage

8   under a training position code.

9      Q.    Okay.  And that's -- that's why I want to

10  be clear because on the previous page on line 6, it

11  does have him down as 3E, correct, for that period,

12  for that same --

13     A.    Yes.

14     Q.    Okay.  So you're not sure why that is,

15  correct?

16     A.    I'm not sure.

17     Q.    Okay.  Line 7, again, he's got the same

18  trainee's position, correct?

19     A.    Yes.

20     Q.    And that -- is that a Washington position

21  or you said Oregon, but is that -- is he working in

22  Washington, or what's the --

23     A.    No, he was working in Oregon.

24     Q.    Okay.

25     A.    He was assigned to an Oregon terminal

SARAH L. KOOGLE; March 15, 2013

135

1  location.

2       Q.   Okay.  And then on line 8, apparently

3  he's assigned to a -- to the Grandview position at

4  that time, correct?

5       A.   Grandview mileage Wal-Mart, yes.

6       Q.   Grandview mileage Wal-Mart, which means

7  what?

8       A.   He was paid a mileage pay.

9       Q.   Okay.  Where is Trout- -- you said

10  Troutville (sic)?

11       A.   Troutdale.

12       Q.   Troutdale.  Where's Troutdale in

13  relationship to Grandview?

14       A.   I have no idea.  One's in Washington.

15  One's in Oregon.

16       Q.   Okay.  Line 9, same position, correct?

17       A.   Yes.

18       Q.   Different matrix, but same position?

19       A.   I believe the matrix is the same 3EW2.

20       Q.   Oh, I'm sorry.  I thought that the matrix

21  on line 8 was salary.  Did I read that wrong?

22       A.   This -- this print of this screen is very

23  confusing because you can tell that the information

24  is wrapping since they printed it portrait and not

25  landscape.  So instead of printing it -- when you

SARAH L. KOOGLE; March 15, 2013

136

1  open this F11 screen up, it's -- it's long across the

2  screen, so they should have printed it on a landscape

3  page so the data wouldn't wrap on three lines like

4  this.

5       Q.   Okay.  Well, I'm looking at the previous

6  page, though, on line 8, information on line 8 has

7  him as a trainee salary.  Is that not consistent with

8  line 8 on the next page?

9       A.   Right.  But I don't know which position.

10  He -- like I had said previously, he wouldn't be in a

11  salary pay matrix with a mileage position code.

12  "GVEXWM" is a mileage position code.

13       Q.   Okay.  I -- I want to understand why

14  that's the case, but right below that, it even has

15  "SALARY SL350 : 350.00 SAL PAY RATE" underneath the

16  position GVEM- -- GVEXWM.  I mean --

17       A.   It's the way it's printed.

18       Q.   Okay.  How do we sort that out?

19       A.   You ask us to -- to provide the HR data

20  that goes along with this, the transfer information

21  that shows the actual transfer detail, the day it was

22  entered, and what the change was from the HR system,

23  not the payroll system.

24       Q.   All right.  Well, let's move on.  Does

25  line 9 appear to have the proper information that's

SARAH L. KOOGLE; March 15, 2013

137

1    consistent with the position code?  In other words,

2    his position code is Grandview EX.  Is that

3    experienced?  Is that what the "EX" stands for?

4         A.   No, not necessarily.  That just tells our

5    system that it's mileage.

6         Q.   Okay.

7         A.   I'm not -- I wasn't here for the coding,

8    how they coded things.

9         Q.   Okay.  In any event, it's the same code

10   that we see in the previous line, and it's Grandview

11   Wal-Mart, correct?

12        A.   Yes.

13        Q.   And it's a mileage rate, correct?

14        A.   Yes.

15        Q.   And for that position, he's being paid

16   under the 3EW2 matrix?

17        A.   Yes.

18        Q.   Okay.  Now, what is the -- the last item,

19   line 10, it's got a position code of "GVCAWM."  What

20   does that stand for?

21        A.   That stands for Grandview Wal-Mart,

22   Grandview Washington Wal-Mart casual.

23        Q.   Casual driver?

24        A.   Yes.

25        Q.   All right.  And that change occurred

138

1    when?

2        A.    It's hard to tell from this screen.   It

3    would be an assumption.

4        Q.    Well, what screen would you need to go

5    to?

6        A.    The HR system.

7        Q.    Is there some reason we don't see -- oh,

8    they're on the next page.   I got you.   So lines 11

9    and 12 are on the next page, correct?

10       A.    Yes.

11       Q.    All right.   Is he still driving as a

12   casual driver here?

13       A.    According to his position, yes.

14       Q.    All right.   Position hasn't changed on

15   either of those, correct?

16       A.    That's correct.

17       Q.    All right.   At some point, though, he --

18   he -- even -- at -- in that position at Wal-Mart, he

19   started being paid under a linehaul matrix, correct?

20       A.    Yes.

21       Q.    WA3E and WA3EE.   Well, actually, both of

22   those, all of those are linehaul matrices, correct?

23       A.    Yes.

24       Q.    3E.   Okay.   Now, you -- you mentioned

25   before that 3E is not a Washington specific matrix,

SARAH L. KOOGLE; March 15, 2013

139

1    correct?

2          A.   That's correct.

3          Q.   Is the Washington -- is WA3E and the

4    WA3EE Washington specific?

5          A.   Yes, it is.

6          Q.   Okay.  And it's your understanding, from

7    looking at this, that that matrix -- he was changed

8    to that matrix on September 1st, 2011 correct?

9          A.   That's correct.

10         Q.   Now, let's skip over to the next page.  I

11   have D010197, and I know we -- we indicated that

12   these were provided to us in sequential order.  I

13   don't believe that this page that's got a title of

14   "Package Details" at the top identifies Mr. Slack

15   specifically, but this is one of the package details

16   that would apply to him, correct?

17         A.   Yes.

18         Q.   3EW2?

19         A.   Yes.

20         Q.   Okay.  Let's go over that.  Now, what --

21   what is meant by package detail?  What is contained

22   in a package detail?

23         A.   The pack- --

24         Q.   What -- what does package detail mean?

25         A.   The package detail is what does the --

SARAH L. KOOGLE; March 15, 2013

140

1   what is the pay package that applies to that position

2   code.  You could see the position code GVEXWM about

3   halfway down the page --

4           Q.    Right.

5           A.    -- is the Grandview experienced Wal-Mart

6   position code.

7           Q.    Okay.

8           A.    This is just something that is entered

9   into our system as the ideal standards to pay a

10  driver that's in that position code.

11          Q.    Okay.  And how do you decide what is

12  being paid to any particular driver, such as

13  Mr. Slack, under this package detail?  What would

14  he --

15          A.    We --

16          Q.    -- in other words, he's being paid under

17  pay matrix 3EW2, correct?

18          A.    Correct.

19          Q.    Does -- does 3EW2 include all of these

20  items that are listed above, which is, "Pay Rate:

21  .28-.38, Stop Off:  $10, Load:  $60"?

22          A.    No.

23          Q.    And on and on?

24          A.    The pay matrix only applies to mileage

25  pay.

SARAH L. KOOGLE; March 15, 2013

141

1       Q.   Okay.  All right.  And so all of these

2  other -- well, actually, we have up here, though,

3  under pay rate, the mileage rate, there's a range,

4  correct?

5       A.   Yes.

6       Q.   Is that the range for 3EW2?

7       A.   I wouldn't know without having the matrix

8  in front of me.

9       Q.   Okay.  And you're saying that these other

10  items -- we don't know about the pay rate, the range

11  that's listed on here for the pay rate, mileage rate,

12  but for all of these other items, you're saying those

13  aren't necessarily tied to the 3EW2 matrix?

14       A.   No, they're not.

15       Q.   Okay.  Now, just since it's the first

16  time we've looked at one of these, these package

17  detail sheets, I want to go over everything.  At the

18  top, right below the title, "Package Details," it's

19  got a field called, "Effective Date."  Do you see

20  that?

21       A.   Yes.

22       Q.   I don't see a date on there.  Ordinarily,

23  would an effective date for this package be provided?

24       A.   It would.

25       Q.   It would?

SARAH L. KOOGLE; March 15, 2013

142

1      A.    Uh-huh.

2      Q.    Do you know why it isn't in this case?

3      A.    Yes.

4      Q.    Why is that?

5      A.    Because when 2006, when I keyed all this

6   data into the pay package --

7      Q.    Right.

8      A.    -- the information was previously stored

9   in an Excel spreadsheet, and we have thousands of pay

10  package details in a spreadsheet and they developed a

11  database, which is the screenshot you're seeing, to

12  house our pay package details.  So when the data was

13  keyed, originally keyed from the spreadsheet into

14  this data housing area, the spreadsheet did not have

15  an effective date on it.  So that was before my time.

16  I have no idea why it didn't have an effective date

17  on it, but that's why there's not an effective date

18  on the screenshot here because at the time, the

19  spreadsheet did not have an effective date on it.

20     Q.    Okay.  For this particular package

21  detail, is there a name or an identifier for this

22  particular package?

23     A.    Not on this sheet, no.

24     Q.    Where would it be?

25     A.    There's a -- a sheet previous to this

SARAH L. KOOGLE; March 15, 2013

143

1    that has the -- it's not in the screenshots here.

2         Q.   Okay.

3         A.   That has the account name and the

4    terminal location.

5         Q.   Okay.  Is there some reason that was not

6    included?

7         A.   I wouldn't know.

8         Q.   Do you recall asking that to be printed

9    or...

10        A.   Not that I'm aware of.

11        Q.   Okay.  Are there -- other than that

12   previous page that would be linked to this package

13   detail page, would there be other pages linked to

14   this?

15        A.   Linked to this -- this particular --

16        Q.   This particular one?

17        A.   No, no.

18        Q.   Okay.  I understand the history could run

19   into another page --

20        A.   Yes.

21        Q.   -- and you would have some more history,

22   correct?

23        A.   Yeah, but it would have been on here.

24        Q.   Okay.

25        A.   Because it prints way down far on the

SARAH L. KOOGLE; March 15, 2013

144

1    screen.

2         Q.   I got you.  Okay.  Below the effective

3    date, which is blank, you've got "Unit Division #:,"

4    correct?

5         A.   Yes.

6         Q.   What does that mean?  What's that for?

7         A.   That's an operations number that is --

8    specifies Grandview Wal-Mart is what division number

9    for the unit that the driver drives.

10        Q.   Okay.  Is there a reason that field is

11   empty?

12        A.   Because it was not on the spreadsheet

13   when it was keyed in.

14        Q.   Now, to the right it says, "Existing

15   Position:  Yes."  Is that just a yes or no, this is

16   an existing position that's GVEXWM?

17        A.   Yes.  When this was keyed into the

18   database, was it already an existing position or are

19   they requesting a new position, and it was already

20   existing, which is why it was on the spreadsheet.

21        Q.   Okay.  "Cost Center," what is that field

22   for?

23        A.   It's the cost center of the unit that the

24   cost -- the revenue of the trip is coded to.

25        Q.   Okay.  It's a -- it's a way to flow the

SARAH L. KOOGLE; March 15, 2013

145

1    money --

2        A.    Yeah.

3        Q.    -- coming from the -- from the trip back

4    to the company?

5        A.    Yes.

6        Q.    Okay.  Then in the -- the next line down,

7    in the middle of the page, it says, "Number of

8    Drivers."  What would that be in that field?

9        A.    It would be the number that when they

10   created this request, how many were they expecting to

11   have in the position, or estimating would be in that

12   position.

13       Q.    Is there a reason that the number of

14   drivers is not included in this field?

15       A.    Yes, because it wasn't on the

16   spreadsheet.

17       Q.    Is that an estimate of how many they

18   would expect to be on there, or is that a number

19   that's -- that's updated to show actually how many

20   drivers are operating under this position?

21       A.    No, it's an estimate, totally an estimate

22   of how many they thought they would be in that

23   position.

24       Q.    Okay.  So if I wanted to find out how

25   many drivers at -- at any given time were operating

SARAH L. KOOGLE; March 15, 2013

146

1   in the GVEXWM position, is that something you could

2   search for, for a particular date range to give that

3   information?

4        A.   That would be something HR would have to

5   provide.

6        Q.   Okay.  You say you could not do that in

7   the --

8        A.   In payroll?

9        Q.   In payroll?

10       A.   No.

11       Q.   Now, down below that, just before we get

12  to the history, there's a -- it looks like a -- a

13  field for details.  What is included in the details?

14       A.   Just any other additional comments that

15  go with that position.

16       Q.   Okay.  Okay.  Now, down below that, and

17  I -- I -- I do want to get an understanding as to how

18  the history works.  Tell me how the history works on

19  these pay -- package details.

20       A.   The history that's got the dates and the

21  names next to it down at the bottom?

22       Q.   Yes.

23       A.   That's just if there is an update made

24  after the -- if there is -- once it goes through each

25  of the approval levels, we're able to make comments

147

1    to what did we do with that pay -- that pay package.

2    And then the -- the requester or all of the people

3    that can pull up this pay package are able to see the

4    comments that were made on there.

5         Q.   Okay.  Now, here's -- here's my -- my

6    confusion.  What -- what is this used for?  You're

7    saying it just comes from some database spreadsheet.

8    Is this a -- is this package tied to the system so

9    that if you're in position GVEXWM being paid under

10   pay matrix 3EW2, then under this package detail,

11   you'll be paid so much per mile and whatever the

12   extra pay is?

13        A.   This pay package is only for the -- the

14   guidelines of what the account holder or account

15   manager creator has -- has said they want to pay a

16   driver that's in this position.  There's -- there's

17   nothing on this other than the pay matrix pays the

18   mileage rate, the stop-off rate is an automated rate

19   in the system also.  All this other stuff on here is

20   completely manual.  That's entered by a manager.  So

21   we are saying here are what your guidelines are, but

22   it's not --

23        Q.   I guess that's my question.  Who is it

24   that uses this?  Are you saying the -- the driver

25   managers use this?

SARAH L. KOOGLE; March 15, 2013

148

 1        A.   Multiple people use it.  Everyone has

 2   access to it, so...

 3        Q.   Name those -- name the people who would

 4   primarily be intended to use this.

 5        A.   A regional manager, a terminal manager, a

 6   fleet manager, a driver manager, all of payroll, the

 7   pricing department, the finance department, the HR

 8   department, business analyst groups.

 9        Q.   Well, let -- okay.  So how -- how do you

10   use this in payroll?

11        A.   We -- we receive this pay package.  It

12   goes -- you can see the routing.  It goes from a

13   terminal manager creating it for a regional VP -- EVP

14   to approve it, pricing has to approve it, finance

15   approves it, HR approves it, and then it comes to

16   payroll.  So each step is putting -- each step of the

17   routing is putting information into the pay package.

18        Q.   Right.

19        A.   After it's done by everybody else, we go

20   into our system and we create -- this position code

21   goes with this mileage matrix and this stop matrix,

22   and then we set up the table.  If it's a new matrix,

23   pay matrix, we set up the table that ties the rates

24   to what they've requested as the rates on this pay

25   package.

SARAH L. KOOGLE; March 15, 2013

149

1      Q.   Okay.  I guess that's what I'm asking.

2   And from a payroll perspective, after everybody's put

3   their two cents worth in here, you use this

4   information to actually set up the -- the -- the

5   payroll system?

6      A.   Pieces of the payroll system.

7      Q.   Pieces of the payroll system to allow

8   this to be implemented for any given driver under

9   this position?

10      A.   Right.  In order for -- you'll have to

11   have it set up in our pay system with a matrix in

12   order for them to be able to assign a driver to that

13   position code.

14      Q.   Okay.  All right.  So this just views the

15   payroll for the setup process?

16      A.   Yes.

17      Q.   All right.  Well, let's look at the

18   history, now that I understand how you used this.  It

19   says, "11/09/2006 02:33:57 p.m., Sarah Koogle,"

20   that's you, "changed the Details field data from:

21   {3EW2 matrix pays $30 more for loads under 151

22   miles}," and you changed that "to:  {3EW2 matrix pays

23   $30 more for loads under 151 miles.  Trainee/spouse

24   position GVTSWM.}"  Looks like you just added

25   trainee/spouse position GVTSWM.  Why would you be

SARAH L. KOOGLE; March 15, 2013

150

1  adding that information?

2      A.  Because after this was originally --

3  after this actual pay package was created, they added

4  a new position code to the Grandview Wal-Mart

5  account.

6      Q.  The trainee/spouse training?

7      A.  Which is the trainee -- yes.

8      Q.  Okay.

9      A.  The Grandview trainee/spouse position

10  code.

11      Q.  Okay.

12      A.  So I can't -- I can't go in and edit

13  the -- there's particular information on here that I

14  cannot edit, and so I have to put it in the comments

15  below.

16      Q.  Okay.  All right.  I guess my question

17  is:  Why -- why were you adding that in the details

18  field up there?

19      A.  Because I'm -- my department is the only

20  one that has access to edit it after it's already

21  been completed.

22      Q.  Okay.

23      A.  Once it's in a completed status, you can

24  not have the requester, the HR department, anywhere

25  else edit the document, only payroll can.

SARAH L. KOOGLE; March 15, 2013

151

1    Q.   Okay.  Now, if a -- if a driver is

2    assigned GVEXWM and he's also assigned a 3EW2 pay

3    matrix, other than manual changes made by a driver,

4    manager, or someone actually managing the driver, do

5    you have any -- all things being equal, do you have

6    any variance in how that driver would be paid from

7    one driver to the next with the same criteria?

8         A.   Are you talking about in respect to the

9    mileage pay?  Or --

10        Q.   The mileage -- well, the mileage pay, I

11   understand, is -- is -- may vary depending on

12   experience level, correct?

13        A.   There's many, many variances --

14        Q.   Okay.

15        A.   -- on mileage pay.

16        Q.   Under 3EW2, pay matrix 3EW2, which you

17   said reflects a certain mileage pay, correct?

18        A.   Yes.

19        Q.   What are the variables that determine

20   what a driver makes?

21        A.   You want me to list all of them?

22        Q.   Well, assuming that -- yeah, assuming

23   it's not -- you know, we're not going to be sitting

24   here for 30 minutes, but, I mean, if it's a lot, tell

25   me what's your understanding, if you know.

SARAH L. KOOGLE; March 15, 2013

152

1        A.    There, it's based on experience, truck

2    driving experience.

3        Q.    Okay.

4        A.    So that's months of service.

5        Q.    Right.

6        A.    It's based on is the load loaded, are the

7    miles -- are there loaded miles on the load or empty

8    miles on the load.

9        Q.    Okay.  For 3EW2?

10       A.    Yes.

11       Q.    Okay.

12       A.    Is the load -- depending on the number of

13   loaded miles on the load, like it says on here under

14   151 miles, it pays $30 more --

15       Q.    Right.

16       A.    -- for the load.  So then it pays a -- an

17   additional flat amount in addition to his mileage.

18       Q.    Right.

19       A.    If it's team, the team rates vary.  If

20   they're a team driver that are both mileage-paid

21   drivers for first seat and second seat.

22       Q.    Okay.

23       A.    If they're mentor student combination

24   where I'm training somebody, my rate could vary based

25   on whether I'm training someone at this time or not.

153

1      Q.    Uh-huh.

2      A.    And for Grandview, Washington, I don't

3  think they go East Coast, so there wouldn't be a

4  change for East Coast.  I believe that's all of the

5  variations --

6      Q.    Okay.

7      A.    -- on the mileage pay.

8      Q.    Now, that's -- that's good, and that's --

9  you tried to give me your best understanding.  If you

10 think of another one, that's fine.  Is that typical

11 of these pay package pay matrices for Washington

12 positions that you would have those variables?

13     A.    There's -- there's more.  That's not

14 specific to Wal-Mart.

15     Q.    Okay.  All right.  All right.  Now, I

16 want to make sure we're comparing apples to apples

17 and oranges to oranges.  If -- if you have a driver

18 under this pay package that we're talking about here,

19 3EW2 matrix, GVEXWM has the same experience as the

20 next driver and the -- I understand that the rate

21 changes depending on the mileage for loads and

22 unloads, but I'm assuming all things being equal,

23 length of the -- length of the trip that would kick

24 in, this 151 miles, $30 more for loads under 151

25 miles, you know, mentor status, mentor -- mentoring.

SARAH L. KOOGLE; March 15, 2013

154

1    All things being equal, if you -- if -- if this -- if

2    these fields are the same for one driver versus

3    another driver, is there any other reason why the pay

4    would be different under this pay package for those

5    two drivers?

6         A.    Comparing they're both Washington

7    Wal-Mart based drivers?

8         Q.    Yes, they're both GVX- -- GVEXWM.

9         A.    No, the rate would be the same.

10        Q.    Okay.  All these -- if all these -- if

11   all these fields are the same, the -- the rates and

12   the pay would be the same, correct?

13        A.    The mileage rate would be the same.

14        Q.    The mileage rate would be the same.

15   Okay.  Okay.  Let's -- sorry to be taking so long.

16   Let's go to the next page.  DE -- D010198, page

17   number.  What are we looking at here?

18        A.    This is -- this is a screen that we just

19   recently created.  As you can see, the last update

20   date is 2012.  It's our -- it's a screen that we

21   created that allows us to put pay package information

22   into what we call AS/400, which is a -- our computer

23   system.  AS/400 is our computer system.  So this --

24   this screen, this document on DZ -- or D010197 that

25   we were just -- we were just reviewing, the previous

SARAH L. KOOGLE; March 15, 2013

155

1    page.

2         Q.    Right.

3         A.    This is a Lotus Notes application.  So

4    it's a database, a Lotus Notes database application.

5    So the screenshot in D010198 is the AS/400

6    information.

7         Q.    Version of the package details we just

8    talked about?

9         A.    Yes.

10        Q.    Okay.

11        A.    It has -- it's not tied -- it's not to

12   anything.  It's not -- it's manually created by our

13   payroll department, and the purpose for it was to

14   allow us to try and do some automation of certain pay

15   items, or allow us to do additional reporting to

16   audit pay items that are based on that position code,

17   but it's -- because it was created in 2012, we've not

18   -- we've not actually tied anything to it.  It's just

19   for informational purposes for our department.  Our

20   payroll department is the only department that can

21   see this information.

22        Q.    Okay.  Are your -- are your other screens

23   based on that same Lotus system?

24        A.    What other screens?

25        Q.    I guess the -- the previous computer

SARAH L. KOOGLE; March 15, 2013

156

1   prints that we talked about.  It looks like the

2   fields are the same.  You've got the same date fields

3   up in the right, date and time fields, the same user

4   code.  I don't know if that's user code in the top

5   left-hand corner.

6        A.   She's the one that printed these when the

7   request -- when the information was requested --

8        Q.   Yeah, I understand.

9        A.   -- for this user.  This is -- this is --

10  the first document is AS/400.  The second document is

11  AS/400.  The third one's AS/400.  This is Lotus

12  Notes.

13       Q.   Okay.  And then the next one is AS/400?

14       A.   AS/400.

15       Q.   I got you.  I misunderstood you.  I

16  apologize.  So the AS/400 screenshot is -- is the

17  representation of the Lotus Notes on the previous

18  page?

19       A.   Yes.

20       Q.   All right.  Let me ask you a couple

21  questions about this.  You said that this -- D010198

22  was created recently; is that correct?

23       A.   The program was created recently, a

24  system that allows us to key it into the AS/400.

25       Q.   Okay.  And is this -- is this information

SARAH L. KOOGLE; March 15, 2013

157

1      or is this -- this -- this data that's keyed in on

2      the AS/400 used in the automated pay process?

3          A.   No.

4          Q.   It is not.  Okay.  What is the purpose of

5      having that into -- in the system?  What is the

6      purpose of re-keying that in to the AS/400 system?

7          A.   It -- the purpose for keying it in was to

8      allow us to do future programming to possibly

9      automate items or edit or audit items that are

10     specific to that position code and pay matrix

11     combination.

12         Q.   Okay.  A couple of questions.  First of

13     all, this is the 3EW2 pay matrix we've been talking

14     about and the position code we've been talking about,

15     correct?

16         A.   Yes.

17         Q.   We have an effective date of four -- of

18     April 1st, 2004.  Where does that date come from?

19         A.   I'm not sure where the date come -- came

20     from.

21         Q.   And then we have a last update of March

22     7th, 2012, correct?

23         A.   Yes.

24         Q.   Do you know what the update consisted of?

25         A.   No, I don't.

SARAH L. KOOGLE; March 15, 2013

158

1    Q.   Okay.  Just so I'm clear, it looks like

2  for every yes or no field, everything is marked no in

3  terms of automated in this -- in terms -- in terms of

4  the automation.  It's marked no for automation,

5  correct?  And then except for down where it says

6  "short haul," and that's "yes."  Do you know if the

7  short haul function on here was automated?

8    A.   The short haul function was automated as

9  part of the pay matrix.

10    Q.   The 3EW2 pay -- pay matrix?

11    A.   Yes.

12    Q.   Yes.  So in this particular case, at

13  least that part of it is -- is -- as part of the

14  AS/400 system, is automated?

15    A.   It's automated.  It was automated before

16  this was ever created, though.

17    Q.   Okay.  And the details of the short haul

18  are on the previous page; is that -- where -- where

19  would we see the details?

20    A.   In the details of the previous page where

21  it says 3EW2 matrix pays $30 more for loads under 151

22  miles.

23    Q.   Okay.  And actually, we see that on the

24  next page as well, correct?

25    A.   That's correct.

Yamaguchi Obien Mangio, LLC,  Reporting & Video  *  www.yomreporting.com
1200 Fifth Avenue, Suite 1820, Seattle, Washington 98101 * 206.622.6875 * 1.800.831.6973

SARAH L. KOOGLE; March 15, 2013

159

1    Q.    D01099; is that correct?

2    A.    Yes.

3    Q.    Okay.  Again, the effective date listed

4    on this next page, which is D010199 is April 1st of

5    2004, correct?

6    A.    That's what it says.

7    Q.    Okay.  What does this page, this

8    screenshot show us, other than --

9    A.    Are you --

10   Q.    Other than the --

11   A.    Are you back on 199?

12   Q.    Yes.

13   A.    It shows the short haul details, the

14   titles at the top.

15   Q.    Okay.

16   A.    And the columns over on the right side

17   that say, loaded, empty, yes or no.

18   Q.    Yes.

19   A.    It tells you is this short haul based on

20   loaded miles, yes or no, or empty miles, yes or no.

21   They could both be yes.  They could, one be, like,

22   it's based on loaded miles only.

23   Q.    Okay.  So for this particular matrix,

24   it's loaded miles?

25   A.    Yes.

SARAH L. KOOGLE; March 15, 2013

160

1    Q.    Okay.  Again, it looks like that was

2    updated March 7th of 2012, correct?

3         A.    That's correct.

4         Q.    All right.  And that's when that short

5    haul information was updated?

6         A.    That's when it was keyed into the screen.

7         Q.    Okay.  Help me out on down below that,

8    several lines, it says, "Single," "First," "Second,"

9    and "Trainer."  And then it's got some -- some

10   numbers below that.  Can you tell me what -- and it

11   looks like under miles, too, it's got numbers.  Can

12   you explain that?  I guess that's a matrix.

13        A.    It -- it is the matrix, and I believe we

14   provided the actual matrix screen, but it -- she

15   copied and pasted it in here, so what it's telling

16   you is if the driver's single, which is a solo --

17        Q.    Right.

18        A.    -- seat.  If it's 1 to 150 miles, it pays

19   $30.

20        Q.    That's what the 300000?

21        A.    Yes.

22        Q.    Or whatever?

23        A.    So it's got five decimals.  So a 30 and

24   then you have to put a decimal in there, and then

25   there is five digits after the decimal.  And then if

SARAH L. KOOGLE; March 15, 2013

161

 1    it's a team rate, so if you're the first seat, you

 2    get $15.  If you're the second seat, you get $15.

 3          Q.    Okay.

 4          A.    And then trainer is the solo, the same as

 5    the solo rate.

 6          Q.    Okay.

 7          A.    $30.

 8          Q.    And that reflects how the -- the short

 9    haul matrix is applied?

10          A.    Yes.

11          Q.    All right.  Next page, D010200.  What is

12    this -- it says, "Pay Package Valid Combo Screen

13    Additional Information."  What's -- what is this

14    showing us?

15          A.    It's the exact same thing as 198, but

16    it's for the Grandview Wal-Mart casual position code.

17          Q.    Well, we've also got a different pay

18    matrix, don't we?

19          A.    Yes.

20          Q.    What is -- what's the difference in the

21    pay matrices on --

22          A.    When this screenshot was created, that's

23    the one that was effective 9-1 of 2011, the effective

24    date on there.

25          Q.    Okay.  Do you know when that pay

SARAH L. KOOGLE; March 15, 2013

162

1    matrices -- matrix was created, the WA3E and WA3EE?

2         A.   9-1 of 2011.

3         Q.   That's when it was created?

4         A.   Yes.

5         Q.   Do you know why it was created on

6    September 1st, 2011?

7         A.   Yes.

8         Q.   Can you tell me why?

9         A.   That is -- at the time frame, we were

10   doing our audit review that I spoke of earlier.

11        Q.   Right.

12        A.   Where we identified there were instances

13   where a mileage-based Washington -- a mileage-paid

14   Washington driver, there were small instances where

15   the newer drivers that had come out of training were,

16   if they had a larger number of hours and a smaller

17   number of miles driven through a pay week, that their

18   rate was not sufficient to cover the overtime

19   inclusive amount.

20        Q.   So you -- you created a matrix to change

21   the mileage rates?

22        A.   Yes.

23        Q.   Okay.  Can you tell me what the changes

24   were?

25        A.   I don't have it in front of me, but I

SARAH L. KOOGLE; March 15, 2013

163

1    remember the lowest rate of the pay matrix was paying

2    25 or 26 -- 26 cents per mile, and it was changed to

3    start at 28 cents per mile.

4          Q.   Okay.  Who made the decision on the

5    increase in the starting amount?

6          A.   I'm not sure.

7          Q.   You don't know?  What department would be

8    responsible for that?

9          A.   It would come from numerous areas.  Our

10   executive team.

11         Q.   Would it be people in payroll?

12         A.   No.

13         Q.   Would it be people in human resources?

14         A.   No.

15         Q.   Can you name the -- the departments,

16   then?

17         A.   It would -- it was a decision that was

18   made without my review.  I wasn't involved in the

19   decision.  I was involved in making the change.

20         Q.   I understand.  I understand you -- you

21   implemented what you were told to -- to put in the

22   system.  But do you know what department made the

23   decisions about the increase?

24         A.   No.

25         Q.   Okay.  But you know it wasn't payroll and

SARAH L. KOOGLE; March 15, 2013

164

1   you know it wasn't HR?

2        A.   Yes.  HR doesn't make decisions on rates

3   for driver -- mileage drivers.

4        Q.   Okay.  What other departments are there?

5             MS. BRONCHETTI:  Objection; vague.  She

6   said she doesn't know what department made the

7   decision, so how does this --

8             MR. LANE:  I didn't know.  I didn't -- I

9   asked her what the other departments are.

10            MS. BRONCHETTI:  At Swift?

11            MR. LANE:  Yes, at Swift.

12            MS. BRONCHETTI:  You want to know all of

13  the departments at Swift?

14  BY MR. LANE:

15       Q.   I want to know the -- the other

16  departments at Swift that are in administration that

17  would have been responsible for -- to have anything

18  to do with the pay rates.

19       A.   I wouldn't know.

20       Q.   Wouldn't know.  Okay.  Okay.  This also

21  has a last update of March 7th of 2012.  Do you know

22  what was updated at that time?

23       A.   That's the date she keyed it into the

24  screen.

25       Q.   Okay.  Now, prior to -- prior to this

SARAH L. KOOGLE; March 15, 2013

165

1   matrix, which was dubbed, that's my words, WA3E and

2   WA3EE, which I assume means empty versus loaded,

3   correct?

4          A.   That's correct.

5          Q.   Were those -- was this one created from

6   the previous 3E and the 3EE?

7          A.   Yes, it was.

8          Q.   Okay.  And so 3E and 3EE were modified to

9   reflect a new pay matrix for Washington, correct?

10  Correct?

11              MS. BRONCHETTI:  Objection; misstates the

12  witness' testimony.

13              THE WITNESS:  What was your question?

14  BY MR. LANE:

15         Q.   So -- well, I'll try to ask it again.  So

16  WA3E and WA3EE were modifications of 3E and 3EE to

17  reflect a new pay matrix for Washington drivers,

18  correct?

19         A.   That's correct.

20         Q.   The next page -- and that may be our last

21  one on this exhibit, the D010201.  Do you have that

22  in front of you?

23         A.   Uh-huh.

24         Q.   What does this reflect?

25         A.   The short haul details.

SARAH L. KOOGLE; March 15, 2013

166

1      Q.   Okay.  Is it the -- is it the same as the

2  previous short haul details?

3      A.   Yeah.

4      Q.   Okay.  Just the "ESLIHE" under the up- --

5  update column, is that the user?"

6      A.   Yes.

7      Q.   Okay.  This is the person that pulled the

8  screen up and...

9      A.   That's the person that keyed the data in

10  the screen.

11      Q.   Keyed the data in.  I got you.  Okay.

12  Thank you.  Now, I -- I hope I have a better

13  understanding of how all that stuff is tied in

14  together, and maybe we can go faster on some other

15  ones, but I want to go to -- before we go to a

16  different client -- well, let's just --

17          MR. LANE:  Do you want to take a quick

18  break?

19          MS. BRONCHETTI:  Sure.

20          MR. LANE:  Okay.

21          THE VIDEOGRAPHER:  Going off record at

22  2:05 p.m.

23      (Recessed from 2:05 p.m. to 2:16 p.m.)

24      (Exhibit 7 was marked for identification.)

25          THE VIDEOGRAPHER:  Back on record at 2:16

SARAH L. KOOGLE; March 15, 2013

167

1    p.m.

2    BY MR. LANE:

3        Q.   Mrs. Koogle, I've handed you what we've

4    marked as Exhibit No. 7 to your deposition.  Do you

5    have that in front of you there?

6        A.   I do.

7        Q.   This appears to be the same type of

8    documents that we just looked at for Mr. Slack; is

9    that correct?

10       A.   Yes.

11       Q.   All right.  And just for the -- just for

12   the record, looks like we've got sequential pages

13   from D010294 through D010300, right?

14       A.   That's correct.

15       Q.   Okay.  A couple questions about this.

16   We're not going to go over the -- all the -- the

17   terms that we previously went over, but I wanted to

18   ask you about a couple of things.  First of all, on

19   the first page, D010294, down on line 13, it appears

20   that Mr. Dublinski, which is the client, the

21   plaintiff that is being referenced here, correct?

22       A.   Yes.

23       Q.   That he was being paid under a 3E matrix,

24   correct?

25       A.   Yes.

SARAH L. KOOGLE; March 15, 2013

168

1    Q.   All right.  On line 14 -- and by the way,

2    it looks like he had been paid under 3E, going back

3    up to line 3, which was sometime in 2003, correct?

4         A.   Yes.

5         Q.   All right.  On line 14, it appears that

6    there was a change to 3EW2, and you told me that that

7    was a recently added matrix, correct?

8         A.   No, I didn't.

9         Q.   Oh, I'm sorry.  What was the one we were

10   just talking about?

11        A.   WA3E.

12        Q.   Oh.  Oh, I'm sorry.  Anyway, at some

13   point, he was switched to 3EW2, correct?

14        A.   Yes.

15        Q.   And that applies to line 14 and 15,

16   correct?

17        A.   Yes.

18        Q.   All right.  My confusion is, again, over

19   on the effective date.  It appears that the last --

20   on line 15, whereas before, that was blank, we have

21   an effective date entered there on line 15 of April

22   14th of '09.

23        A.   Go on to the next page.

24        Q.   Okay.  Oh, okay.  I'm sorry.  That

25   explains it.  There's another page.  So going --

SARAH L. KOOGLE; March 15, 2013

169

1    okay.  That answers my question.  So going down to

2    line 18, the effective date of whatever that status

3    change was, was May the 28th of '09; is that the way

4    I would read that?

5         A.    Yes.

6         Q.    Okay.  So the May 28th of '09 would apply

7    to line 18, correct?

8         A.    Yes.

9         Q.    As when that came into effect?

10        A.    From what I can tell on the screen, yes.

11        Q.    Okay.  All right.  That's what I needed

12   to know.  When this -- on line 14, do you know when

13   the 3E -- what -- what is the 3EW2?  That's specific

14   for Grandview, I believe you told me, correct?

15        A.    Yes.

16        Q.    All right.  Do you know when that matrix

17   was created?

18        A.    No, I don't.

19        Q.    Okay.  Looking over the third page in the

20   exhibit -- it's page 296.  Under -- or over on line

21   11, that's where we see the position codes.  Do you

22   see those?

23        A.    Yes.

24        Q.    We have a new one, it appears to be

25   "LMEXDE."  What does that stand for?

170

1      A.   I'm assuming it's Hermiston, Oregon, like

2  it says in the comments next to it.

3      Q.   Hermiston?

4      A.   Hermiston, Oregon.

5      Q.   Hermiston, Oregon.  All right.  Is

6  Hermiston, Oregon a Wal-Mart dedicated terminal such

7  as Grandview?

8      A.   Not existing today.

9      Q.   Okay.

10      A.   That I -- that I'm aware of.

11      Q.   Okay.  All right.  When -- do you know

12  when that one stopped being an active terminal?

13      A.   No, I don't.

14      Q.   Okay.  Well, help me out with line 13.

15  Is he working -- is -- on line 13, is he still

16  working in the Oregon terminal, or is -- it looks

17  like he's got a new position code of GVEXWM; is that

18  a printing issue again?

19      A.   Yes.

20      Q.   Okay.

21      A.   I would need to see that HR paperwork to

22  follow the dates exactly.

23      Q.   Okay.  Because we've got three lines

24  there, 13, 14, and 15 that have that position code,

25  but 13 is 3E and the other two are 3EW.  Do you -- do

SARAH L. KOOGLE; March 15, 2013

171

1    you know, can you explain that for me?

2         A.   No, I can't.

3         Q.   Okay.  Maybe you told me, but I -- I

4    don't remember on the previous one.  Where it says,

5    "ST10" under -- for instance, at the top of the page,

6    under 11, what does that stand for?

7         A.   Stop pay.

8         Q.   Okay.  I got ya.  Down at the bottom,

9    it's got "SW10."  What does that stand for?

10        A.   That's also stop pay.

11        Q.   Okay.  Do you know what the difference is

12   between those?

13        A.   At some point, for Wal-Mart, they made a

14   change on the stop pay.  SW means it's a Wal-Mart

15   stop matrix.

16        Q.   I got ya.  Okay.  And based on our issues

17   with the lines there, you can't tell me when that

18   occurred?

19        A.   No, I can't.

20        Q.   Okay.  All right.  Look over on page

21   D010298.  Again, we have the package details which

22   was the Lotus file, correct?

23        A.   That's correct.

24        Q.   And on the next page, does -- does the

25   next page reflect the AS/400 version of the Lotus

172

1    package details?

2         A.   Yes.

3         Q.   All right.  And, again, we see this pay

4    matrix is for a position -- well, this is a pay

5    matrix of 3EW2.  We've said that's Grandview,

6    correct?

7         A.   Yes.

8         Q.   Or is that just Washington?  Is it

9    specific for Grandview?

10        A.   Yes.

11        Q.   Okay.  And the position is specific for

12   Grandview as well, correct?

13        A.   That's correct.

14        Q.   All right.  With an effective date of

15   April 1st, 2004.  And an update of March 7th --

16        A.   Yes.

17        Q.   -- 2012, which you say is the date the --

18   the date it was entered?

19        A.   Into the AS/400, yes.

20        Q.   Is it -- make sure I'm clear.  Before

21   March 7th of 2012, was there a screenshot like we see

22   here that was intended to duplicate the Lotus pages?

23        A.   No.

24        Q.   Okay.  I thought that's what you said.  I

25   just want to make sure I'm clear.  And I believe the

SARAH L. KOOGLE; March 15, 2013

173

 1    next page, the last page is the same as -- same --

 2    same basic details as the previous, Mr. Slack's,

 3    correct?

 4          A.   Yes, for short haul.

 5          Q.   All right.

 6       (Exhibit 8 was marked for identification.)

 7             MR. LANE:   This one we may need to put

 8    the pages -- I think the pages may be out of order,

 9    but, so.   Looks like I've got --

10             MS. BRONCHETTI:   You want them numbered?

11             MR. LANE:   Two, three and four are out of

12    order.   Sorry.   Okay.   Yeah, that does it.

13    BY MR. LANE:

14          Q.   Let me show you what we've marked as

15    Exhibit No. 8 to your deposition, Mrs. Koogle.   Can

16    you tell me what -- what that first page on that

17    document represents?

18          A.   Henry Ledesma's pay status rate history

19    screen.

20          Q.   Okay.   Like the previous client --

21    plaintiff's, correct?

22          A.   Yes.

23          Q.   All right.   We appear to have some

24    different matrices here, and I wanted to go over

25    those.   WCSL, what is that?

SARAH L. KOOGLE; March 15, 2013

174

1       A.    WCSL is a matrix that's used for casually

2  driving employees.

3       Q.    Okay.  Is that specific for Washington?

4       A.    No.

5       Q.    It is not.  Okay.

6       A.    That's West Coast casual.

7       Q.    West Coast casual.  Okay.  WCSLE?

8       A.    West Coast casual empty.

9       Q.    Empty?

10      A.    Empty.

11      Q.    Empty, yes.  And then, again, we -- then

12  we see down below there, somewhere around 2012, we

13  have a -- the matrices we've already talked about,

14  3EW2, WA3E, and WA3EE, correct?

15      A.    That's correct.

16      Q.    And, yes.  Let's look at the next page,

17  D010302.  What is Mr. Ledesma, plaintiff in this

18  case, what is his -- what's his -- up at the top,

19  under line 21, we have a driver code of IG- -- I'm

20  sorry, not a driver code, a position code of IGDM2W?

21      A.    He -- it seems as if he was a Grandview

22  Washington driver leader, so when he was an office

23  employee.

24      Q.    Okay.  And how was -- what was his --

25  based on this, what was his method of payment?  Is he

SARAH L. KOOGLE; March 15, 2013

175

1    a mileage base pay?

2          A.    Yes.

3          Q.    Okay.

4          A.    When driving on the driver side.

5          Q.    Okay.  Down on line 25, it appears he has

6    a hire date of April 28th of '04; is that correct?

7    Line 25 or -- see where it says "H DT"?

8          A.    It says "042804"?

9          Q.    Yes.  Is that his hire date?

10         A.    I assume so, yes.

11         Q.    Okay.  Now, looking at the other

12   positions here, we've talked about GVEXWM, correct?

13   That's Grandview specific?

14         A.    Grandview mileage -- mileage, yes,

15   Wal-Mart.

16         Q.    Grandview experienced Wal-Mart

17   mileage-based, correct?

18         A.    Right.

19         Q.    GVCAWM, is that Grandview casual?

20         A.    That's correct.

21         Q.    Wal-Mart dedicated?

22         A.    Yes.

23         Q.    Okay.  Same thing for the next one and

24   the next one, correct?

25         A.    That's correct.

SARAH L. KOOGLE; March 15, 2013

176

1      Q.   All right.  But all of those are still

2  mileage-based pay positions, correct?

3      A.   Yes, yes.

4      Q.   All right.  Well, when did he change from

5  -- if you can help me out, looking at the first page,

6  when did Mr. Ledesma change from a West Coast casual

7  pay matrix to a Wal-Mart Washington specific pay

8  matrix, 3EW2?

9      A.   On line 23?

10     Q.   I understand.  But what would have been

11  the date based on our understanding of -- of how

12  those lines work?  Would the date that that came into

13  effect would be April 29th, 2011?

14     A.   That's correct.

15     Q.   Okay.  Now, the positions that are listed

16  on the next page, D010302, are those all Washington

17  positions?

18     A.   Yes, they seem to be.

19     Q.   Okay.  Would there be any way of

20  accounting for why he's -- well, is the West Coast --

21  the West Coast casual driver matrices that we were

22  talking about, are those specific for Washington or

23  is that number of states in the west?

24     A.   That's the west -- the whole West Coast.

25     Q.   Okay.  Do -- is there any way, based on

SARAH L. KOOGLE; March 15, 2013

177

1    that pay matrices, for drivers who are in a

2    Washington position to be making a higher mileage

3    rate, all things being equal, to drivers who are

4    under this pay matrices in non-Washington positions?

5             MS. BRONCHETTI:  Objection; assumes facts

6    not in evidence, vague and ambiguous, compound.

7    BY MR. LANE:

8        Q.   Okay.  Well, I'll break it down.  I -- I

9    thought maybe we could cover several points at once.

10   But WCSL applies not only to Washington, that pay

11   matrix not only applies to Washington drivers,

12   drivers in Washington holding and Washington

13   positions, but also drivers in other western states,

14   correct?

15       A.   That's correct.

16       Q.   If Mr. Ledesma is working in any of these

17   positions we see on page 302, those are all

18   Washington-based positions, correct?

19       A.   Yes, they are.

20       Q.   And on several -- a couple of those

21   items, he's -- he's being paid under a non-Washington

22   specific pay matrix, correct?

23       A.   Just the West Coast casual matrix.

24       Q.   Yes, exactly.  So my question is:  How

25   would he be making more under the West Coast, as far

SARAH L. KOOGLE; March 15, 2013

178

1   as mileage rate, how would he be make -- making more

2   in a Washington position than any other driver in a

3   non-Washington position, all things being equal?

4        A.   All things being equal, it would be the

5   same rate.

6        Q.   Okay.  A new -- new page that we've got

7   here, D010304, and I think we've talked about one of

8   these before.  It's a position request, apparently.

9   Do you see that?

10       A.   Yes.

11       Q.   What is that about?  What's the purpose

12  of this and how was it used?

13       A.   I have no idea.  I didn't provide this.

14       Q.   Okay.

15       A.   It's an HR document.

16       Q.   Okay.  Page D010307.  Again, that's the

17  same package detail that we talked about previously,

18  correct?

19       A.   That's correct.

20       Q.   Okay.  And the next page is a -- is

21  a -- what do you call that, the 400 --

22       A.   The AS/400?

23       Q.   AS/400 representation of that pay

24  package, correct?

25       A.   Yes.

SARAH L. KOOGLE; March 15, 2013

179

1      Q.   All right.  I want to call your attention

2    to D010311.  Do you see that one?

3      A.   Yes.

4      Q.   Now, the position is GV casual Wal-Mart,

5    correct?  Grandview casual Wal-Mart?

6      A.   Yes.

7      Q.   The pay matrix is WM3E or WM3E empty,

8    correct?

9      A.   Yes.

10     Q.   This has an effective date of September

11   1st, 2011; whereas, some of those previous ones I

12   think had an effective date of April.  Do you know

13   why -- what -- what the significance of that

14   September 1st, 2011 -- well, we did talk about that

15   before, correct?

16     A.   Yes, we did in Slack.

17     Q.   And that was where you said you'd done

18   your -- I got you.  I'm sorry.  Never mind.  That was

19   done for -- for the reason that you said that you --

20   you increased the starting mileage rate?

21     A.   That is correct.

22     Q.   Okay.

23     A.   September 1st, 2011.

24        MR. LANE:  I think these are in order.

25      (Exhibit 9 was marked for identification.)

SARAH L. KOOGLE; March 15, 2013

180

1    BY MR. LANE:

2         Q.   I'm going to show you what we've marked

3    as Exhibit No. 9, Mrs. Koogle.  This appears to be

4    the same type of information that's provided for

5    plaintiff, Richard Erickson, correct?

6         A.   That's correct.

7         Q.   Okay.  Now, I just want to call your

8    attention to the second page, D010189, line 10.  I --

9    there's a position down there I don't think we've

10   talked about.  I believe we've talked about the other

11   position, haven't we?

12        A.   Uh-huh.

13        Q.   IGECTW, what is that?

14        A.   He's an also office casual, or was at

15   this time, Grandview, Washington extended coverage

16   team.

17        Q.   Okay.

18        A.   Office employee.

19        Q.   Okay.

20        A.   And then drives casual.

21        Q.   All right.  But still under the same 3EW2

22   pay matrix, correct?

23        A.   Yes.

24        Q.   For all of those positions, correct?

25        A.   Yes.

SARAH L. KOOGLE; March 15, 2013

181

1      Q.   That was a fast one.

2           MS. BRONCHETTI:  I know.  I like it.

3           MR. LANE:  My trusty assistant provided

4    me with a summary sheet on the front of each one of

5    these, but it's more of a nuisance.

6      (Exhibit 10 was marked for identification.)

7    BY MR. LANE:

8      Q.   Exhibit No. 10 to your deposition,

9    Mrs. Koogle.  Take a look at that.  Is that the

10   payroll status for Mr. -- for plaintiff, Jacob

11   Grismer?

12     A.   Yes.

13     Q.   Okay.  I don't see any new pay matrices

14   that we haven't talked about on his sheet, and I -- I

15   believe that we talked about the positions, but I

16   wanted to ask you, LMEXDE.  What was that again?

17     A.   Hermiston, Oregon.

18     Q.   Okay.  Based on the information you have

19   in front of you, can you tell me when he changed to

20   the Grandview experienced Wal-Mart position?

21     A.   I wouldn't be able to say because of the

22   way it's printed.

23     Q.   I got you.  I can't either, that's why --

24   okay.  All right.

25           MR. LANE:  Let 's move on to the next

1   one.

2        (Exhibit 11 was marked for identification.)

3   BY MR. LANE:

4        Q.   This will be Exhibit No. 11 to your

5   deposition, Mrs. Koogle.  Can you identify that for

6   me?

7        A.   Gary -- employee, Gary Roberts, status

8   changes.

9        Q.   Okay.

10       A.   Payroll status changes.

11       Q.   All right.  And, again, this appears to

12  be one of those where we've got the zeros up in the

13  first column.  I'm not really sure what that means

14  under the effective date, but -- but we've talked

15  about those pay matrices, though, correct?

16       A.   That's correct.

17       Q.   All right.  And it appears that his -- he

18  has been in the same position during the reported

19  time at the Grandview experienced Wal-Mart position,

20  correct?

21       A.   It looks as if he's always been in

22  Grandview.

23       Q.   Correct.  Yes, starts at line 1, correct?

24       A.   Yes.

25       Q.   What's his hire date?  December 14th of

SARAH L. KOOGLE; March 15, 2013

183

1    '05?

2         A.    I'm assuming that's his hire date.

3         Q.    Well, I'm looking at line 4 on the second

4    page.

5         A.    I didn't say for sure that was hire date,

6    though.

7         Q.    Okay.

8         A.    I'm assuming that's hire date.

9         Q.    Okay.  And we have a "T Dt," which I

10   believe is the termination date of 10-29-11, but

11   we'll -- we'll get that confirmed somehow else.

12   Under the 3EW2 AS/400 representation of the pay

13   package, again, it appears to show the effective date

14   of April 1st, 2004, correct?

15        A.    Right.

16        Q.    All right.  And you don't know where that

17   date comes from?

18        A.    I do not.

19        Q.    Okay.  Maybe I asked you, but do you --

20   can you tell me again who entered the information on

21   the AS/400 screen we were talking about?

22        A.    Which would be page?

23        Q.    317.

24        A.    It's -- see the user on the right side,

25   ESLIHE?

SARAH L. KOOGLE; March 15, 2013

184

1      Q.    Okay.

2      A.    It's got the date, time, and then user.

3  That's her user code.

4      Q.    And that's someone in payroll?

5      A.    Yes.

6      Q.    Okay.

7      A.    She just did the data entry and keyed in

8  the screen.

9      Q.    I got you.  I -- I guess I'm trying to

10 figure out how we -- you -- I think you indicated you

11 know where the 9-1-2011 effective date came from on

12 some of these representation -- these AS/400 pay

13 package representations, but you don't know where the

14 April 1st, 2004 date came from, correct?

15     A.    No, I don't.

16     Q.    Okay.  Now, each one of these we've

17 looked at and we've talked about are -- are pay

18 positions during the applicable claims period going

19 back to July 18th of 2008, correct?

20     A.    Yes.

21     Q.    Okay.

22     (Exhibit 12 was marked for identification.)

23 BY MR. LANE:

24     Q.    Exhibit No. 12.  I'm handing you Exhibit

25 No. 12 to your deposition.  Can you identify that one

SARAH L. KOOGLE; March 15, 2013

185

1    for me, please?

2         A.    Dennis Stuber.  Employee Dennis Stuber's

3    status changes -- payroll status changes.

4         Q.    Okay.

5              MR. LANE:  Thank you.

6              MS. BRONCHETTI:  What is this, 12?

7              THE WITNESS:  Yes.

8              MR. LANE:  Yeah, that's -- yes, 12.

9    BY MR. LANE:

10        Q.    Okay.  Looking at the first two pages, it

11   appears that we've talked -- well, no, we've got a --

12   we've got a different pay matrix here we need to talk

13   about, I suppose.  It -- it goes back to 2003, but it

14   appears that there is a pay matrix entitled, "DCH."

15   What does that stand for?

16        A.    That's for a Costco Heavy-Haul.

17        Q.    Okay.

18        A.    It's a dedicated Costco Heavy-Haul.

19        Q.    And what position would he -- he be

20   working in for that pay matrix?

21        A.    It doesn't apply to him during the time

22   period requested, but that would be a Costco

23   Heavy-Haul position code.

24        Q.    Okay.  In -- in either Seattle or Sumner?

25        A.    Costco Heavy-Haul operates in multiple

SARAH L. KOOGLE; March 15, 2013

186

1    West Coast locations.

2        Q.    Okay.   I got you.   And then as of April

3    sometime -- sometime in 2004, early 2004, he switched

4    to the 3EW2 matrix, correct?

5        A.    Yes.

6        Q.    And he was on that, as far as we know, up

7    to the present time?

8        A.    That's correct.

9        Q.    All right.   And that was in a Grandview

10   experienced driver, a Wal-Mart dedicated position,

11   correct?

12       A.    That's correct.

13       Q.    Okay.   Sorry.

14       (Exhibit 13 was marked for identification.)

15   BY MR. LANE:

16       Q.    Show you Exhibit No. 13.   Can you

17   identify that for me, please?

18       A.    Employee status change history for

19   Timothy Helmick.

20       Q.    Okay.   And, again, just for my benefit,

21   because I -- I understand it may not apply during the

22   claim period, but it appears to be a pay matrix on

23   the first page that's different than what we've seen

24   before.   "COMF" and a "COMF1" and a "COMF2."   Do you

25   see that?

SARAH L. KOOGLE; March 15, 2013

187

1        A.    Yes, I do.

2        Q.    What are those?

3        A.    They don't apply because they're out of

4    Corinne, Utah.

5        Q.    Okay.

6        A.    Those are for a Utah location, Wal-Mart

7    location.

8        Q.    Okay.  Those are Wal-Mart dedicated

9    Corinne, Utah?

10       A.    Yes.

11       Q.    Pay matrices?

12       A.    Pay matrices.

13       Q.    Okay.  And do those pay matrices still

14    exist?  Are they still being used?

15       A.    For certain employees, yes.

16       Q.    Okay.  And then 3EW2, which apparently he

17    started in June of 2005?  If I'm reading -- if I'm

18    reading it according to our understanding of the

19    dates.

20       A.    Yes.

21       Q.    That -- that -- is that the Grandview

22    specific pay matrix?

23       A.    Yes.

24       Q.    Okay.  And he's apparently been on that

25    pay matrix, as far as we know, up till now, correct?

SARAH L. KOOGLE; March 15, 2013

188

1      A.   Yes.

2      Q.   The -- on the second page where we see

3 the -- the positions, there's a new one there.  I

4 wanted to ask you about that.  WMEXCO in the last

5 line, 15, what position is that?

6      A.   Corinne, Utah, Wal-Mart experienced.

7      Q.   Okay.  And do you know why he's being

8 paid, at least as far as I can see, under a Grandview

9 Washington specific pay matrix with a driver position

10 in Utah?

11      A.   I am not sure.  Is he still employed?

12      Q.   I don't see -- on my little termination

13 date -- as of the time of printing this, I -- I --

14 I'm not aware of a termination date, so I -- I'm

15 relying on the document.  I can't really tell you off

16 the top of my head.

17      A.    It -- actually, the matrix that goes with

18 Corinne, Utah is on the next page.

19      Q.   Oh, it is?

20      A.   The WALD, WAEM.

21      Q.   I see.

22      A.   Is for the Corinne, Utah record.

23      Q.   Okay.  Okay.  So is the way you're

24 supposed to read this second page that we've been

25 talking about is to apply the -- the top lines of

SARAH L. KOOGLE; March 15, 2013

189

1   what we've been thinking of, the lines that go

2   with -- in other words, you look at what's above line

3   15 to tie it up with line 15; is that your

4   understanding?  I'm just trying to figure out why

5   this is so messed up.

6           A.   I -- I don't know.

7           Q.   You don't know?

8           A.   I wouldn't have -- like I said, I

9   wouldn't have printed it this way.

10          Q.   Okay.

11          A.   Because it wrapped in three lines.

12          Q.   As far as these pay matrices is -- are

13  concerned, WMEXCO, the Corinne, Utah Wal-Mart pay

14  matrices, when was that created?

15          A.   Is that the position code you're talking

16  about?

17          Q.   I'm sorry, the position code.  Yes.  When

18  was that -- is that -- do you know when that position

19  code was created?

20          A.   I'm not sure.

21          Q.   How about the pay matrices on WAEM and

22  WALD?

23          A.   I am not sure.

24          Q.   Okay.  Is it -- has it been recent or has

25  it been there as long as you are aware?

SARAH L. KOOGLE; March 15, 2013

190

1      A.   We purchased Corinne -- we acquired a

2  Corinne, Utah location in 2003 with an acquisition,

3  so I am not sure if that matrix, WALD, was part --

4  was created back in 2003 when we acquired Corinne or

5  when.

6      Q.   Okay.

7      A.   I would have to have the matrix in front

8  of me.

9      Q.   Okay.  All right.

10     (Exhibit 14 was marked for identification.)

11  BY MR. LANE:

12     Q.   Let's look at number -- Exhibit No. 14 to

13  your deposition.  Can you identify that for me?

14     A.   That is Robert Ullrich.  Employee Robert

15  Ullrich's pay status changes.

16     Q.   Okay.  There appears to be on the first

17  page for Mr. Ullrich a -- well, let me ask you this.

18  The driver code up there is a little unusual.  Do you

19  see that?

20     A.   Yes.

21     Q.   Do you -- do you know why he doesn't have

22  a number?

23     A.   Yes.

24     Q.   Why is that?

25     A.   Years and years ago, we used -- all of

SARAH L. KOOGLE; March 15, 2013

191

1       our driver codes were alpha.

2              Q.    Okay.

3              A.    And I don't remember what year it was

4       they converted to employee numbers that were numeric.

5              Q.    I see.

6              A.    So our old drivers that have been with

7       Swift for a long time, we didn't change their driver

8       code.

9              Q.    I see.

10             A.    So all the history would stay the same.

11             Q.    Okay.  And apparently, he was here

12      sometime before or around 2002, correct?

13             A.    Right.

14             Q.    Up until -- I -- if I'm looking at it

15      right -- I'm sorry.  I have to draw this out for

16      myself.  On the first page, I'm looking at the pay

17      matrices that he's been paid under, predominantly

18      under 3E and 3EE, correct?

19             A.    Yes.

20             Q.    For most of the years.  And then -- and

21      the end of 2006, he's -- his pay matrix changed to

22      3 -- C3E.  You see that?

23             A.    Yes.

24             Q.    What's C3E?

25             A.    It's -- that's a matrix that's under

SARAH L. KOOGLE; March 15, 2013

192

1      multiple positions, but it applied, it looked like,

2      to the Willows, California terminal.  You can see

3      that on page 374.

4              Q.   Okay.

5              A.   The line 13, LWEXVN.

6              Q.   Okay.  Okay.  Good.  Well, that blows my

7      theory about which line applies to what.

8                   Then he's back, apparently, in -- after

9      that period in California being assigned to that

10     terminal, he's back in Grandview, correct?

11             A.   Yes.

12             Q.   All right.  And he's being paid under 3E

13     and 3EEM initially, 415?  I'm sorry.  As of 3/09/08,

14     he was being paid under 3E and 3EEM, correct?

15             A.   Yes.

16             Q.   All right.  And then he -- then he was

17     switched to 3EW2, correct?

18             A.   Right.  When he moved to Grandview.

19             Q.   Well, where was he when he was being paid

20     under 3E and 3EEM?

21             A.   3E and 3EEM.  It's hard to tell from this

22     page, but it looks like the 3 -- it was either

23     Hermiston, Oregon or Willows, California.

24             Q.   Okay.  Well, I'm looking at -- and,

25     again, I'm looking at 374, second page.  We looked at

SARAH L. KOOGLE; March 15, 2013

193

1    line 13 and we associated that with the next line,

2    which was the -- the California position, correct?

3          A.   I'm not -- I'm not sure which one it

4    belongs to looking at the positions here.

5          Q.   Because it appears that he's -- the only

6    other location is Grandview for -- for each of the

7    next two matrices, correct?

8          A.   But it could be that 3E applies to

9    Wilmington -- or Willows, California, and C3E applies

10   to Hermiston, Oregon.  I would have to look at his --

11   his personnel action transactions, because I know 3E

12   has never applied to Grandview -- to a Grandview

13   position.

14         Q.   Okay.  All right.  Okay.  Well, that was

15   what was throwing me off because we associated

16   California with 3CE -- or C3E, and you're saying that

17   may be the one above, correct?

18         A.   I -- yeah, I would have to look further

19   into his records.

20         Q.   Okay.  All right.

21              (Discussion off the record.)

22              MR. LANE:  Okay.  I think they're in

23   order.  What was the last one I gave you?

24              THE WITNESS:  14.

25              MR. LANE:  Okay.

SARAH L. KOOGLE; March 15, 2013

194

1          THE WITNESS:  That's my sticker.

2          MS. BRONCHETTI:  This says 15, Ullrich.

3          THE WITNESS:  Yeah, I haven't got a 15.

4          MS. BRONCHETTI:  All right.  I'm wrong.

5          THE WITNESS:  Huh?

6          MS. BRONCHETTI:  You have them all, so...

7          THE WITNESS:  9, 8, 7, 6, 5.  I have them

8      in order.

9          MS. BRONCHETTI:  All right.

10          THE WITNESS:  10, 11, 12, 13.

11      (Exhibit 15 was marked for identification.)

12  BY MR. LANE:

13      Q.   Okay.  Let's look at what we've marked as

14  Exhibit No. 15.  Can you identify that for me?

15      A.   It's the payroll status changes for

16  Employee Sean Forney.

17      Q.   Okay.  This appears to have a different

18  set of pay matrices associated with this.  Can you --

19  can you describe or define those for me that are on

20  the first page of 320?

21      A.   SL450 is the student salary pay --

22      Q.   Now, previously --

23      A.   -- matrix.

24      Q.   I'm sorry.  Previously, we had sent a --

25  seen -- seen a rate down there of SL350.  Is there --

SARAH L. KOOGLE; March 15, 2013

195

1    do you know what the explanation is between the 350

2    and the 450?

3         A.   For salary -- for salary paid students,

4    this matrix doesn't apply to that.  No one sees that

5    matrix except for payroll.  That doesn't apply to the

6    rates that are paid.

7         Q.   Okay.  But I guess what I'm asking is:

8    Is there a difference between the SL450 and SL350?

9         A.   There's no rates tied to that code.

10        Q.   Okay.  I -- I guess what I'm saying is:

11   What is the difference between the pay matrix or

12   the -- or the -- why do you have two different codes?

13   Maybe that's the way to ask it.

14        A.   At my beginning of employment at Swift,

15   they had a salary rate of -- a different salary rate

16   for students that was for all students nationwide.

17   It was a lower rate.  And I don't know the year they

18   increased the rate, the salary pay rate, and so

19   that's when the new matrix was assigned to it.

20        Q.   Just the -- the -- the name that was

21   applied to --

22        A.   Yes.

23        Q.   -- to the -- to that class of pay?

24        A.   Of students, yes.

25        Q.   Okay.

SARAH L. KOOGLE; March 15, 2013

196

1        A.    I don't know the date, though.

2        Q.    Okay.  All right.  And then go ahead.

3   DCH, what is that?

4        A.    That's the Costco Heavy-Haul again.

5        Q.    Okay.

6        A.    And then DCHEM is the Costco Heavy-Haul

7   empty.

8        Q.    Okay.  What positions do those pay

9   matrices apply to?  Are those specific for

10  Washington?

11       A.    The DCHW and DCHWE are.

12       Q.    That's the last two?

13       A.    Yes.

14       Q.    Okay.

15       A.    So he was -- he was in Sumner, Washington

16  the whole time, and you can see the date over there,

17  9-1 of '11.

18       Q.    Right.

19       A.    Is when we changed it to a -- a specific

20  Washington matrix.

21       Q.    All right.  And can you tell me why there

22  was this -- was that when the DCHW and DCHWE was

23  created?

24       A.    Yes.

25       Q.    And was that created for the same reason

SARAH L. KOOGLE; March 15, 2013

197

1  that you gave me before, for -- for the changes that

2  occurred on September 1st, 2011?

3       A.   Yes.

4       Q.   What was -- what was the basic change

5  that occurred between DCH, DCHEM, and DCHW, and

6  DCHWE?

7       A.   It's the -- it was the starting rate,

8  like I had explained previously.

9       Q.   Starting mileage rate?

10      A.   The starting rate per mile.

11      Q.   Okay.

12      A.   I don't -- I don't know the exact rates

13  for Costco because I don't have the matrix here in

14  front of me.

15      Q.   Okay.  Okay.

16      A.   But it was -- it was increased because of

17  the change I had talked about previously.

18      Q.   Okay.  So it changed up, down, what --

19  what did the rate change?

20      A.   It increased.

21      Q.   Okay.  But you don't know how much?

22      A.   I don't know the rates.

23      Q.   Was the high end also raised?

24      A.   I don't recall.

25      Q.   Okay.  We may have some documents that

SARAH L. KOOGLE; March 15, 2013

198

1  will show that.  So we'll hopefully get to that.

2  Okay.  Looking on the second page, which shows us our

3  position -- positions, these are all Washington

4  positions, you said?

5      A.  Yes.

6      Q.  And that's -- that's for Sumner,

7  Washington?

8      A.  Yes.

9      Q.  Okay.  And it's Costco -- Costco

10  experienced?

11      A.  Yes.

12      Q.  Now, down -- down on the last -- what I

13  think is, well, the last three lines, we have a -- a

14  position code of SCTRD1.  What is that?

15      A.  That means he was moved into a Costco

16  Heavy-Haul Sumner, Washington mentor position.  He

17  was a level 1 trainer, mentor.

18      Q.  I got you.  And -- and -- and I -- what

19  that means is that in the event that he is mentoring

20  someone, he gets extra pay for that, correct?

21      A.  The level 1 mentors do not.  Level 2 and

22  a senior level mentor do get an extra -- or an extra

23  rate.

24      Q.  Okay.  Does -- does that general policy

25  apply for drivers whether they are in -- mentors, I'm

199

1    talking about, whether they are working out of a

2    Washington position or -- or other states?

3         A.   Yes.

4         Q.   It does?

5         A.   The additional rates do.

6         Q.   Okay.  The same mentoring rates apply

7    across the board, correct?

8         A.   The additional -- so they get a penny or

9    two cents more.

10        Q.   Uh-huh.

11        A.   So their -- their Washington -- the base

12   rates are different.

13        Q.   Right.

14        A.   Because they're in Washington.

15        Q.   Right.

16        A.   But the mentor additional rates when you

17   have a student on your truck --

18        Q.   Are the same?

19        A.   -- are the same nationwide?

20        Q.   I got ya.  Okay.  Help me out.  This is

21   sort of a new page.  I think we may have seen it

22   before, but I didn't ask you about it.  D010323, what

23   is that?

24        A.   That's the HR personnel transaction.

25        Q.   Are we looking at the same thing?

SARAH L. KOOGLE; March 15, 2013

200

1      A.    Yeah, 323.

2      Q.    Yeah.  That's what now?

3      A.    It's the human resources personnel

4  transaction that shows the date that the record was

5  entered, is it a new hire, a status change, a rate

6  change, what position was he in, tells us who entered

7  it.  This is what's done by our HR department.

8      Q.    Okay.  I didn't see that for all of them,

9  it just -- but is this -- is this the information

10  that you were talking about previously that -- that

11  would give us the hire date and the -- and all of

12  that?

13      A.    Yes.

14      Q.    Okay.  It doesn't show on the -- it

15  doesn't show on the position sheet that we were

16  looking at, the additional information sheet, but on

17  this sheet, 323, it appears that he was hired to

18  position SUTEDE.  Do you see that on page 323?

19      A.    Yes.

20      Q.    What is that?

21      A.    A student Sumner, Washington trainee

22  position.

23      Q.    Do you know why that's not -- or did I

24  just miss it?

25      A.    No, I don't see it on here either.

201

1      Q.    Okay.

2      A.    I see the matrix, the student matrix, but

3  the position is SCEXDE.

4      Q.    Yeah.

5      A.    His trainee flag is yes on that page 321.

6      Q.    Okay.  Right.  Okay.  That just

7  further -- further confuses us on that page, I think.

8  Okay.  Looking down on that same page, 323, under

9  description, do you know where it says

10  "Curr/Home/SUTA"?

11      A.    Current state, home state, and SUTA

12  state, Washington, Washington, Washington.

13      Q.    Okay.  And -- okay.

14      A.    It's all for tax purposes.

15      Q.    Okay.

16      A.    To attract wage bases and things.

17      Q.    And is that information that's stored on

18  every driver?

19      A.    I'm not sure.

20      Q.    Okay.

21      A.    It's keyed by HR.

22      Q.    Do you know who -- who -- who printed

23  this sheet out?

24      A.    I don't know.

25      Q.    Was there a -- is there a code on here

SARAH L. KOOGLE; March 15, 2013

202

1    for a user?

2        A.   I'm assuming it's the same user because

3    the dates are the same on the previous pages,

4    "8/22/12."

5        Q.   Okay.  And this "ROSAVA" user, she's

6    in -- she's in payroll, correct?

7        A.   Yes.

8        Q.   So this sheet that we're looking at, 323,

9    would be something that payroll has access to?

10       A.   We have access to it, yes.

11       Q.   Okay.

12       A.   We don't key it.

13       Q.   Okay.  I got you.  You can print it out,

14   though?

15       A.   Yes.

16       Q.   As -- as we see?

17       A.   Yes.

18       Q.   So when it says "Curr" Washington, what

19   does that mean?  What does "Curr" mean?

20       A.   Current state.  I'm not sure.  You would

21   have to ask HR.

22       Q.   And same thing for "Home," what does that

23   mean to you?

24       A.   I don't know.

25       Q.   Okay.

SARAH L. KOOGLE; March 15, 2013

203

1      A.    I would be assuming.

2      Q.    And then you said "SUTA" stands for what?

3      A.    The SUTA state, so Social Security.

4      Q.    I got ya.  Okay.  Are those fields that

5    you can search for, those -- those fields we just

6    talked about?

7      A.    I -- I don't have the ability to do that.

8    I personally don't.

9      Q.    You personally don't?

10     A.    No.

11     Q.    I mean, is that something that someone in

12   your -- your department could do?

13     A.    No.

14     Q.    I mean, does IT have to do that or HR?

15     A.    Or human -- I'm not sure if human

16   resources would, but HR would (sic).

17     Q.    Okay.

18     A.    I mean, IT would.

19     Q.    IT would, yes.  Now, looking over at 325

20   on Mr. Forney's paperwork again, this is the -- what

21   we talked about before, right, where it's the

22   representation of the Lotus pay package?

23     A.    Yes.

24     Q.    And this is talking about the salary

25   during the time that he's a student, correct?

SARAH L. KOOGLE; March 15, 2013

204

1          A.   Yes.

2          Q.   Where it says, "Pay Rate...:  450.00."

3     Is that $450?

4          A.   Yes.

5          Q.   All right.  And that's automated, it

6     says, correct?

7          A.   The pay rate is automated, yes.

8          Q.   Okay.  Is that your understanding that's

9     what applied during the time that -- that Mr. Forney

10    was going through the training based on this

11    documentation?

12         A.   Yes.

13         Q.   Okay.  Is there any way for you and

14    payroll to manually change that?

15         A.   To manually change?

16         Q.   Change that automated function.

17         A.   No, it's an IT automated function.

18         Q.   Okay.

19         A.   The flag on there is us keying it in.

20         Q.   Of the yes or no?

21         A.   Yes.

22         Q.   Okay.

23              MR. LANE:  Okay.  Time?  Break?

24              THE VIDEOGRAPHER:  We have like two

25    minutes left.

205

1          MR. LANE:  Okay.

2          THE VIDEOGRAPHER:  This marks the end of

3  Disk 3.  Off record at 3:13 p.m.

4      (Recessed from 3:13 p.m. to 3:27 p.m.)

5          THE VIDEOGRAPHER:  This is the start of

6  Disk 4 in the deposition of Sarah Koogle.  Back on

7  record at 3:27 p.m.

8      (Exhibit 16 was marked for identification.)

9  BY MR. LANE:

10         Q.   Mrs. Koogle, I've handed you Exhibit

11 number 16 to your deposition.  And I believe this is

12 just a compilation of a number of -- these are

13 sequentially numbered.  We'll go through this.  It's

14 not any particular grouping, but I -- I think we can

15 -- we can get through it as a composite Exhibit 16.

16 What is the first page we're looking at here?

17         A.   It's a pay package.

18         Q.   Okay.  It has an effective date of

19 September 8th of 2008; is that correct?

20         A.   Yes.

21         Q.   All right.  A unit division number of

22 585, correct?

23         A.   That's correct.

24         Q.   What does that mean again?  What's the

25 unit?

206

1              (Cellphone interruption.)

2              THE WITNESS:  The unit --

3              THE REPORTER:  What was your question?

4              MR. LANE:  Sorry.

5              MS. BRONCHETTI:  Sorry.

6              MR. LANE:  Was that you?

7              MS. BRONCHETTI:  Yes.

8              MR. LANE:  Oh, I thought it was a

9    doorbell.

10   BY MR. LANE:

11        Q.   My question was:  What does that unit

12   division number 585 stand for?

13        A.   That's the division number for the units

14   that are assigned to this account.

15        Q.   The units that are assigned to this

16   account -- account.

17        A.   The tractors.

18        Q.   Can you explain?

19        A.   The tractor -- the truck that the

20   driver -- the driver drives, it's the division that

21   is assigned to Wal-Mart, or division that's assigned

22   to Costco or a flatbed or a Heavy-Haul.

23        Q.   Okay.

24        A.   It doesn't have anything to do with

25   payroll.  It's the unit.

SARAH L. KOOGLE; March 15, 2013

207

1      Q.   Okay.  Looking at -- at -- this has an

2   effective date of September 8, 2008, and it's got

3   "position" down here.  You see it down below there?

4      A.   Yes.

5      Q.   It looks like it has several positions.

6   This is a little different format than what we've

7   seen previously, and that's why I wanted to go over

8   this.  What are all those positions?  Are -- are

9   those all new positions?

10     A.   I don't -- I don't -- I really don't know

11  what they are without the order of what they came in,

12  like, the pages that went before this.  Without

13  having the front page that would show me what account

14  it is, it would just be a guess of what the positions

15  are.

16     Q.   Okay.  Well, WATRW1, have you seen that

17  position before?

18     A.   I've seen it before, but we have

19  thousands of position codes.  So to know for sure

20  that that's a Wal-Mart position or a Costco position,

21  I wouldn't know off the top of my head.  It's a

22  mentor level 1.  The "TR" in the middle tells you

23  it's a trainer position.

24     Q.   Okay.

25     A.   The 1, 2, or S at the end tells you if

SARAH L. KOOGLE; March 15, 2013

208

1    it's a level 1, level 2, or a senior trainer

2    position.

3         Q.   Okay.  Which says the -- the first three

4    of those have that notation, correct?

5         A.   Right.  The WMCACO is a casual position,

6    but, again, I'm assuming it's Wal-Mart.  I don't know

7    for sure.  And then W- -- WMEXCO would be a standard

8    mileage experienced.

9         Q.   Right.  I believe we talked about the

10   WMEXCO previously.  That was Corinne, Utah, correct?

11        A.   I would have to look.

12        Q.   Okay.

13        A.   Yes, it is.

14        Q.   Okay.

15        A.   It's on Timothy Helmick's record.

16        Q.   Right.  And the WMCACO, based on the --

17   the general way those acronyms work, would it be safe

18   to say that's a casual driver in Corinne?

19        A.   It's a casual position.

20        Q.   Okay.  And Corinne is Wal-Mart, correct?

21        A.   Yes.

22        Q.   All right.  The pay matrices -- the pay

23   matrices that are on the right-hand side, can you

24   explain what is meant by that?  It looks like it's

25   WALD.

SARAH L. KOOGLE; March 15, 2013

209

1        A.    WALD is loaded.  WAEM is empty.

2        Q.    Okay.

3        A.    WA2LD is level 2 mentor loaded, WA2EM is

4   a level 2 mentor empty, and WASLD is senior level

5   mentor loaded, and then WASEM is a senior level

6   empty.

7        Q.    Do you know whether or not these pay

8   matrices are location specific?

9        A.    Those specifically, no, I don't know.

10       Q.    You don't know?

11       A.    Without doing research.

12       Q.    Okay.  The way this -- these package

13  details have been structured, would all of those pay

14  matrices apply that pay rate range of 27 cents to 36

15  cents?

16       A.    I would have to look to see.

17       Q.    Okay.  Look down at the payroll comments.

18  These are comments -- well, are those payroll

19  comments?  They're under the payroll comment.

20       A.    Yes, they're payroll comments.

21       Q.    Okay.  Does that explain the relationship

22  between the positions in the pay matrices up above?

23  It says, "Position WMEXCO, WMCACO and W ATRW1

24  assigned to matrix WALD and WAEM," correct?

25       A.    Yes.

SARAH L. KOOGLE; March 15, 2013

210

1    Q.   All right.  What does that mean to you?

2    A.   That means the standard experience WMEXCO

3    matrix, the casual matrix, and the level 1 mentor --

4    or position, I'm sorry, positions are assigned to

5    those two pay matrices that are at the end of the

6    sentence there.

7    Q.   Okay.  And, again, when we're talking

8    about the pay matrices for -- that's for

9    mileage-based pay for drivers, correct?

10   A.   Yes.

11   Q.   Okay.  "Position WATRW2 assigned to

12   matrix WA2LD (loaded) and WA2EM," which is empty,

13   correct?

14   A.   Right.

15   Q.   All right.  So that tells you how those

16   are related, correct?

17   A.   Right.

18   Q.   WATRWS is assigned to matrix WASLD and

19   WASEM.  Again, that gives you the relationship or how

20   this package detail is -- the relationship between

21   the position in the matrix, correct?

22   A.   That's correct.

23   Q.   All right.  Okay.  But as you sit here,

24   you don't know whether or not this pay rate -- this

25   pay matrix mileage rate range up here applies to all

211

1    of those, correct?

2          A.    No, I don't.

3          Q.    Well, the next page maybe helps us a

4    little bit on that.  Do you see page 357?

5          A.    Yes.

6          Q.    WMEXCO, which is one of our positions on

7    the previous page?

8          A.    Yeah.

9          Q.    Is -- is this an example of the AS/400

10   representation?

11         A.    That's the AS/400 representation for the

12   pay matrix COMF though.

13         Q.    Oh, okay.  What is COMF?

14         A.    That is a -- that was the Corinne, Utah

15   account that was acquired in 2003, and that's the

16   dedicated -- or that's the grandfathered pay matrix

17   that came over in that acquisition.

18         Q.    Okay.  All right.

19         A.    That's why it's not on this front page

20   that you were just going over.

21         Q.    Okay.  But as of the effective date of --

22   well, let me ask you, when it says the effective date

23   of September 8, 2008, with a pay rate down there of

24   27 cents a mile, is that the pay rate as of 2008 or

25   is it when it was last updated?

SARAH L. KOOGLE; March 15, 2013

212

1        A.    I don't know.

2        Q.    Okay.

3        A.    The matrix is what ties the actual

4   effective date.  The matrix page.  I -- I think we've

5   provided those also.

6        Q.    Yeah, we're about to look at those.  I

7   just wanted to get through this.  I -- I don't see

8   anything that we haven't talked about yet in the

9   subsequent pages.  Have you seen anything yet as far

10  as the pay matrix and the positions?

11       A.    No, they're all the same.

12       Q.    Okay.  We've talked about all of those,

13  correct?

14       A.    Yep.

15       Q.    Okay.

16    (Exhibit 17 was marked for identification.)

17  BY MR. LANE:

18       Q.    Let me show you Exhibit No. 17.  And the

19  reason I wanted to talk to you about this is, I don't

20  think we've talked about a position request.  That --

21  that -- that is apparently what this is?

22       A.    Yeah, it was on Erickson or one of the

23  other guys.  This is the document that's provided by

24  HR for office employees.

25       Q.    Okay.  Okay.

SARAH L. KOOGLE; March 15, 2013

213

```
1          A.   This is a driver manager Wal-Mart office

2     employee position.

3          Q.   Okay.

4          A.   We don't see these.  I didn't provide

5     this.

6          Q.   Okay.  All right.  Okay.

7        (Exhibit 18 was marked for identification.)

8     BY MR. LANE:

9          Q.   I think these are -- these are different

10    pages.  I thought they were all the same, but they're

11    not.  Well, they're different numbers, but they're

12    the same exhibit, the same thing.  Let me show you

13    what I've marked as Exhibit No. 18.

14             MR. LANE:  And I'll -- and I'll give you

15    exactly the same thing.  It's got a different Bates

16    stamped number on the bottom.

17             MS. BRONCHETTI:  It's the same thing?

18             MR. LANE:  It's just -- it's the same

19    document.  Now, what did I just --

20    what -- what --

21             MS. BRONCHETTI:  This is already an

22    exhibit.

23             THE WITNESS:  It's in all of these

24    exhibits.

25             MS. BRONCHETTI:  Yeah, we've already gone
```

SARAH L. KOOGLE; March 15, 2013

214

1    through this, like, several times.

2            MR. LANE:  Well, I -- I think we have.  I

3    just wanted to make sure.

4    BY MR. LANE:

5        Q.   Did we talk about a pay matrix -- well,

6    yes, we did.  The 3EW2, when was that created?

7        A.   I can't tell from this sheet.

8        Q.   Okay.  Yesterday, we marked an exhibit in

9    Ms. Rohwer's deposition, Exhibit No. 3, and I don't

10   believe she could answer the questions about --

11   about -- that I posed from that exhibit, and I wanted

12   to see if I could get you to take a look at that for

13   me.

14       A.   Okay.

15       Q.   Rohwer Exhibit No. 3.  Can you tell me

16   what that is, first of all?

17       A.   A pay statement for Gary H. Roberts.

18       Q.   Okay.  Now, down at the bottom of that

19   statement, what's the -- what's the Bates stamp

20   number on that, by the way?

21            MS. BRONCHETTI:  3037.

22   BY MR. LANE:

23       Q.   3037.  There's some fine print, which I'm

24   not going to try to read, but do you know anything

25   about when that information was added?

SARAH L. KOOGLE; March 15, 2013

215

1        A.    No, I don't.

2        Q.    You don't?  Do -- do you remember it

3   being added, even though you may not remember when?

4        A.    Yes, I do.

5        Q.    Do you know who added it?

6        A.    Our IT group did.

7        Q.    Your IT group did.  Was that done within

8   the last year, two years?  What --

9        A.    I -- I don't know when exactly.

10        Q.    Okay.  Did your department have any input

11   into the language that was put into that though?

12        A.    We did not have any input at all.

13        Q.    Okay.  Do you know who was responsible

14   for that language?

15             MS. BRONCHETTI:  Objection; calls for

16   attorney-client privileged information.

17   BY MR. LANE:

18        Q.    Well, do you know if anyone in the

19   company, other than a lawyer, was responsible for the

20   language?

21        A.    I wouldn't know that.

22        Q.    Okay.  Do you know why it was added?

23        A.    No, I don't.

24        Q.    All right.

25        (Exhibit 19 was marked for identification.)

SARAH L. KOOGLE; March 15, 2013

216

1    BY MR. LANE:

2        Q.    Let me show you what I've marked as

3    Exhibit No. 19.  Can you identify that for me?

4        A.    The Swift Transportation linehaul driver

5    pay plan.

6        Q.    This says it was revised on -- at the

7    bottom right-hand corner, it's got a revision date of

8    May 23rd, 2012; is that correct?

9        A.    Yes, according to the document.

10       Q.    Do you know what was -- what was changed

11   from whatever the previous version was?

12       A.    I do not because this is not complete.

13       Q.    Okay.  What should go with that?  I may

14   have it here.

15       A.    The --

16       Q.    I just don't know what goes with it.

17       A.    That right there.  You're holding it in

18   your hand, in your left hand.

19       Q.    Okay.

20       A.    It's the one with the effective date

21   April 27th, '09 at the top.

22       Q.    From what I can see, it says, August

23   25th, effective August 25th.  Let's see if I can find

24   one with a description.

25       A.    No, there's a one effective 4/27/09.

217

1      Q.   Tell you what I'll do, I'll hand you

2  everything I've got.

3           MR. LANE:  We'll mark it, and I'll hand

4  you everything I've got, and you can help me sort it

5  out.

6      (Exhibit 20 was marked for identification.)

7  BY MR. LANE:

8           Q.   Exhibit No. 20, can you tell me what that

9  is?

10     A.   It's the linehaul driver pay plan that

11 was effective December 1st of '06.

12          Q.   I'm sorry, tell me that again, please.

13          A.   Linehaul driver pay plan, effective date

14 Jan- -- or December 1st of '06.

15          Q.   I think I may have given you my last

16 copy.  We marked one yesterday, I think, and I don't

17 have any more copies.  Can I look at that?

18          A.   Uh-huh.

19          Q.   Now, do -- looking at Exhibit No. 20 --

20          MS. BRONCHETTI:  Wait.  I'm sorry, I need

21 to have a copy of that.  If you don't have one --

22          MR. LANE:  I handed you a copy.  That's

23 it.

24          MS. BRONCHETTI:  Well, no, and you -- but

25 then you took the witness' copy.

SARAH L. KOOGLE; March 15, 2013

218

1           THE WITNESS:  We're sharing.

2           MR. LANE:  I'm sorry.  Okay.

3           MS. BRONCHETTI:  So --

4           MR. LANE:  There's probably one in this

5    stack, and I think we marked it yesterday.

6           MS. BRONCHETTI:  All right.  I have one.

7           MR. LANE:  You do?  Here, why don't you

8    use this one, just in case I get the urge to write on

9    it.  Thank you.

10   BY MR. LANE:

11       Q.   Okay.  We're looking at Exhibit No. 20,

12   correct?

13       A.   You have document 225 at the bottom?

14       Q.   Yes.

15       A.   Yes.

16       Q.   And -- and a second page, 226, correct?

17       A.   That's correct.

18       Q.   Okay.  What is this?  This is a linehaul

19   driver pay plan?

20       A.   That's correct.

21       Q.   And it was effective 12-1-2006?

22       A.   Yes.

23       Q.   Did -- did this pay plan apply to any

24   Washington assigned or Washington positioned Swift

25   drivers when it was effective in 2006?

SARAH L. KOOGLE; March 15, 2013

219

1    A.   Washington mileage paid?

2    Q.   Yes, Washington mileage paid.

3    A.   Yes.

4    Q.   Which mileage-paid Washington drivers did

5  it apply to?

6    A.   It applied to numerous drivers.

7    Q.   Okay.  Which ones did it not apply to who

8  were paid by the mile?

9    A.   I would have to do an individual check,

10  but Wal-Mart, for sure, Costco, Heavy-Haul, for sure,

11  and I'm not sure who else.

12    Q.   Okay.  The rest of the linehaul drivers

13  driving in Washington assigned to Washington

14  positions, this would apply to?

15    A.   Yes.

16    Q.   Okay.  Is there any indication on this

17  sheet for the mileage rates that would indicate that

18  Washington assigned or positioned drivers were being

19  paid more in the mileage rate than other drivers that

20  this applied to who were not Washington-positioned

21  drivers?

22    A.   No.

23    Q.   Okay.  Are you aware of anything that

24  would have documented that distinction?

25         MS. BRONCHETTI:  Objection; overbroad,

SARAH L. KOOGLE; March 15, 2013

220

1   vague.

2   BY MR. LANE:

3        Q.   Are you aware of any documentation during

4   this time, effective 12-1-2006, that would have

5   documented Washington mileage-based drivers, linehaul

6   drivers, who were making more per mile different than

7   what we see on this scale right here?

8        A.   More per mile for what?

9        Q.   Well, that would be -- that would -- that

10  would show a different mileage rate, all things being

11  equal, for -- because they were Washington-positioned

12  drivers?

13          MS. BRONCHETTI:  Objection; vague,

14  overbroad.

15  BY MR. LANE:

16       Q.   Do you understand -- I'm asking you,

17  you've indicated that on Exhibit No. 20, that there

18  is no different set of -- of mileage rates that apply

19  to the Washington-assigned drivers, correct?

20       A.   Correct.

21       Q.   They would be paid under the same matrix

22  that -- this same matrix that

23  non-Washington-positioned drivers would be paid on,

24  correct?

25          MS. BRONCHETTI:  Objection; misstates,

SARAH L. KOOGLE; March 15, 2013

221

1    overbroad, incomplete hypothetical.

2    BY MR. LANE:

3         Q.    In terms of the mileage pay plan, was

4    there different mileage pay plan than the one we see

5    here of the linehaul driver pay plan that applied to

6    Washington-positioned drivers who were doing the same

7    linehaul driver position?

8         A.    Repeat your question.

9         Q.    Is there something that we don't know

10   about that would show a different mileage range, mile

11   rate range for Washington-positioned drivers during

12   this effective period of 12-1-2006?

13        A.    No.

14        Q.    Okay.  So they would be paid the same,

15   all things being equal, experience level being the

16   main factor over here in terms of the mileage rate,

17   correct?

18             MS. BRONCHETTI:  Objection; incomplete

19   hypothetical.

20   BY MR. LANE:

21        Q.    Am I reading the -- am I reading the form

22   correct when it -- when I -- when it shows that the

23   driving experience on the left-hand column of this

24   matrix is the primary variable that determines which

25   mileage rate applies to each driver in each one of

SARAH L. KOOGLE; March 15, 2013

222

1    these zones?

2            MS. BRONCHETTI:  Objection; overbroad,

3    vague.

4    BY MR. LANE:

5        Q.   Can you answer the question?

6        A.   No.

7        Q.   Is there --

8            MS. BRONCHETTI:  Joe, let me help --

9    here's my problem, and I'm not trying to be

10   difficult, but we've -- we've spent hours today going

11   over these pay plans, and the way your question is

12   phrased is you're saying that, quote, "All things

13   being equal, people are going to be paid the same."

14   Sarah has spent hours today testifying about all the

15   additional pay that is on top of the mileage-based

16   rate.

17           MR. LANE:  Yeah, that's not what we're

18   talking about, and you know, I'm talking about the

19   mileage rate.

20           MS. BRONCHETTI:  No, I don't.  From your

21   question, I don't.

22           MR. LANE:  Okay.

23           MS. BRONCHETTI:  That's the problem.

24   That's why I'm objecting.

25           MR. LANE:  I mean, I prefaced -- I

SARAH L. KOOGLE; March 15, 2013

223

1   included -- that was in every question I asked, I was

2   talking about the mileage rate.  I said mileage rate.

3            MS. BRONCHETTI:  But then you said, "All

4   things being equal, are they paid the same?"  And

5   that's not a fair question.

6            MR. LANE:  Okay.  Let's break it down

7   because I want to be fair.

8   BY MR. LANE:

9        Q.   A driver in Washington who you've told me

10  that these -- this linehaul driver pay plan would

11  apply to, if he's driving out of Washington and he's

12  got three -- three months of experience, would he

13  make a different mileage rate than a non- -- a

14  California linehaul driver driving for Swift with the

15  same experience level?

16       A.   Based on the other variations, he

17  possibly could.

18       Q.   Based on what?

19       A.   Length of haul.

20       Q.   No, no, no.  I -- I'm talking about the

21  same mileage, the same -- every -- I'm looking at the

22  matrix.  With regards to the variables on this

23  matrix, is there any indication that mileage for

24  Washington-positioned drivers would be higher than

25  anyone else's?

SARAH L. KOOGLE; March 15, 2013

224

1          A.   During this time frame?

2          Q.   Yes.

3          A.   No.

4          Q.   Okay.  And you're not aware of any other

5     documentation that would show that, correct?

6          A.   During this time frame?

7          Q.   Yes.

8          A.   No.

9          Q.   All right.

10         (Exhibit 21 was marked for identification.)

11              MR. LANE:  I'm going to show you -- I

12    don't think I have any more, but Exhibit No. 21.

13    Again, I think we used -- I used my only copies on

14    this.  I'm sorry.

15              MS. BRONCHETTI:  Well, can you tell me

16    what I'm looking for so I can see if I have it?

17              MR. LANE:  It's this -- it's this one

18    that's got an effective date of 12-1-2006, which is

19    the same one, I believe, but I just want to confirm

20    that.

21              MS. BRONCHETTI:  I don't -- what's the --

22              MR. LANE:  I mean, it's a different

23    printout, so that's why I don't know.

24              MS. BRONCHETTI:  What's the Bates stamp

25    number?

SARAH L. KOOGLE; March 15, 2013

225

1          MR. LANE:  The Bates stamp number --

2     well...

3          THE WITNESS:  It doesn't have it.

4          MR. LANE:  I don't see one on mine.

5          MS. BRONCHETTI:  It's a different

6     document.

7          MR. LANE:  Yeah.  Do you want me to make

8     you a copy?  I'll make you a copy.

9          MS. BRONCHETTI:  That would be

10    delightful.

11         MR. LANE:  I'm sorry.

12         MS. BRONCHETTI:  That's okay.

13         THE VIDEOGRAPHER:  Going off record?

14         MS. BRONCHETTI:  Sure.

15         THE VIDEOGRAPHER:  Off record?  Off

16    record at 3:52 p.m.

17         (Recessed from 3:52 p.m. to 3:56 p.m.)

18         THE VIDEOGRAPHER:  Back on record at 3:56

19    p.m.

20    BY MR. LANE:

21         Q.   Okay.  Mrs. Koogle, I've handed you what

22    we've marked as Exhibit No. 21.  Do you recognize

23    that document?

24         A.   I cannot say that I do recognize this

25    document.

SARAH L. KOOGLE; March 15, 2013

226

1    Q.   Okay.  How is it -- how is it different

2    than the Exhibit No. 20 that we looked at?

3              MS. BRONCHETTI:  Objection; the document

4    speaks for itself.

5              THE WITNESS:  Exhibit --

6    BY MR. LANE:

7    Q.   Well, what I'm saying, do you -- do you

8    know if there's -- if there's any difference in the

9    pay matrices?  I don't see any, but that's...

10             MS. BRONCHETTI:  Well, I mean, that

11   misrepresents the document, Joe.  I mean, it's -- the

12   actual chart itself; is that your question?

13             MR. LANE:  The actual, the matrix, yes.

14   This, the matrix.

15   BY MR. LANE:

16   Q.   Is this the same effective 12-1-2006?  It

17   says it's effective 12-1 of 2006.  Does it appear to

18   be the same matrix to you?

19   A.   No.

20   Q.   It isn't?

21   A.   No.

22   Q.   Okay.  What's different?

23   A.   The entire first column here that says,

24   zero to one -- 01 to 24 miles is missing off of the

25   document, Exhibit 21, you gave me.

SARAH L. KOOGLE; March 15, 2013

227

1      Q.   Okay.  Yeah.  Okay.  All right.  Do you

2   have any explanation for that?

3      A.   No, I don't know where this came from.

4      Q.   Okay.  Do the other columns appear to be

5   the same wages and the same pay?

6      A.   I would have to go each -- through each

7   one.

8      Q.   Okay.  Well, like your lawyer said, it

9   speaks for itself.

10          MR. LANE:  Okay.  Let's look at what

11   we'll mark as Exhibit No. 22.

12       (Exhibit 22 was marked for identification.)

13   BY MR. LANE:

14      Q.   Do you recognize that document?

15      A.   I do not.  It looks like a blown-up

16   version of the next page.

17      Q.   You know what, I -- actually, I think

18   those are mismatched again because there's -- this --

19   this page is exactly the same as the previous one,

20   the second page, 25, is the same as what we've

21   previously marked.

22          MS. BRONCHETTI:  No, it isn't.

23          MR. LANE:  It's only the first page --

24   beg your pardon?

25          MS. BRONCHETTI:  No, it isn't.

SARAH L. KOOGLE; March 15, 2013

228

1          MR. LANE:  Okay.  Well, I'll tell you

2    what, let's take a look at it.  I think it is.

3          THE WITNESS:  So he has exhibit --

4          MR. LANE:  Exhibit 20 is the same.

5          THE WITNESS:  Yes.

6          MS. BRONCHETTI:  No, it's not.  As this?

7          MR. LANE:  Not the first page, the second

8    page.

9          MS. BRONCHETTI:  Oh, the second.

10          THE WITNESS:  Okay.

11          MR. LANE:  In other words, the second

12    page we've already marked, the second and third.

13          MS. BRONCHETTI:  Yeah, we've already been

14    through that.

15          MR. LANE:  It's just the front page is

16    the only thing --

17          MS. BRONCHETTI:  Right.

18          MR. LANE:  -- that's different.

19          MS. BRONCHETTI:  Correct.

20          MR. LANE:  I guess what I'm saying is I

21    mis-stapled it.  That's been stapled incorrectly.

22    There you go.

23    BY MR. LANE:

24          Q.   This is -- Exhibit No. 22, I think I've

25    tried to correct it, is one page, D010224.  Is that

SARAH L. KOOGLE; March 15, 2013

229

1      what you've got?

2            A.   Yes.

3            Q.   Okay.  It appears to be another matrix

4      similar to what we saw before, but with different

5      mileage rates, correct?

6            A.   Right.

7            Q.   Down in the bottom right-hand side, above

8      the Bates number, there's a date, "5/23/12."  Do you

9      know what that represents?

10           A.   I do not.

11           Q.   Okay.  Has the linehaul, looking back at

12      Exhibit No. 20.  Has the linehaul driver pay plan

13      that we talked about on Exhibit 20, the -- the -- the

14      scale been changed for Washington assigned drivers

15      since the effective date of this driver pay plan

16      dated 12-1-06?

17                 MS. BRONCHETTI:  Objection; vague and

18      ambiguous, asked and answered.

19                 THE WITNESS:  Can you ask your question

20      again?

21      BY MR. LANE:

22           Q.   Yes.  We talked about that as of

23      12-1-2006, this was the linehaul drive -- driver pay

24      plan matrix that applied to Washington-positioned

25      drivers as well as other linehaul drivers with Swift,

SARAH L. KOOGLE; March 15, 2013

230

1    correct?

2         A.   Yes.

3         Q.   Okay.  Since -- since the effective date

4    of this linehaul driver pay plan, are you aware of

5    changes that have been made to this matrix -- this

6    mileage rate matrix that applies only to

7    Washington-positioned linehaul drivers?

8         A.   Yes.

9         Q.   When did that occur?

10        A.   September 1st, 2011.

11        Q.   September, same date that we talked about

12   previously?

13        A.   Yes.

14        Q.   How was it -- how was it changed?

15        A.   I wouldn't know for sure without having

16   it in front of me.

17        Q.   Okay.  And is it now for linehaul

18   drivers, for Washington-assigned linehaul drivers are

19   no longer paid on the same linehaul driver pay plan

20   mileage matrix as they were prior to September 1st,

21   2011, correct?

22        A.   I didn't understand your question.

23        Q.   Okay.  I -- I don't -- I don't blame you.

24   My question is:  After that change occurred, is that

25   the first time that the linehaul drivers that are

SARAH L. KOOGLE; March 15, 2013

231

1    Washington positioned were paid under a totally

2    separate linehaul driver mileage rate matrix?

3              MS. BRONCHETTI:  Objection; misstates.

4              MR. LANE:  It's a question.  I'm not

5    misstating anything.

6    BY MR. LANE:

7        Q.   I'm saying after that change you just

8    told me about, September 11th -- excuse me.

9        A.   September 1st, 2011.

10       Q.   September 1st, 2011, after that change,

11   is that the first time that there was a specific

12   mileage matrix for linehaul drivers that was intended

13   specifically for Washington assigned drivers?

14             MS. BRONCHETTI:  Objection.  Joe, the

15   problem is she never said there was a different

16   matrix.  She said the rate increase for starting

17   drivers.  So you're -- you're saying that there's a

18   different matrix.  There's not.

19   BY MR. LANE:

20       Q.   Okay.  Well, let me ask it this way,

21   then, because I -- I thought we were talking about a

22   separate -- that the matrix had changed after

23   September 1st, 2011.

24       A.   The matrix code?

25       Q.   No, the matrix.  The actual mileage

SARAH L. KOOGLE; March 15, 2013

232

1   matrix changed after September 1st, 2011; is that

2   correct?

3        A.   There was a -- there was a Washington

4   linehaul mileage pay matrix created, a new code

5   created on September 1st of 2011, so it was assigned

6   to only Washington mileage-paid drivers.

7        Q.   Okay.  Prior to that time, did -- did

8   those drivers have their own separate mileage matrix

9   that applied only to them?

10       A.   No.

11       Q.   Okay.  They were paid under the same one

12  that we've been talking about, correct?

13       A.   Yes.

14       Q.   Okay.  Now, did the -- did that change,

15  that creation of a separate Washington-based

16  Washington driver matrix change the mileage rates

17  that applied to those drivers assigned to Washington?

18       A.   Can you repeat that question?

19       Q.   Well --

20            MS. BRONCHETTI:  You've already answered

21  it.

22  BY MR. LANE:

23       Q.   -- we don't have the document in front of

24  us because I, apparently, don't have one with me.

25  But can you tell me, did all of the mileage rates

SARAH L. KOOGLE; March 15, 2013

233

1    change on the matrix for those Washington drivers?

2         A.    I would have to have it in front of me.

3         Q.    Okay.  All right.  But there's the first

4    time, that you -- you're aware of, that there was any

5    separate matrix such as we see on Exhibit 20

6    specifically for Washington drivers, correct?

7         A.    As of 9-1-11.

8         Q.    Okay.  Now, going back to Exhibit No. 19,

9    you had indicated that wasn't complete.  Have you

10   seen any document that this Exhibit 19 goes with?

11        A.    Yeah, it goes with this one.

12        Q.    Okay.

13        A.    The numbers at the bottom are even

14   sequential.  It goes 19 and 22.

15        Q.    Oh, okay.  This goes in front of --

16        A.    That's correct.

17        Q.    I got ya.  Okay.

18        A.    But 22's not complete either.

19        Q.    Where's 22?

20             MS. BRONCHETTI:  This.

21             THE WITNESS:  Exhibit 22.

22   BY MR. LANE:

23        Q.    All right.  Well, that's the way it was

24   produced to us.  So are you saying there should be a

25   page after this?  It's sequentially numbered D010224

SARAH L. KOOGLE; March 15, 2013

234

1    and then 225 is this document, the one after it.  So

2    that's the way it was produced to us.  Are you saying

3    there was something else that goes with 22?

4            A.   Well, it stops at four years down here.

5            Q.   Yeah.

6            A.   And the matrix actually goes to five

7    years.

8            Q.   Right.

9            A.   So I know there's another page.

10           Q.   Right.

11           A.   And it's not -- it's not Exhibit 20

12    that's coded as 225.

13           Q.   I'm just saying that's the sequential

14    order that it was produced to us.  So we'll have to

15    get that straightened out, I guess, at a later date.

16               Did we talk about Mr. Praye?

17               MS. BRONCHETTI:  We did.

18               MR. LANE:  We did?  Okay.

19               MS. BRONCHETTI:  Uh-huh.

20               MR. LANE:  Okay.  I'll tell you what

21    we're going to do, we're going -- we're going to

22    just -- I believe these are sequentially numbered, so

23    I'm just going to mark them all as one exhibit.

24    These are the pay matrices that were provided to us

25    recently, and I'm going to show you a copy of that.

235

1      (Exhibit 23 was marked for identification.)

2  BY MR. LANE:

3      Q.   Make sure -- if you could, just review

4  that, make sure that that is sequential.  I believe

5  it's sequential.

6      A.   Yes.

7      Q.   Okay.  Let's -- let's just go down

8  through this.  Did you play any -- what -- what are

9  we looking at here?

10     A.   These are the pay matrices that are set

11 up to pay and determine a mileage rate.

12     Q.   Okay.  Did you play any role in producing

13 these -- these documents?

14     A.   Actually printing them, no.

15     Q.   Okay.  Did you -- did you play any role

16 in determining what documents would be printed?

17     A.   Just the documents that were assigned to

18 the drivers that were -- that are on the pay rate

19 history screens.

20     Q.   Okay.

21     A.   So if it -- if the -- if the matrix was

22 on the pay rate history screens that we were

23 reviewing for Scott Praye and Erickson and everybody

24 --

25     Q.   Right.

SARAH L. KOOGLE; March 15, 2013

236

1      A.   -- that's the matrix, the actual matrix

2   table we provided.

3      Q.   Okay.  And just so I'm clear, did you

4   provide any examples of matrices that were not

5   applicable to any of the named plaintiffs?

6      A.   I -- not that I'm aware of, but like I

7   said, I didn't print them.

8      Q.   Okay.  Did you provide, to your

9   knowledge, did you provide the pay matrices for --

10   for any matrices that would have been paid to any and

11   all of the plaintiffs?  In other words, is it a

12   complete representation of all the matrices that

13   would have applied to the plaintiffs?

14          MS. BRONCHETTI:  Objection.  I mean, this

15   document -- why don't you ask us that in discovery

16   instead of Ms. Koogle?  I don't understand how you're

17   going to get there.  This is a 50-page document.  And

18   she already testified that she didn't pull these, so

19   I don't think that's a fair question.

20          MR. LANE:  Well, this was a response to

21   discovery, and that's not what I was told that was

22   being produced.

23          MS. BRONCHETTI:  But -- if you know the

24   answer --

25          MR. LANE:  In other words, I've already

SARAH L. KOOGLE; March 15, 2013

237

1    asked the question.

2           MS. BRONCHETTI:  -- you can answer.

3    BY MR. LANE:

4           Q.   In other words, was it your intent to

5    produce a printout of all the matrices that would

6    have applied to the plaintiffs during the claims

7    period?

8           A.   During the -- yes.

9           Q.   Okay.  All right.  Well, I think we

10   talked about most of these, if not all of them, but I

11   want to go through them so we can understand what

12   we're looking at here.  Okay?

13          A.   Okay.

14          Q.   What is the first page, D010393?

15          A.   Yes.

16          Q.   What are we looking at?

17          A.   This is the Wal-Mart Grandview Washington

18   mileage pay rate that was effective July 2nd of 2012.

19          Q.   Okay.  Now, do you know what the Wal-Mart

20   Grandview mileage rate would have been prior to July

21   2nd, 2012?

22          A.   No.

23          Q.   Okay.  And what happened on -- did the

24   mileage rate change on the effective date that's

25   listed here?

SARAH L. KOOGLE; March 15, 2013

238

```
 1              MS. BRONCHETTI:   Objection.

 2    BY MR. LANE:

 3         Q.   July 2nd of 2012?

 4              MS. BRONCHETTI:   Asked and answered.

 5              MR. LANE:   It's not asking -- I asked if

 6    it changed, not what if she knew what the previous

 7    rate was.

 8    BY MR. LANE:

 9         Q.   Do you know if the mileage rate was

10    changed on July 2nd, 2012?

11         A.   July 2nd, 2012, yes.

12         Q.   Okay.  And how was it changed?

13         A.   It was increased a penny per mile from

14    the previous matrix.

15         Q.   Okay.  Now, let's look at the -- the way

16    this matrix works down underneath.  We've got a user

17    row defined column, a single seat, first seat, second

18    seat, trainer position, and training position seat.

19    But there looks like -- then there's a matrix of

20    numbers down below.  I want to ask you what those

21    mean.  Okay?

22         A.   Okay.

23         Q.   Now, what does -- first of all, what does

24    the -- under the single seat number there, "29000,"

25    what does that represent?
```

SARAH L. KOOGLE; March 15, 2013

239

1      A.    That is 29 cents per mile.

2      Q.    29 cents a mile.  Okay.  And then to the

3  right of that first seat for 3EW2, what does that

4  represent?

5      A.    The 19 cents per mile.

6      Q.    19 cents per mile.  And is that for first

7  seat?

8      A.    Those are if you're a team.

9      Q.    If you're a team?  Okay.

10     A.    First seat's paid 19, second seat's paid

11  19.

12     Q.    Oh, okay.  All right.  And then on the

13  end, we've got a -- what does that represent, the

14  2900 -- 29000?

15     A.     If -- if -- if you're a mentor, the pay

16  rate is the same as if -- as if you're driving solo

17  if you're under this matrix.

18     Q.    Okay.  So 3EW2 mentors don't make any

19  more per mile than non-mentors?

20     A.    On this matrix.

21     Q.    On this matrix, yes.  On 3EW2, that's the

22  matrix?

23     A.    That's correct.

24     Q.    Okay.  Okay.  The second line where it

25  says, 24.  What does the 24 represent?

SARAH L. KOOGLE; March 15, 2013

240

1    A.    Twenty-four months of experience.

2    Q.    Okay.  And at 24 months of experience,

3    what -- what happens to the rate, the mileage rate?

4    A.    It increases a penny and a half.

5    Q.    And that's what the 1500 stands for,

6    correct?

7    A.    That's correct.

8    Q.    Is that the same across the board, half a

9    cent for team?

10   A.    Yes.

11   Q.    Members at 24 months?

12   A.    That's correct.

13   Q.    And then a penny and a half for the

14   mentor, correct?

15   A.    That's correct.

16   Q.    All right.  So at 24 months, you would be

17   making 30 and a half cents, correct?

18   A.    That's correct.

19   Q.    Per mile under this matrix?

20   A.    Yes.

21   Q.    At 36 months, again, if I've -- if I've

22   got the gist of it now, that adds another penny,

23   correct?

24   A.    That's correct.

25   Q.    So then you're making 31 and a half

SARAH L. KOOGLE; March 15, 2013

241

1    cents, correct?

2          A.    Right.

3          Q.    At 48, another cent and a half, correct?

4          A.    That's correct.

5          Q.    For 33 cents, correct?  Did I do my math

6    right?

7          A.    Yes.

8          Q.    And then at 60 months, which is 5 years,

9    you go up another 3 cents, correct?

10         A.    That's correct.

11         Q.    So -- so a high of 36 cents a mile,

12   correct?

13         A.    Yes.

14         Q.    All right.  Starting at 29 and going up

15   to 36, that would be the range for 3EW2 as of July

16   2nd, 2012, correct?

17         A.    That's correct.

18         Q.    Do you, off the top of your head,

19   remember what that range was prior to this change

20   that occurred on July 2nd, 2012?

21         A.    No.

22         Q.    Okay.  Maybe it's in here.  Okay.

23   Looking at the next page, we have a trip matrix code,

24   "GFLAT."  Sounds like a musical note.  What -- what

25   does that mean?  What is that matrix?

SARAH L. KOOGLE; March 15, 2013

242

1      A.   If you look at the front page --

2      Q.   Right.

3      A.   -- there is a --

4      Q.   Combined?

5      A.   -- in the middle of the page, it says,

6   "Combined with GFLAT."

7      Q.   Right.

8      A.   This is the -- the matrix that says if

9   the load is between 100 and 150 miles, it pays an

10  additional 30 cents if you're solo -- or $30 if

11  you're solo, and an additional $15 if you're a team.

12     Q.   Okay.  And that's what that means on the

13  matrix down below, correct?

14     A.   That's correct.

15     Q.   All right.  And that's anything under 151

16  miles?

17     A.   That's correct.

18     Q.   Okay.  Which is what the columns on --

19  column on the left is referring to?

20     A.   Right.

21     Q.   Okay.  Now, looking back at the first

22  page, let me ask you to define a couple of other

23  fields for me, if you could.  "Row Pgm" about just

24  underneath the word, "Effective Date."

25     A.   Yes.

243

1      Q.    It's got "Row Pgm TJMONTHS."  What is

2   that referring to?

3      A.    Months of experience.

4      Q.    Okay.  So that's the heading for the 24,

5   36, 48, and 60 down there?

6      A.    That's correct.

7      Q.    Okay.  "Matrix Type," up at the top.

8   That "I," what does that -- it -- it looks like it's

9   the choices are D, I, and S.  What do each one of

10  those mean?

11     A.    D means -- means direct.  It pays a

12  direct amount, which is -- the next page shows a

13  direct type of a matrix.  It pays directly what's on

14  the matrix table at the bottom.  It pays directly

15  $30.

16     Q.    Okay.

17     A.    This one that starts, this has an I is

18  incremental, which is how it increments a penny and a

19  half, a penny when the --

20     Q.    Experience level?

21     A.    -- experience changes.

22     Q.    Okay.

23     A.    And then the S is for stop, if it was a

24  stop matrix.

25     Q.    Okay.  And we've talked about this

SARAH L. KOOGLE; March 15, 2013

244

1    before, but 3EW2 is the matrix that's unique for

2    Grandview -- Wal-Mart Grandview?

3           A.    That's correct.

4           Q.    Okay.  Let's go to the third page, 395.

5    And this is matrix code 3EW2G, correct?

6           A.    That's correct.

7           Q.    What, is this also a Grandview Washington

8    specific matrix?

9           A.    Yes.

10          Q.    And it has an effective date of July 2nd,

11   2012 as well, correct?

12          A.    That's correct.

13          Q.    What -- what happened -- what changed on

14   July 2nd, 2012?

15          A.    It's the same penny in increase.

16          Q.    Okay.

17          A.    Penny increase.

18          Q.    Penny increase in the -- in the mileage

19   rates?

20          A.    That's correct.

21          Q.    Across the board?

22          A.    What do you mean "across the board"?

23          Q.    Well, in other words, is it a penny

24   increase -- well, if you start at a penny increase,

25   everything else is increased at the same incremental

245

1   rate, correct?

2          A.   Right.

3          Q.   All right.  So the whole thing, the whole

4   range goes up a penny, correct?

5          A.   Right.

6          Q.   All right.  This is read exactly the same

7   way as the 3EW2, correct?

8          A.   It is.  Can I point out the difference,

9   though?

10         Q.   Yes, there's a G.  And what -- 3EW2G,

11   what does the "G" stand for?

12         A.   That's the level 2 mentor position.

13         Q.   Okay.

14         A.   So if you look at the last column on the

15   right --

16         Q.   It's up at the --

17         A.   -- it's up a penny if you're a mentor.

18         Q.   Okay.

19         A.   And you have a student on your truck.

20         Q.   I got ya.  So as long as you have a

21   student on your truck, you start off at a penny

22   higher --

23         A.   That's correct.

24         Q.   -- rate per mile?  Okay.  The next page,

25   does that apply to that previous GFLAT part of the

SARAH L. KOOGLE; March 15, 2013

246

1   matrix?

2          A.    Yes, it's exactly the same.

3          Q.    It's exactly the same.  Okay.  It works

4   the same way as the first one we talked about?

5          A.    Yes.

6          Q.    3EW2.  All right.  The next page,

7   D010397.  What are we looking at here, 3EW2S?

8          A.    That's the senior level mentor position.

9          Q.    Okay.

10         A.    Or a matrix, so it's an increase of two

11  cents if you have a trainee on your truck.

12         Q.    Okay.

13         A.    A mentor.

14         Q.    Otherwise, it's the same as the previous

15  matrices?

16         A.    Yes.

17         Q.    Okay.  And we see that over in the last

18  column where it starts at 31 cents as opposed to 29?

19         A.    That's correct.

20         Q.    Okay.  Again, effective date of July 2nd,

21  2012.  Does this -- it -- did this matrix go up a

22  penny just like the previous ones --

23         A.    Yes.

24         Q.    -- at that time?  So prior to that, it

25  was -- started at 28 cents, correct?

SARAH L. KOOGLE; March 15, 2013

247

1        A.   I believe so.

2        Q.   The next page, GFLAT again.  Does that

3   apply to the -- to the 3EW2S?

4        A.   Yes, they're all the same thing.

5        Q.   All right.  Same thing.  Yeah.  Okay.  I

6   don't know why they're stapled in this order, but

7   hopefully that won't be a problem.

8             The next one is D010399.  Pay matrix code

9   WA3E, correct?

10       A.   Correct.

11       Q.   All right.  What -- what -- is that a

12  specific Washington state matrix?

13       A.   Yes.

14       Q.   Okay.  When was it created?

15       A.   9-1-11.

16       Q.   Okay.  Now, is that when the matrix was

17  created from scratch or was this a previous one that

18  was modified on that date?

19       A.   That's the new matrix that was created

20  September 1st, 2011.

21       Q.   Okay.  Completely new matrix, correct?

22       A.   Yes.

23       Q.   All right.  We read this the same way

24  that we've done before?

25       A.   Yes.

SARAH L. KOOGLE; March 15, 2013

248

1        Q.    So the -- the TJMONTHS over there, that

2   column where it says, "6," that's referring to at six

3   months --

4        A.    Yes.

5        Q.    -- it would increase two cents, correct?

6        A.    That's correct.

7        Q.    And then at nine months, it would

8   increase a penny and so on and so on?

9        A.    Yes.

10       Q.    Okay.  The -- the page after that,

11  D010400, what does that apply to?

12       A.    That is the Washington East Coast loaded

13  pay matrices.

14       Q.    Explain that to me.  What is a Washington

15  East Coast?  East Coast of what?

16       A.    It -- I'm sorry.

17       Q.    Go ahead.  Because I'm -- I'm confused as

18  to how you have an East Coast in Washington.

19       A.    Because if you are a linehaul driver, you

20  drive nationwide.

21       Q.    Okay.

22       A.    And if you pick up and deliver east of

23  the Mississippi River --

24       Q.    Okay.

25       A.    -- the system automatically will change

SARAH L. KOOGLE; March 15, 2013

249

1    you to this WAEE pay matrix.

2        Q.   Okay.  All right.  My question, then, is:

3    Does that do that on -- you said it automatically

4    changes you.  Is it -- regardless of where you're

5    assigned, this matrix would then apply if you're

6    driving east of the Mississippi?

7        A.   Only Washington people.  Only Washington

8    mileage-based --

9        Q.   Okay.

10       A.   -- driver -- or a mileage-paid driver.

11       Q.   And this was a -- a matrix created on

12   September 1st, 2011?

13       A.   That's correct.

14       Q.   It didn't exist before then?

15       A.   No, it did not.

16       Q.   Okay.  And it's created specifically for

17   Washington assigned drivers, correct?

18       A.   Yes.

19       Q.   What -- why was it created?

20       A.   It was the review that we did in

21   September 1st, 2011.

22       Q.   Okay.  I guess my question is:  What --

23   what was the matrix that would have applied to this

24   same driver prior to September the 1st, 2011 doing

25   the same linehaul work that we're talking about here?

250

1       A.   It would have been 3E.

2       Q.   3E.  Okay.

3       A.   The WA in the front is for Washington.

4       Q.   Okay.  I got you.  And how did -- how did

5  this new matrix compare with 3E?  Did it have

6  different mileage rates?

7       A.   Yes, the rates are different.

8       Q.   Okay.  Do you know what the difference in

9  the starting mileage rate was for 3E?

10      A.   It varies depending on the effective

11 date, and I don't know without having it here.

12      Q.   Okay.  Lower or higher than this?

13      A.   3E?

14      Q.   Yes.

15      A.   Is lower than this.

16      Q.   All right.  Now, a -- a new term, maybe

17 it's on one of the previous ones, but I'll ask you

18 here.  I don't think I've asked you about it, where

19 it says, "Combine" and it says, "MB."  What does that

20 stand for?

21      A.   It stands for mileage band.

22      Q.   And what does that mean?

23      A.   It's on the next document, 401.

24      Q.   Okay.  Let's look at that.  "Mileage band

25 loaded miles only."  MB.  Now, over on the matrix

SARAH L. KOOGLE; March 15, 2013

251

1    type, it says "D" in this case.  Is that another

2    direct pay?

3         A.   Yes.

4         Q.   Is that what that means?  Okay.  And then

5    under the "Row Pgm," it says "TJLOHAUL."  Does that

6    stand for long-haul?

7         A.   That stands for loaded.

8         Q.   Loaded haul.

9         A.   Haul miles.

10        Q.   Okay.  I got you.  All right.  This has

11   an effective date of 12-1-06, correct?

12        A.   That's correct.

13        Q.   Tell me about this particular -- who --

14   who does this pay matrix apply to?  Is that specific

15   for Washington or is it --

16        A.   This -- this applies to all -- it applies

17   to various pay matrices, but it's not specific to

18   Washington.

19        Q.   Okay.

20        A.   Because it's combined with the Washington

21   pay matrices.

22        Q.   Okay.  As well as others?

23        A.   Yes.

24        Q.   As the case may be, correct?

25        A.   Yeah.

SARAH L. KOOGLE; March 15, 2013

252

1       Q.    All right.  How does this work?

2       A.    Down on the -- I'm sorry.

3       Q.    Well, for instance, where it says

4  "TJLOHAUL," that column, excuse me, where it says 25,

5  is that miles?

6       A.    Yes, 25 loaded miles.

7       Q.    So anything 25 miles or less, you're paid

8  what?

9       A.    20 -- 20 -- less than 25 miles, you don't

10  get an additional amount.  It starts at 25 miles.

11      Q.    Okay.  So at 25 miles, what -- what

12  does -- how do you read the matrix?

13      A.    It -- it pays an additional 16 cents per

14  mile.

15      Q.    After 25 miles?

16      A.    Yes.

17      Q.    Okay.

18      A.    To 149 miles.  At 150 miles, it pays an

19  additional 10 cents.  At 200 miles, it pays an

20  additional 8 cents.  At 250 miles, it pays an

21  additional 6 cents.  At 300 miles, it doesn't pay any

22  additional, it just pays their standard months of

23  experience.  Months of --

24      Q.    Under the matrix we were talking about?

25      A.    Yeah.

SARAH L. KOOGLE; March 15, 2013

253

1   Q.   Okay.  The -- and by matrix, I'm talking
2   about the linehaul matrices we --
3   A.   These -- these WA3E, this is their
4   standard rate.  So if you're -- if you are a new
5   hired -- or a newly experienced mileage driver, you
6   get paid 28 cents per mile.  But if you're at a load
7   that's 25 miles, you get paid 28 cents plus an
8   additional 16 cents.  If you do a load that's 300
9   loaded miles, you're only paid 28 cents.
10   Q.   Okay.
11   A.   Per mile.
12   Q.   Okay.
13   A.   So that's why they're combined.
14   Q.   Right.  All right.  The next one,
15   D010403.  It looks like it's hazard or a hazmat
16   matrix.  Go ahead.
17   A.   Yes.
18   Q.   How does that work?
19   A.   That says if the load is a hazmat load,
20   if the order is flagged as hazmat, hazardous
21   materials, it pays an additional flat dollar amount
22   of $35.
23   Q.   Regardless of the length of the load?
24   A.   That's correct.
25   Q.   All right.  And that's a -- that's

SARAH L. KOOGLE; March 15, 2013

254

1   matrix, that's a D matrix type, correct?

2        A.    Yes.

3        Q.    Okay.  The next one, D010404.  WA3EE?

4        A.    So this is the empty matrix that applies

5   for Washington mileage drivers.

6        Q.    Okay.  All right.

7        A.    It doesn't have any combined matrices to

8   it.  It is just the standard experience pay matrix.

9        Q.    Okay.  Let me -- let me go back to the

10  previous page, and just make sure I'm clear.  Is this

11  hazard -- haz- -- hazard pay, is it specific for

12  Washington or is this what applies across the board?

13       A.    Applies across the board.

14       Q.    Okay.  The mileage band matrix that we

15  looked at, is that specific to Washington or is that

16  across the board?

17       A.    Across the board.

18       Q.    Okay.  WA3EE.  And you were telling me

19  about that.  I apologize.  What -- how is this --

20  this is the empty matrix, correct?

21       A.    That's correct.

22       Q.    It was created September 1st, 2011,

23  correct?

24       A.    Right.

25       Q.    Before that, it was the EE, 3EE?

SARAH L. KOOGLE; March 15, 2013

255

1          A.    3EE.

2          Q.    Okay.  And it's your understanding that

3    this started at a higher mileage rate after that

4    date, correct?

5          A.    9-1-11, yeah.

6          Q.    Okay.  Before that, the 3EE was

7    nonspecific for Washington, correct?

8          A.    Yes.

9          Q.    Okay.  Here's one I don't think we -- I

10   don't recall seeing.  Matrix code, we're looking at

11   D010405.  WCSLW.  What is that?

12         A.    It's -- it is on your employees that are

13   office casual, or I believe Slack is a casual driver.

14   That's the West Coast casual Washington matrix.

15         Q.    Okay.  Before 9-1-11, which is the

16   effective date on this matrix, did you have a

17   specific casual Washington pay matrix for Washington

18   assigned drivers?

19         A.    This was created on 9-1, so, no.

20         Q.    Okay.  Again, this reads the same way as

21   the previous ones, correct?

22         A.    Yes.

23         Q.    And this appears to be combined with the

24   mileage band as well, correct?

25         A.    Yes, exactly the same one.

SARAH L. KOOGLE; March 15, 2013

256

1        Q.    Okay.  The next one, again, it's -- it's
2    a mileage band loaded.  Is this the same as the
3    previous one we looked at?

4        A.    Yes.

5        Q.    No difference?

6        A.    No difference.

7        Q.    And it applies across the board, correct?

8        A.    That's correct.

9        Q.    The next one is D010407, which appears to
10   be "SH" for short haul, correct?

11       A.    Yes.

12       Q.    How does this work?

13       A.    This is a -- this is an additional $25
14   flat if the load has loaded miles between 25 and 100
15   loaded miles.

16       Q.    Okay.  So between 25 and 100 is when you
17   get the 25 cents, or as a team, 12 and a half cents?

18       A.    It's $25.

19       Q.    I'm sorry.

20       A.    Yes.

21       Q.    $25 or $12 and a half dollars --

22       A.    Yes.

23       Q.    -- for teams.  All right.  And this --
24   it's got a combo -- combination with hazard pay; is
25   that correct?

SARAH L. KOOGLE; March 15, 2013

257

1          A.     The hazmat, yes.

2          Q.     Okay.   Is it only when it's hazard pay

3     that this applies, or is this -- or I -- I'm trying

4     to figure out why it's -- is it always combined with

5     the hazard pay?

6          A.     The short haul matrix?

7          Q.     Yes.

8          A.     Yes.

9          Q.     Okay.

10         A.     It's in the previous document also.

11         Q.     Okay.   Now, I'm sure it's clear if I went

12    back.  Can you help me out one more time on the

13    mileage band, it's the previous page.

14         A.     Yes.

15         Q.     Are we -- we're talking about dollars --

16    $16 for --

17         A.     No, it's 16 cents.

18         Q.     16 cents, I'm sorry.

19         A.     If -- if you look above that number

20    there --

21         Q.     Yes.

22         A.     -- the 16000 --

23         Q.     Yes.

24         A.     -- it's got the Xs and it shows the

25    decimal.  It tells you that it's -- there is the

SARAH L. KOOGLE; March 15, 2013

258

1    decimal, and there's five Xs after the decimal.

2          Q.    Right.

3          A.    So that lets you know that there is, in

4    your number down below, that's -- it's -- if there's

5    only five numbers there, that's a cent per mile.

6          Q.    Okay.  I got ya.  All right.  Thank you.

7    I knew there was some significance to that.  All

8    right.  The next one, I'm looking at D010408.

9    Effective date of October 4th of 2008; is that

10   correct?

11         A.    Yes, that's the same hazmat as we

12   reviewed previously.

13         Q.    Okay.  Just flat $35?

14         A.    That's correct.

15         Q.    Okay.  The next one is D010409.  WCSWE,

16   correct?

17         A.    Yes.

18         Q.    What is that?

19         A.    The West Coast Washington empty mile

20   rate.

21         Q.    Who does this apply to?

22         A.    Only Washington mileage linehaul drivers.

23         Q.    Linehaul drivers?

24         A.    Yes.

25         Q.    Okay.  This would not apply to the

SARAH L. KOOGLE; March 15, 2013

259

1    Wal-Mart dedicated drivers, correct?

2         A.    That's correct.

3         Q.    Would it apply to the Costco drivers?

4         A.    No, it would not.

5         Q.    Okay.  And, again, this was created on

6    September 1st, 2011.  What applied to those

7    Washington drivers before this was created

8    specifically for the Washington drivers?

9         A.    WCSE, I believe it is.

10        Q.    Okay.  And that was a -- a pay matrix

11   that applied to all West Coast linehaul drivers?

12        A.    Yes.

13        Q.    Okay.  Now, do you know what the

14   difference in the starting rate for this

15   newly-created Washington matrix compared to the --

16   the one that applied prior to that?

17        A.    No, I don't.

18        Q.    Okay.

19        A.    Not without seeing it.

20        Q.    Okay.  But you know that it was a lower

21   rate, correct?

22        A.    This one here is a higher rate.

23        Q.    That's what I mean.  The previous version

24   was a lower rate?

25        A.    Yeah.  Yes.

SARAH L. KOOGLE; March 15, 2013

260

1      Q.   Okay.  Now, DCHW, next page.  We're

2  looking at D010410.  What's DCHW?

3      A.   These -- this is a -- the Washington

4  Costco Heavy-Haul months of experience matrix.

5      Q.   Okay.

6      A.   It reads just the same as the others.

7      Q.   All right.  And this has an effective

8  date of July 16th, 2012, correct?

9      A.   Yes, that's correct.

10     Q.   Was that when this matrix was created

11  specifically for Washington Costco Heavy-Haul

12  drivers?

13     A.   No.

14     Q.   Okay.  What -- what -- when was this

15  originally created?

16     A.   9-1-11.

17     Q.   9-1-11?

18     A.   Yes.

19     Q.   Okay.  So that was originally -- what

20  happened -- well, prior to 9-1-11, was there a

21  specific Washington Costco Heavy-Haul mileage matrix?

22     A.   No.

23     Q.   Okay.  After 9-1-11, one was created.  Do

24  you know what happened in July of 2012?

25     A.   Yes.

SARAH L. KOOGLE; March 15, 2013

261

1     Q.    What changes were made at that point?

2     A.    It was increased a penny.

3     Q.    Okay.  It was increased a penny.  Okay.

4  Prior to 9-1-11, what -- what was the Costco

5  Heavy-Haul pay matrix?

6     A.    I don't know without having it here.

7     Q.    Was it -- was it less than the matrix

8  that was created on September 1st, 2011?

9     A.    Yes.

10    Q.    But you just -- as you sit here, you

11 don't know how much?

12    A.    No.

13    Q.    And then again in July of 2012, it

14 increased more, correct?

15    A.    It -- in July of 2012, it increased a

16 penny.

17    Q.    One penny.  Okay.  It says this is

18 combined with DCHD.  What is that?

19    A.    The next page.

20    Q.    Okay.  All right.  The next page is

21 D010411?

22    A.    That's correct.

23    Q.    And is that the same matrix basically,

24 but for payment for double trailers?

25    A.    Yes.

SARAH L. KOOGLE; March 15, 2013

262

1      Q.    Okay.

2      A.    That only applies to Costco Heavy-Haul.

3      Q.    Costco Heavy-Haul.  Okay.  Is this

4  specific for Washington?

5      A.    This matrix here?

6      Q.    Yes.

7      A.    No, it's specific to all Costco

8  Heavy-Haul.

9      Q.    Okay.  Regardless of where you -- where

10  you're assigned?

11      A.    Yes.

12      Q.    All right.  And to make sure I'm reading

13  it correctly, is this -- what is the payment down

14  there for heavy -- for double Heavy-Haul?

15      A.    It's an additional -- the -- the rates

16  down at the bottom?

17      Q.    Yes.

18      A.    Additional 4 cents per mile.

19      Q.    Additional 4 cents a mile.

20      A.    So it's .04000.

21      Q.    I got you.  I got you.  Okay.  Thank you.

22  And that's also combined with the mileage band,

23  correct?

24      A.    Yes.

25      Q.    All right.  Next code, mileage band, is

SARAH L. KOOGLE; March 15, 2013

263

1    this any different than what we previously talked

2    about?

3            A.    Exactly the same.

4            Q.    Okay.  Again, that's not specific for

5    Washington, correct?

6            A.    Correct.

7            Q.    Short haul?

8            A.    Combined with hazmat, exactly the same.

9            Q.    And not specific for Washington, correct?

10           A.    That's correct.

11           Q.    Hazard pay any different than what we've

12   talked about?

13           A.    Exactly the same.

14           Q.    $35, correct?

15           A.    That's correct.

16           Q.    DCHWE?

17           A.    This is the Costco Heavy-Haul empty rate

18   per mile for Washington.

19           Q.    Okay.  Effective date of 7-16-12?

20           A.    Yes.

21           Q.    Again, was this created on 9-1?

22           A.    Originally created?

23           Q.    Yes.

24           A.    Yes, 9-1-11.

25           Q.    All right.  And prior to that, was there

SARAH L. KOOGLE; March 15, 2013

264

1      any Costco empty mile specific for Washington?

2              A.   No.

3              Q.   No -- no matrix specific for Washington?

4              A.   No.

5              Q.   Okay.  Same change on July 16th, 2012,

6      was increased a cent?

7              A.   Yes.

8              Q.   Okay.  It says, this is combined with

9      DCHD2.

10             A.   Yes.

11             Q.   Is that the mentor level?

12             A.   No, it's the next page.

13             Q.   Okay.

14             A.   Which is the same as the previous one.

15             Q.   Four cents?

16             A.   It pays an additional 4 cents.

17             Q.   Got ya.  Okay.  For double trailers?

18             A.   Right.

19             Q.   I got ya.  Okay.  DCHWM?

20             A.   These are the level 2 mentor.  So the

21     only difference is the trainer rate over on the side

22     is an additional penny.

23             Q.   Okay.

24             A.   All the combines are the same.

25             Q.   All right.  And the creation date and the

SARAH L. KOOGLE; March 15, 2013

265

1    modification date of July 16th, 2012 is the same?

2         A.    Yes.   The original creation date of

3    9-1-11.

4         Q.    Okay.   And prior to that, there was no

5    Washington specific dedicated Costco Heavy-Haul level

6    2 mentor?

7         A.    Prior to 9-1-11, no.

8         Q.    Yes.   The next one is D010418.   Matrix

9    code DCHD?

10        A.    Same as all the other previous we

11   reviewed.

12        Q.    Okay.   Again, this is a --

13        A.    An additional 4 cents.

14        Q.    Yes.   Got ya.   MB, it's the same as

15   previously?

16        A.    Exactly.

17        Q.    Okay.   Page 420, short haul, same as we

18   previously talked about?

19        A.    Exactly.

20        Q.    Hazard pay, page 421, same?

21        A.    Exactly the same.

22        Q.    DCHW2, have we talked about that one?

23        A.    No, it's the empty mile for level 2

24   mentor Costco Washington Heavy-Haul.

25        Q.    Okay.   Again, we've got an effective date

SARAH L. KOOGLE; March 15, 2013

266

1    of July 16th, 2012, was also a creation date of --

2         A.   9-1-11.

3         Q.   Okay.   September 1, '11.   And was there a

4    Washington specific Costco empty mile level 2 mentor

5    matrix prior to that September 1st, 2011 creation?

6         A.   No.

7         Q.   And, again, the rates for the 9-1-11

8    creation was higher than the -- the non-Washington

9    specific matrix that applied, correct?

10        A.   That's -- that's correct.

11        Q.   The next one, D010423.   Effective date

12   October 1, 2008.   What -- what is this one?

13        A.   It's exactly the same as the previous,

14   the Heavy-Haul for an additional four cents.

15        Q.   Okay.   Non-specific for Washington?

16        A.   That's correct.

17        Q.   Okay.   The next one, 424.   Page 424.

18   DCHWS?

19        A.   Exactly the same.   It's just the senior

20   mentor matrix that pays an additional two cents if

21   you're training.

22        Q.   Okay.   Otherwise, the creation date of

23   9-1-11, and the additional change on July 16th, 2012?

24        A.   That's correct.

25        Q.   Okay.   DCHD?

Yamaguchi Obien Mangio, LLC,  Reporting & Video  *  www.yomreporting.com
1200 Fifth Avenue, Suite 1820, Seattle, Washington 98101 * 206.622.6875 * 1.800.831.6973

SARAH L. KOOGLE; March 15, 2013

267

1         A.    Is the additional four cents.

2         Q.    Okay.

3         A.    That's previously reviewed.

4         Q.    Again, non -- non-Washington specific,

5    correct?

6         A.    That's correct.

7         Q.    MB, same as what we've talked about?

8         A.    Exactly.

9         Q.    SH, same as what we've talked about?

10        A.    Exactly.

11        Q.    Hazard, same as we've talked about,

12   correct?

13        A.    Exactly.

14        Q.    DCHSW?

15        A.    This is the same exact matrix, but for

16   the empty rate for the senior mentors.  So an

17   additional two cents per mile.

18        Q.    Okay.  Again, this appears to have been

19   one that's created September 1st of 2011?

20        A.    That's correct.

21        Q.    And a -- a last effective date of July

22   16th, 2012?

23        A.    That's correct.

24        Q.    Same modifications as we talked about

25   before?

SARAH L. KOOGLE; March 15, 2013

268

1        A.    Yes.

2        Q.    For those creation dates?

3        A.    Yes.

4        Q.    And non -- and prior to 9-11, nonspecific

5   for Washington, correct?

6        A.    That's correct.

7        Q.    In other words, there was -- there was no

8   Washington specific matrix prior to 9-11, correct?

9        A.    9-1-11, yes.

10       Q.    9-1-11.  Page 430.  Same thing, direct

11   pay nonspecific for Washington, correct?

12       A.    That's correct.

13       Q.    Costco Heavy-Haul doubles?

14       A.    That's correct.

15       Q.    DCH, same as we've talked about?

16       A.    Yes.

17       Q.    This -- this says a modification, or

18   effective date of July 16th, 2012?

19       A.    Yes.

20       Q.    And prior to 9-1-11, this was -- there

21   was no Washington specific dedicated Costco

22   Heavy-Haul matrix?  In other words, was this created

23   on 9-1-11 as well?

24       A.    No.  This is -- see how it doesn't have

25   Washington at the top of it?

SARAH L. KOOGLE; March 15, 2013

269

1    Q.   Yeah.

2    A.   This is the Costco Heavy-Haul

3    non-Washington matrix.

4    Q.   Oh, okay.  Okay.  All right.  So this was

5    not created on 9-1-11?

6    A.   That's correct.  This is the original

7    one.

8    Q.   Oh, okay.  I got you.

9    A.   The rates are not the original rates.

10   This is the July 16th rate of 2012 rate.

11   Q.   Okay.  What happened to the rates on July

12   16th, 2012 for this matrix code?

13   A.   The same as the others where it was

14   increased a penny.

15   Q.   Okay.  So this was increased a penny,

16   even though this is not Washington specific?

17   A.   This was an increase for all of Costco

18   Heavy-Haul, the penny increase on July 16th.

19   Q.   Okay.

20   A.   Wal-Mart, all of Wal-Mart, all of Costco

21   were given a penny increase in July of 2012.

22   Q.   I got you.

23   A.   Regardless of Washington or not.

24   Q.   And that's the penny that's reflected in

25   the -- the Washington specific matrices that were

SARAH L. KOOGLE; March 15, 2013

270

1    created on 9-1-11?

2            A.    Right.

3            Q.    The additional penny in July of 2012?

4            A.    That's correct.

5            Q.    I got you.  For both Wal-Mart and -- and

6    Costco?

7            A.    Yes.

8            Q.    All right.  The next one, we talked about

9    that one.  DCHEM?

10           A.    This is the empty matrix.

11           Q.    Okay.  The nonspecific?

12           A.    That is nonspecific to Wal-Mart.  Or, I

13   mean, on Washington.

14           Q.    Okay.  And that -- that effective date of

15   July 16th, 2012 was the one-cent across-the-board

16   increase, correct?

17           A.    That's correct.

18           Q.    D010433?

19           A.    Yes.

20           Q.    What are we looking at here; is this --

21           A.    Nonspecific to Wal-Mart, empty.

22           Q.    Well, nonspecific to Wal-Mart or Costco?

23           A.    Washington.  I'm sorry.

24           Q.    I'm sorry.  Good.

25           A.    I'm getting tired.

SARAH L. KOOGLE; March 15, 2013

271

1        Q.    Nonspecific to Washington Costco

2   Heavy-Haul, correct?

3        A.    Mentor 2.

4        Q.    Okay.

5        A.    Level 2.

6        Q.    All right.  Otherwise, everything's the

7   same, this was at an increase of one cent across the

8   board on July 16th, 2012?

9        A.    That's correct.

10       Q.    And this was the matrix that would have

11  applied prior to the creation of the Washington

12  specific dedicated Costco Heavy-Haul level 2 mentor?

13       A.    From 9-1-11.

14       Q.    From 9-1-11, correct?

15       A.    Yes.

16       Q.    DC- -- DCHME?

17       A.    The exact same as the previous, but this

18  is the empty matrix.

19       Q.    Okay.  Again, one cent across the board,

20  July 16th, 2012, correct?

21       A.    Correct.

22       Q.    And this would have been the one that

23  applied to Costco Heavy-Haul empty level prior to

24  9-1-11?

25       A.    Correct.

SARAH L. KOOGLE; March 15, 2013

272

1      Q.   Okay.  Well, the matrix that -- yeah.

2      A.   The matrix code, not the rate.

3      Q.   Right.  Right.  DCHS?

4      A.   The exact same as the previous, but

5  senior mentor, so the two cents.

6      Q.   Okay.  Again --

7      A.   While training.

8      Q.   -- non-Washington specific, correct?

9      A.   Correct.

10     Q.   And would have been the one that applied

11 to Costco Heavy-Haul senior mentor prior to 9-1-11?

12     A.   Yes.

13     Q.   That was created for Washington, correct?

14     A.   That's correct.

15     Q.   Okay.  Prior to the 9-1-11 matrix, it was

16 created for Washington?

17     A.   Yes.

18     Q.   Okay.  DCHSE?

19     A.   All exactly the same, except this is the

20 empty for senior mentor 2.

21     Q.   Okay.

22     A.   Or mentor level.

23     Q.   Everything else is the same.  This is

24 would have -- this is nonspecific for Washington?

25     A.   Yes.

SARAH L. KOOGLE; March 15, 2013

273

1      Q.   And it would have applied to Costco

2   Heavy-Haul empty senior mentor prior to 9-1-11

3   creation of the Washington specific matrix, correct?

4      A.   That's correct.

5      Q.   Okay.  WALD?

6      A.   This is the Wal-Mart matrix, Wal-Mart

7   loaded mile matrix.

8      Q.   Okay.

9      A.   Looking at this, I'm not sure if this is

10   the -- I'm not sure what location this is for.  It

11   doesn't appear to be Grandview because it doesn't say

12   Grandview at the top.

13      Q.   Right.  Well, can you name me any

14   location that this pay matrix would have been

15   applicable to?

16      A.   I wouldn't know.

17      Q.   Okay.  Now, it says it's got an effective

18   date of July 2nd.  I think we were saying 16th

19   before, correct?

20      A.   Yes, July 2nd.

21      Q.   What happened on July 2nd, 2012?

22      A.   A penny increase from the previous

23   Wal-Mart.

24      Q.   Across -- across the board --

25      A.   For?

SARAH L. KOOGLE; March 15, 2013

274

1       Q.   For Wal-Mart.

2       A.   Yes.  Wal-Mart was July 2nd of 2012.

3   Costco was July 16th of 2012.

4       Q.   Okay.  I see.  Same month.  Little bit

5   different date.

6       A.   Yes.

7       Q.   Okay.  This one says, "Combine WAFL."

8   What is that?

9       A.   A flat amount.  And I don't see that

10  here.

11          MS. BRONCHETTI:  What are you looking

12  for?

13          THE WITNESS:  WA, F as in Frank, L.  I

14  don't see that one here.  It pays a flat amount based

15  on number of miles on the load.

16  BY MR. LANE:

17      Q.   Okay.  Okay.  The next one, page 438,

18  WAEM?

19      A.   That is the same as the previous, but for

20  empty miles.

21      Q.   Okay.  Again, effective date of 7-2-12,

22  which was the one-cent across-the-board increase,

23  correct?

24      A.   Correct.

25      Q.   Is this nonspecific for Washington?

275

1     A.     Nonspecific for Washington.

2     Q.     And the previous one, is it

3     nonspecific -- the WALD, is that nonspecific for

4     Washington?

5     A.     Yes.

6     Q.     WASEM?

7     A.     That's the senior mentor position --

8     Q.     Okay.

9     A.     -- for the Wal-Mart nonspecific

10    Washington.

11    Q.     Nonspecific -- it's nonspecific for

12    Washington?

13    A.     Correct.

14    Q.     I'm sorry.  Okay.  Okay.  And the same

15    increase on July 2nd, 2012?

16    A.     A penny increase.

17    Q.     Okay.  Penny increase.  3EWM?

18    A.     This is a Wal-Mart matrix.  I'm not sure

19    what location this is for either.  For -- just pays a

20    rate per mile.  It doesn't have any combined flat

21    amounts or anything.

22    Q.     Okay.  And this has an effective date of

23    7-2 of 2012, and that's when the one-cent increase

24    was reflected?

25    A.     That's correct.

SARAH L. KOOGLE; March 15, 2013

276

1      Q.   Okay.  And make sure I'm clear.  Do you

2  know, this is or is not Washington specific?

3      A.   This is not Washington specific.

4      Q.   Okay.

5      A.   I don't know the location.

6      Q.   Okay.  3EWS?

7      A.   That's the same as the previous, but this

8  is the senior level mentor.

9      Q.   Okay.  Non-Washington specific?

10     A.   Correct.

11     Q.   And, again, the -- the cent increase on

12  July 2nd, 2012?

13     A.   That's correct.

14     Q.   Okay.  3E?

15     A.   This is the standard linehaul pay matrix.

16     Q.   That would be combined with miles band,

17  correct?

18     A.   Yes.

19     Q.   All right.  And it has an effective date

20  of 4-27-09.  Do you know what happened on that date?

21     A.   That is the date that in 2009, Swift did

22  a penny decrease.

23     Q.   Penny decrease.  Okay.  That was in 2000

24  and --

25     A.   '9.

SARAH L. KOOGLE; March 15, 2013

277

1      Q.    '9.  Okay.  Was that a penny decrease

2  across the board for all --

3      A.    Linehaul.

4      Q.    -- linehaul matrices?

5      A.    Yes.

6      Q.    Okay.  Is this spec- -- Washington

7  specific or nonspecific for Washington?

8      A.    Nonspecific.

9      Q.    Okay.

10      A.    This the exact same, just the empty.  The

11  next one.

12      Q.    Okay.  You said 3E.  That's just the

13  empty, correct?

14      A.    Yes.

15      Q.    All right.  Nonspecific for Washington?

16      A.    Yes.

17      Q.    Effective date of 4-27-09?

18      A.    Yes.

19      Q.    And that was a reduction in the mileage

20  rates across the board by one cent?

21      A.    Yes.

22      Q.    As far as the -- the pay matrices that we

23  talked about for each of the plaintiffs, did we cover

24  all of those in this exhibit, No. 23?

25      A.    Yes, I believe so.

SARAH L. KOOGLE; March 15, 2013

278

1      Q.   All right.

2           MS. BRONCHETTI:  Counsel, can we go off

3   record, off the record, please?

4           MR. LANE:  Yeah.

5           THE VIDEOGRAPHER:  Off record at 4:56

6   p.m.

7      (Recessed from 4:56 p.m. to 5:01 p.m.)

8           THE VIDEOGRAPHER:  Back on record at 5:01

9   p.m.

10  BY MR. LANE:

11     Q.   Mrs. Koogle, just to kind of summarize

12  what we just went through in terms of the pay

13  matrices, we talked about the pay matrices, each one

14  individually that have been produced to us, and it's

15  my understanding that -- that prior to 9-1-11, with

16  regards to the matrices that we reviewed, none of

17  those were Washington specific pay matrices, correct,

18  prior to 9-1-11?

19     A.   Where the -- are you talking about the

20  effective date that was on the --

21     Q.   Yes.

22     A.   -- pay matrix?

23     Q.   Yes.

24     A.   Yes, that's correct.

25     Q.   Okay.  And after 9-1-11, that's when the

SARAH L. KOOGLE; March 15, 2013

279

1   Washington specific pay matrices were created,

2   correct?

3          A.   That's correct.

4          Q.   All right.  Are you aware of any other

5   pay matrices that -- that were not reflected in the

6   exhibit, No. 23, that we just reviewed, that were

7   prior to 9-1-11 specific to Washington-positioned

8   drivers?

9               MS. BRONCHETTI:  Objection; asked and

10  answered.

11  BY MR. LANE:

12         Q.   I mean, can you think of any others

13  that --

14         A.   No.

15         Q.   Okay.  I want to review a couple things

16  from the -- from the 30(b) notice.  We've been

17  talking about some of these items, but I want to make

18  sure I'm -- I'm clear that -- that you are or are not

19  testifying on behalf of Swift on these items that

20  we've -- we've discussed.  No. 11.

21              MS. BRONCHETTI:  Joe, give me a minute,

22  please.

23              MR. LANE:  Oh, I'm sorry.

24              MS. BRONCHETTI:  Do you have another

25  copy?  Okay.  Proceed.

SARAH L. KOOGLE; March 15, 2013

280

1    BY MR. LANE:

2          Q.   Okay.  Item No. 11, which was at the

3    beginning of your deposition, we talked about that

4    that would be an area that you would testify as the

5    representative of Swift, correct?

6                MS. BRONCHETTI:  No, that's not correct,

7    Joe.  What we said is that she can testify as to the

8    payroll capacity communications, not to other

9    communications.

10               MR. LANE:  Okay.  I -- I understand.  I

11   wasn't -- I was going to ask her about the

12   communications.

13   BY MR. LANE:

14         Q.   Have we talked about all of the

15   communications from payroll reflecting communications

16   regarding the overtime rate for Washington-based

17   drivers?  Have we talked about all of the

18   communications, that you're aware of, that came out

19   of the payroll department and went to the

20   Washington-based or Washington-positioned drivers?

21         A.   That I'm aware of, yes.

22         Q.   Okay.  And -- and you're speaking on

23   behalf of the corporation as the -- as the person

24   most knowledgeable about those communications coming

25   out of the payroll department, correct?

SARAH L. KOOGLE; March 15, 2013

281

1        A.    From -- to my extent of my knowledge,

2   yes.

3        Q.    Yes.

4        A.    Yes.

5        Q.    Yes.  And we talked about the

6   acknowledgment form to some degree.  Any other -- is

7   there any other communication, that you're aware of,

8   other than the acknowledgment form?

9              MS. BRONCHETTI:  Asked and answered

10  several times.  The last time she's answering this

11  question, Joe.

12             MR. LANE:  Okay.

13             THE WITNESS:  Can you ask your question

14  again?

15  BY MR. LANE:

16       Q.    Yes.  Other than the acknowledgment form,

17  are there -- you know, we've been at this a long

18  time, and I don't remember your specific answer on

19  this, but other than the acknowledgment form, are

20  there any other communications that we have not

21  talked about that communicated to the drivers

22  anything having to do with overtime rates and their

23  mileage rate of pay?

24             MS. BRONCHETTI:  From payroll?

25             MR. LANE:  Yes, from payroll.

SARAH L. KOOGLE; March 15, 2013

282

1          THE WITNESS:  Not that I'm aware of.

2    BY MR. LANE:

3          Q.   Okay.  Now, Item No. 16, because I don't

4    think -- you were listed for Item No. 12, but I think

5    that's -- your answers would be the same for Item No.

6    12, which take us back to 1998.  And you're not aware

7    of any communications going back that far any

8    differently than what you've told me about, correct,

9    coming out of payroll?

10          MS. BRONCHETTI:  We -- we designated --

11    designated her for 2006 onward.

12          MR. LANE:  Exactly.  And that's -- that's

13    why I'm saying I don't think it's any different than,

14    really, 11.

15    BY MR. LANE:

16          Q.   Is there any difference in your answer

17    with regards to going back to 2006?

18          A.   Which one are you talking about now?

19          MS. BRONCHETTI:  Objection; asked and

20    answered.

21    BY MR. LANE:

22          Q.   Never mind.  I'll tell you what, it's --

23    you're not aware of any other communications,

24    regardless of the date, than the ones we've talked

25    about, correct?

SARAH L. KOOGLE; March 15, 2013

283

1    A.    That I'm aware of, that's correct.

2    Q.    Right.  Okay.  Testimony of documents

3  detailing, pertained to, and/or describing the pay

4  plans for local and linehaul drivers that were in

5  place from 1995 through 2007.

6    A.    Where are you now?

7    Q.    That's -- that's Item No. 16, and I

8  understand that you were just testifying going back

9  to 2006, correct?

10    A.    That's correct.

11    Q.    All right.  Have we -- have you told me

12  about all of -- have we talked about all of those pay

13  plans that -- that would be discussed under that

14  item?

15    MS. BRONCHETTI:  Objection.

16  BY MR. LANE:

17    Q.    Have we talked about all the pay plans

18  for local and linehaul drivers that were in place

19  from 1995 through 2007 -- or 2006 through 2000 and --

20  it's supposed to be 2006 to the present, I assume is

21  what you're being put up for, correct?

22    MS. BRONCHETTI:  Well, no, we identified

23  her responsive to your request and it was 2006 to

24  2007.  And, Joe, if you're asking have we reviewed

25  all pay plans throughout the country related to local

SARAH L. KOOGLE; March 15, 2013

284

1    and linehaul drivers, the answer is absolutely not.

2            MR. LANE:  Okay.

3            MS. BRONCHETTI:  And as stated in our

4    objections, that request is way overbroad.

5            MR. LANE:  Okay.  We'll revisit that.

6    But that's -- that's fine.

7    BY MR. LANE:

8        Q.  Let's look at No. 17.  I'll just read it

9    because I can't remember what it says without reading

10   it again.  "Testimony and documents detailing,

11   pertaining to" --

12           THE REPORTER:  I'm sorry, can you slow

13   down, please?

14   BY MR. LANE:

15       Q.  "Testimony and documents detailing,

16   pertaining to, and/or describing the changes to your

17   compensation plans for linehaul drivers that occurred

18   after the Bostain decision."  Do you -- are you

19   familiar with the Bostain decision?

20           MS. BRONCHETTI:  Objection; calls for a

21   legal conclusion.

22   BY MR. LANE:

23       Q.  Are you aware of the Bostain decision?

24           MS. BRONCHETTI:  If you know what he's

25   talking about, you can answer.

SARAH L. KOOGLE; March 15, 2013

285

1          THE WITNESS:  I am not aware with the

2     details of it, no.

3     BY MR. LANE:

4          Q.   Okay.  So you don't have knowledge that

5     would be responsive to No. 17 as it's worded?

6          A.   No.

7          Q.   Okay.  I'll -- I'll represent to you that

8     the Bostain decision I'm referring to there is March

9     the 1st of 2007.  Have we talked about the changes to

10    the compensation plans for linehaul drivers that

11    occurred after the -- that date, March of 2007, with

12    regards to the Washington pay plans?

13         A.   As we've described in our documents

14    today, yes.

15         Q.   Yes.  Okay.  Are you aware of any that we

16    have not discussed that would have applied to

17    Washington drivers?

18         A.   No.

19         Q.   Okay.  No. 18.  You were put up for, at

20    least for the time frame 2006 to the present.  Let's

21    read it.  "Testimony and documents detailing,

22    pertaining to, and/or describing the changes to the

23    compensation plans for local drivers that occurred

24    after -- well, in this case, 2006."

25              We didn't really talk about local

286

1    drivers.  Have there been any changes to the local

2    drivers' compensation plans since 2006?

3                MS. BRONCHETTI:  Objection; overbroad,

4    calls -- calls for speculation, lacks foundation.

5    BY MR. LANE:

6         Q.   Okay.  Well, let me just ask this:  Are

7    local drivers paid by the mile or by the hour?

8         A.   I'm -- I'm not the one that can be

9    deciding whether or not local drivers are paid by the

10   mile or by the hour.

11        Q.   Okay.  You -- you don't have knowledge

12   about typically how they're paid?

13        A.    It would -- it would vary based on what

14   location they're at, what state they're at, are they

15   at Washington --

16        Q.   Okay.

17        A.    -- Wal-Mart or Costco.

18        Q.   Local drivers are not considered -- do

19   you know if they're considered to be interstate

20   drivers or long-haul drivers, or if they're local,

21   they're not long-haul, correct?

22        A.   I don't know.

23        Q.   Okay.  All right.  So you don't have --

24   in terms of local driver pay plans, you don't have

25   information about that, correct?

SARAH L. KOOGLE; March 15, 2013

287

1          MS. BRONCHETTI:  Objection; misstates

2    testimony.

3    BY MR. LANE:

4          Q.   I mean, you -- you don't have any pay

5    plans that apply to local drivers that you're aware

6    of?

7          A.   That -- I don't know what you mean by pay

8    plans.  I mean, pay packages?  Pay matrices?

9          Q.   Have -- have we talked about any pay

10   plans today that would apply to local -- what you

11   understand to be local drivers?

12         A.   Not that I'm aware of.

13         Q.   Okay.  No. 24.  Have you told me, have we

14   discussed, and have you talked about, on behalf of

15   Swift, the availability and accessibility of

16   information in the payroll department for the hire

17   date, compensation rates, and rates of pay for Swift

18   drivers?

19         MS. BRONCHETTI:  In Washington?

20         MR. LANE:  Well, in Washington or

21   elsewhere.

22   BY MR. LANE:

23         Q.   I mean, is -- is the information

24   available regardless of where they're located?

25         A.   For the sections that you were talking

SARAH L. KOOGLE; March 15, 2013

288

1    about, the hire date, the --

2          Q.    Compensation and rates of pay?

3          A.    Yes.

4          Q.    Okay.  And that's available regardless of

5    where they're from, correct?

6          A.    Yes.

7          Q.    Going back to July of 2008, correct?

8          A.    Yes.

9          Q.    The last item that you were -- put up for

10   testimony on behalf of Swift was Item No. 30.  And it

11   says, "Testimony and documents detailing, pertaining

12   to, or describing the identity of all

13   Washington-based drivers as classified by Defendant

14   Swift."

15          Now, obviously, we haven't identified

16   every driver that -- that Swift claims or classifies

17   as Washington-based, but have we talked about the --

18   the manner in which Swift classifies those drivers;

19   in other words, by position?

20          A.    Washington-based drivers?

21          Q.    Yes.

22          A.    Yes.

23          Q.    Okay.  And Washington-based drivers, as

24   far as Defendant Swift is concerned, and the new pay

25   matrices that have been developed to address

SARAH L. KOOGLE; March 15, 2013

289

1   Washington-based drivers, is based upon their

2   Washington position, correct?

3          A.    Their Washington position, yes.

4          Q.    Yes.  Okay.

5          A.    Working at a Washington location.

6          Q.    Okay.  Regardless of where they're

7   driving, correct?

8          A.    That's correct.

9          Q.    I think that's all -- all on that.  Let

10  me just look at my notes to see if there's...

11              Do you know anything about the -- the

12  Qualcomm system that's used by the drivers?

13         A.    I have limited knowledge about the

14  Qualcomm system.

15         Q.    Okay.  And the payroll department, do you

16  rely upon driver's logs, whether electronic or

17  manual, in any way, in -- in doing the payroll

18  functions?

19         A.    Yes.

20         Q.    How do you rely on those?

21         A.    For our student pay scale, our student

22  hourly pay scale.

23         Q.    How do -- and how do you -- how do you

24  utilize that?  Give me an example.

25         A.    Our students that are -- our student --

SARAH L. KOOGLE; March 15, 2013

290

1    our trainee students are paid based on an hourly rate

2    as of 11-12-2012.   And it's used -- we use log hours

3    for on-duty driving hours and on-duty not-driving

4    hours --

5            Q.   Okay.

6            A.   -- in order to determine what -- how many

7    hours they've worked for the pay week.

8            Q.   Okay.   And what was that date again?

9            A.   November 12, 2012.

10            Q.   Prior to November 12, 2012, how were --

11    how were the students paid?

12            A.   The student salary pay, that's among a

13    bunch of these documents.

14            Q.   Okay.   Those matrices that you were --

15            A.   The salary rates.

16            Q.   Yeah.   Okay.   Did you use the logs, in

17    any way, to determine the students' pay prior to

18    11-12-12?

19            A.   No.

20            Q.   Okay.   Now, after 11-12-12, using that

21    hourly, those hours that are part of the loggings,

22    the -- the DOT logs, do you use those hours for

23    calculating overtime pay?

24            A.   For Washington-based drivers, yes.

25            Q.   For Washington-based drivers, student

SARAH L. KOOGLE; March 15, 2013

291

1    drivers?

2         A.   Yes.

3         Q.   Okay.  Do you know of any calculations as

4    a function of the payroll department that was done

5    prior to 11-12-12 to account for student overtime

6    pay?

7         A.   Not me specifically, no.  In my

8    department.

9         Q.   Okay.  And I'm speaking about in

10   Washington.

11        A.   No.

12        Q.   Okay.  Typically, the students that

13   you're -- you're -- you're talking about, do they --

14   during that training period, do they typically work

15   over 40 hours in a week?

16        A.    It completely varies.

17             MS. BRONCHETTI:  Objection.

18   BY MR. LANE:

19        Q.   Okay.  And that -- that would be

20   reflected in their logs, correct?

21        A.   Yes.

22        Q.   Are those logs, those records that you're

23   talking about, are those retained by the payroll

24   department?

25        A.   Not by payroll, no.

SARAH L. KOOGLE; March 15, 2013

292

1          Q.    Okay.  Are they retained somewhere in

2    the -- in the Swift organization?

3          A.    For a -- a certain date and -- a date --

4    a certain date that I -- it's in 2009.  I don't, off

5    the top of my head, know exactly the date.

6          Q.    Okay.

7          A.    But it's not back to 2008.

8          Q.    Okay.

9                MR. LANE:  And I think that's all I have.

10               MS. BRONCHETTI:  Thank you.  I have no

11   questions.

12               MR. LANE:  Okay.

13               THE VIDEOGRAPHER:  This marks the end of

14   Disk 4 of 4 in the deposition of Sarah Koogle.  The

15   original disks of today's testimony will be retained

16   by Yamaguchi Obien Mangio.  Going off the record at

17   5:18 p.m.

18               (The proceedings concluded at 5:18 p.m.)

19

20

21

22

23

24

25

SARAH L. KOOGLE; March 15, 2013

293

1
ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name:          Slack, et al. v. Swift
2
Dep. Date:          March 15, 2013
Deponent:          Sarah L. Koogle
3
CORRECTIONS:

4
Pg._____  Ln._____     Reason_____
NOW READS: _____
5
SHOULD READ: _____

6
Pg._____  Ln._____     Reason_____
NOW READS: _____
7
SHOULD READ: _____

8
Pg._____  Ln._____     Reason_____
NOW READS: _____
9
SHOULD READ: _____

10
Pg._____  Ln._____     Reason_____
NOW READS: _____
11
SHOULD READ: _____

12
Pg._____  Ln._____     Reason_____
NOW READS: _____
13
SHOULD READ: _____

14
Pg._____  Ln._____     Reason_____
NOW READS: _____
15
SHOULD READ: _____

16
Pg._____  Ln._____     Reason_____
NOW READS: _____
17
SHOULD READ: _____

18
Pg._____  Ln._____     Reason_____
NOW READS: _____
19
SHOULD READ: _____

20
Pg._____  Ln._____     Reason_____
NOW READS: _____
21
SHOULD READ: _____

22
Pg._____  Ln._____     Reason_____
NOW READS: _____
23
SHOULD READ: _____

24

25
_____
Signature of Deponent

SARAH L. KOOGLE; March 15, 2013

294

1            I, Sarah L. Koogle, do hereby declare

2    under penalty of perjury that I have read the

3    foregoing transcript; that I have made any

4    corrections as appear noted, in ink, initialed by me,

5    or attached hereto; that my testimony as contained

6    herein, as corrected, is true and correct.

7

8    _____  I have made changes to my deposition.

9    _____  I have NOT made any changes to my deposition.

10

11            EXECUTED this _____ day of

12    _____, 20___, at _____,

13    _____.            (City)

14        (State)

15

16

17

18              _____

19                          Sarah L. Koogle

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2

 3          I, Janice E. Harrington, Certified Court

 4     Reporter for the State of Arizona, certify:

 5          That the foregoing deposition was taken

 6     by me; that I am authorized to administer an oath;

 7     that the witness, before testifying, was duly sworn

 8     by me to testify to the whole truth; that the

 9     questions propounded by counsel and the answers of

10     the witness were taken down by me in shorthand and

11     thereafter reduced to print by computer-aided

12     transcription under my direction; that deposition

13     review and signature was requested; that the

14     foregoing pages are a full, true, and accurate

15     transcript of all proceedings and testimony had upon

16     the taking of said deposition, all to the best of my

17     skill and ability.

18          I FURTHER CERTIFY that I am in no way

19     related to nor employed by any of the parties hereto

20     nor am I in any way interested in the outcome hereof.

21          DATED this 28th day of March, 2013

22

23     _____

24     Janice E. Harrington
       Certified Court Reporter No. 50844
25     For the State of Arizona
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**



TROY SLACK, JACOB GRISMER, RICHARD
ERICKSON, and SCOTT  PRAYE, Individually,
and as Putative Class Representatives,

               Plaintiffs,

         v.

SWIFT TRANSPORTATION CO. OF ARIZONA,
LLC,

               Defendants.

No. 3:11-cv-05843-BHS

**SECOND AMENDED NOTICE OF**
**30(b)(5) & (6) DEPOSITION**

16

17

18

19

20

21

22

23

**TO:**    **Paul Cowie and/or Ellen Bronchetti, Attorneys for Defendant Swift**

       Please take notice that plaintiffs, pursuant to Federal Rules of Civil Procedure 30(b)(5)

& (6), will take the deposition(s) of Defendant Swift Transportation Co. of Arizona (hereinafter

Defendant Swift), upon oral examination, through the  designated representative(s) of

Defendant Swift relative to Plaintiffs claims beginning on the following date at the following

location:

         **DATE:**          **Friday, March 15, 2013**
         **TIME:**          **11:00 a.m. (Contemporaneous with or following previous**
                        **depositions)**
         **PLACE:**       **Clarendon Corporate Park in the Office of Driver + Nix**
         **ADDRESS, CITY:**  **3131 E. Clarendon Avenue, Suite 108**
                        **Phoenix, Arizona 85016**

Second Amended Notice of 30(B)(5) & (6)
Deposition

1          Plaintiffs will examine the witness(es) in his or her capacity as a Defendant Swift

2    designated representative(s) regarding the matters described herein below.  Said witness(es)

3    should be knowledgeable on the matters for which they are designated by Defendant Swift

4    and/or which are known or reasonably available to the Defendant on the following subjects:

5

6    1.     Testimony   and   documents,   detailing,   pertaining   to,   and/or   describing   the
organizational structure of SWIFT TRANSPORTATION CO. OF ARIZONA, LLC.

7

8    2.     Testimony   and   documents,   pertaining   to,   describing,   and/or   evidencing   the
procedures, formulas and/or calculations associated with the process of *building*

9    *overtime* into the rates paid to Swift's *Washington based drivers* as indicated in the

10   "Acknowledgement" attached as Exhibit A.

11   3.     Testimony and documents, pertaining to, describing, and/or evidencing all "mileage

12   rates" paid by Swift to "Washington based drivers" and all documents evidencing all

13   "mileage rates" paid by Swift to its drivers "elsewhere" as those terms are intended in

14   the "Acknowledgement" attached as Exhibit A, dating back to March of 2006, one year
prior to *Bostain v. Food Express, Inc.,* (2007) 159 Wash. 2d 700 (the *Bostain* decision).

15   4.     Testimony   and   documents,   pertaining   to,   describing,   and/or   evidencing   all

16   "compensation plans" paid by Swift to "Washington based drivers" and all documents

17   evidencing all "compensation plans" paid by Swift to its drivers "elsewhere" as those

18   terms are intended in the "Acknowledgement" attached as Exhibit A, dating back to
March of 2006 (one year prior to the *Bostain* decision).

19

20   5.     Testimony and documents, pertaining to, and/or describing this Defendant contends
supports its claim that "mileage rates" paid by Swift to "Washington based drivers" are

21   higher that the "mileage rates" paid by Swift to its drivers "elsewhere" as those terms

22   are intended in the "Acknowledgement" attached as Exhibit A, dating back to March of

23   2006 (one year prior to the *Bostain* decision).

Second Amended Notice of 30(B)(5) & (6)
Deposition

NELSON BOYD, PLLC
411 University Street, Suite 1200
Seattle, Washington 98101
(206) 971-7601

6.    Testimony and documents, pertaining to, and/or describing this Defendant contends supports its claim that "mileage rates" paid by Swift to "Washington based drivers" includes an amount representing "overtime" pay as those terms are intended in the "Acknowledgement" attached as Exhibit A, dating back to March of 2006 (one year prior to the *Bostain* decision).

7.    Testimony and documents, pertaining to, and/or describing Plaintiffs' class claims as set out in Plaintiffs' Complaint (as amended), including, but not limited to, Plaintiffs' claims regarding:

- Numerosity:  That is, the number of Washington based drivers that have worked for Defendant in the years beginning July 18, 2008 to the present who drove over forty hours in a week and were paid predominantly by the mile, or participated in the orientation and in-truck training program provided by Defendant, or participated in the Defendant's "Per Diem" "benefit" program;
- Questions of law or fact common to the class;
- Typicality of the claims or defenses of the class;
- Adequacy of representation of class members;
- Predominant nature of questions of law or fact common to the members of the class compared to any questions affecting only individual members; and
- Manageability of the Class Claims, or the Superiority of class treatment of the claims as compared to other available methods of adjudication of the controversy.

8.    Testimony and documents, detailing, pertaining to, and/or describing Defendant Swift's policies and practices regarding the maintenance of records of hours worked and wages paid for truck drivers, both local and line haul, for the last ten years, including records and the manner of record storage of all paid driving trips performed by Plaintiffs and potential class members.

Second Amended Notice of 30(B)(5) & (6)
Deposition

NELSON BOYD, PLLC
411 University Street, Suite 1200
Seattle, Washington  98101
(206) 971-7601

9.  Testimony and documents detailing, pertaining to, and/or describing Defendant Swift's communications (if any) with the Washington Department of Labor and Industries inquiring about, referencing, or seeking approval of any of Defendant's pay practices pertaining to Washington State's requirement that Washington based drivers be paid overtime for hours driven or worked over forty hours or be paid the reasonable equivalent of overtime pay.

10. Testimony and documents, detailing, pertaining to, and/or describing the training or orientation of Plaintiffs, and/or all Washington-based drivers, employed by Defendant regarding payment programs or policies for hours driven or worked in excess of forty hours in a week.

11. Testimony and documents, detailing, pertaining to, and/or describing any and all communications with any or all Washington-based drivers, employed by Defendant at any time during the claim period (July 18, 2008 to the present) regarding whether its payment programs or policies for hours driven or worked in excess of forty hours in a week include or do not include any provisions for the payment of overtime for hours driven or worked in excess of forty hours in a week.

12. Testimony and documents, detailing, pertaining to, and/or describing any and all communications with any or all Washington-based drivers (employed by Defendant at any time since 1998 to the present) regarding whether its payment programs or policies for hours driven or worked in excess of forty hours in a week include or do not include any provisions for the payment of overtime for hours driven or worked in excess of forty hours in a week.

13. Testimony and documents pertaining to, detailing and describing the orientation material and documents provided to new hires, including the compensation or lack of compensation associated with the orientation of new drivers.

14. Testimony and documents, detailing, pertaining to, and/or describing the "in-truck"

training program implemented by Defendant during the claim period, including the pay plans associated with those "in-truck" training periods for the driver trainees.

15. Testimony and documents, detailing, pertaining to, and/or describing the methodology used by the Defendant Swift to support its position that its compensation is reasonably equivalent to overtime.

16. Testimony and documents, detailing, pertaining to, and/or describing the pay plans for local and line haul drivers that were in place from 1995 through 2007.

17. Testimony and documents, detailing, pertaining to, and/or describing the changes to your compensation plans for line haul drivers that occurred after the *Bostain* decision.

18. Testimony and documents, detailing, pertaining to, and/or describing the changes to your compensation plans for local drivers that occurred after 1997.

19. Testimony and documents, detailing, pertaining to, and/or describing Defendant Swift's pay plans and policies for local and line haul truck drivers for the last ten years, including the positions of the persons involved in formulating the plans and policies, what training, if any, is provided to inform employees and supervisors of these policies, and what measure, if any, are taken to ensure compliance with these policies.

20. Testimony and documents, detailing, pertaining to, and/or describing the methodology used to establish competitive rates of pay for your drivers.

21. Testimony and documents, detailing, pertaining to, and/or describing the job descriptions in your policy manual.

22. Testimony and documents, detailing, pertaining to, and/or describing the basis upon which Defendant Swift asserts it has acted in good faith.

23. Testimony and documents, detailing, pertaining to, and/or describing the nature and extent of any information concerning current and former employees that is maintained on or retrievable from any computer or other electronic or mechanical source of Defendant Swift, including, but not limited to, information concerning hire

Second Amended Notice of 30(B)(5) & (6)
Deposition

NELSON BOYD, PLLC
411 University Street, Suite 1200
Seattle, Washington 98101
(206) 971-7601

date, job assignments, hours worked, overtime worked, compensation, rates of pay, termination date, and any other personnel, human resource, or employment data.

24. Testimony and documents, detailing, pertaining to, and/or describing the most efficient, effective and reliable method of tabulating or compiling information for Defendant Swift concerning hire date, job assignments, hours worked, overtime worked, compensation, rates of pay, termination date, and any other personnel, human resource, or employment data.

25. Testimony and documents, detailing, pertaining to, and/or describing the job requirements for hourly truck drivers and job requirements for drivers paid by the mile.

26. Testimony and documents, detailing, pertaining to, and/or describing the record retention policy of Defendant Swift and the means by which Defendant Swift maintains information on current and former employees.

27. Testimony and documents, detailing, pertaining to, and/or describing the nature and type of work performed by Plaintiffs and similarly situated workers on Defendant Swift's behalf.

28. Testimony and documents, detailing, pertaining to, and/or describing the identity of the person(s) who supervised, managed, evaluated or otherwise monitored the work performed by the named Plaintiffs on Defendant Swift's behalf.

29. Testimony and documents, detailing, pertaining to, and/or describing the steps taken to notify drivers that the mileage rates were reasonably equivalent to overtime.

30. Testimony and documents, detailing, pertaining to, and/or describing the identity of all Washington based drivers as classified by Defendant Swift.

31. Testimony and documents pertaining to, and/or describing to Defendant Swift's responses to any discovery served in this case.

32. Testimony and documents, detailing, pertaining to, and/or describing Defendant

Second Amended Notice of 30(B)(5) & (6)
Deposition

NELSON BOYD, PLLC
411 University Street, Suite 1200
Seattle, Washington 98101
(206) 971-7601

Swift's pay plans for drivers that are not Washington based drivers as Defendant Swift defines or classifies those drivers.

33.     Testimony and documents pertaining to, detailing and/or describing Defendant Swift's "PER DIEM" pay plan "benefit" for drivers that are Washington based drivers as Defendant Swift defines or classifies those drivers, as that part of the benefit plan was implemented from July 18, 2008 to the present.

34.     Testimony and documents pertaining to, detailing and/or describing Defendant's knowledge of the requirement of compensating its Washington based drivers for hours driven over forty hours a week at any time, from 1998 to the present.

35.     Testimony and documents pertaining to, detailing and/or describing Defendant's knowledge of the requirement of compensating its Washington based drivers for overtime pay (or the reasonable equivalent thereof) for all hours driven over forty hours in a week at any time, from 1998 to the present, and any and all actions Defendant took to comply with this requirement at any time from 1998 to the present.

Dated: February 18, 2013.            Respectfully submitted,

_____

**JOSEPH D. LANE**
jlane@cochranfirm.com
**J. FARREST TAYLOR**
ftaylor@cochranfirm.com
**ANGELA J. MASON**
amason@cochranfirm.com
**THE COCHRAN FIRM**
163 W. Main Street
Dothan, Al 36301
(334) 793-1555 -- Phone

**DEBORAH M. NELSON, WSBA #23087**
nelson@nelsonboydlaw.com
**JEFFREY D. BOYD, WSBA #41620**

Second Amended Notice of 30(B)(5) & (6)
Deposition

NELSON BOYD, PLLC
411 University Street, Suite 1200
Seattle, Washington  98101
(206) 971-7601

boyd@nelsonboydlaw.com
**NELSON BOYD, PLLC**
1700 7th Avenue, Suite 2220
Seattle, WA 98101
(206) 971-7601 – Phone


**ROBERT J. CAMP**
rcamp@jacobymeyers.com
**JACOBY & MEYERS, LLC**
111 E. Main Street
P. O. Box 5551
Dothan, AL  36302
(334) 794-8000 – Phone
(334) 699-6885 – Facsimile


## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 3013, I caused to be served a copy of the foregoing **Plaintiffs' Second Amended Notice of 30(b)(5) and (6) Deposition** on the following person(s) in the manner indicated below at the following address(es):

Rudy A. Englund, Esq.
EnglundR@LanePowell.com
**Lane Powell, PC**
1420 Fifth Avenue, Suite 4100
Seattle, WA  98101-2338

Ellen Brochetti, Esq.
Ebronchetti@sheppardmullin.com
Paul Cowie, Esq.
pcowie@sheppardmullin.com
**Sheppard Mullin Richter & Hampton LLP**
379 Lytton Avenue
Palo Alto, CA  94301-1479


▪ By **Electronic Mail**
▪ By **First Class Mail**

_____
**JOSEPH D. LANE**


Second Amended Notice of 30(B)(5) & (6)
Deposition