UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | |
|---|---|
| TROY SLACK, JACOB GRISMER, RICHARD ERICKSON, SCOTT PRAYE, GARY H. ROBERTS, ROBERT P. ULRICH, HENRY LEDESMA, TIMOTHY HELMICK, DENNIS STUBER, ERIC DUBLINSKI, AND SEAN P. FORNEY, Individually, and as Putative Class Representatives,<br><br>Plaintiffs,<br><br>v.<br><br>SWIFT TRANSPORTATION CO. OF ARIZONA, LLC,<br><br>Defendant. | Case No. 3:11-cv-05843-BHS<br><br>ASSIGNED TO THE HONORABLE BENJAMIN H. SETTLE<br><br>**DECLARATION OF SUSANN WOOSLEY**<br><br>[Complaint Filed: September 9, 2011] |

I, Susann Woosley, declare under penalty of perjury that the facts set forth in this declaration are true and correct and based on my own personal knowledge. If called as a witness, I could and would competently testify thereto.

1. I am currently employed by Swift Transportation Co. of Arizona, LLC ("Swift") as a truck driver, assigned to the Sumner, Washington terminal. I began working for Swift in October 21, 2005. This is my first and only trucking job.

SMRH:409660548.1                                     -1-

2. I live in Vaughn, Washington.

3. I attended Swift Trucking Academy in Portland, Oregon.

4. As an over the road driver, it is totally random where I drive, which is part of the excitement. We do get into patterns where you're doing a figure eight and doing the same runs for a while. For example, I do several runs from Texas to the east coast and back and forth for several weeks at a time, and then I will be back doing the same run a few months later.

5. I almost never work in Washington, unless I'm going home, and I don't go home that much. Usually, I go back 2 times a year, and I'm off duty when I'm there. We have done local runs when we're home, but very rarely. I rarely do loads in Washington. I did go home for Fourth of July.

6. I work on the east coast a lot as well, but it depends how long. We can sometimes be stuck east of the Mississippi for several months and not come back.

7. My last route started in Mississippi, where we picked up. We t-called it in El Paso, Texas because it doesn't deliver until a few days later. We then picked up a load in El Paso, Texas and we're taking to Lebanon, Oregon.

8. I am dispatched out of whatever terminal that I happen to empty out at, and that is where the planners plan us to go. The planners for team freight are out of Phoenix, Arizona. I've been on a team for almost a 2 years. Before that, I was a solo driver.

9. I do negotiate my loads sometimes. For example, I will negotiate to take my loads for a certain length of run. Sometimes I will negotiate with terminals all over the United States, or terminals will call me and we will change the loads.

10. I receive my paychecks by direct deposit. Before we had direct deposit, I had it go to my Comdata card, which I could access from wherever I am located. I submit my bills of lading electronically, and those go to Trans-flow electronically. None of these go physically to Washington.

11. I did orientation out of Troutdale, Oregon because that is where I was doing driving school, and I found it easier to do orientation in Oregon than going back to Washington. I was

hired in Oregon after orientation as well. I don't think I was paid for orientation, but I don't remember. My orientation was three days long.

12. During orientation, we had to prove that we could climb and bend and lift. A lot of it was sitting around waiting. We also went over Qualcomm and what to expect when you're with your trainer.

13. I started the in truck training program the Monday after orientation. My mentor was Joe Heath. My in truck training program was a total of 6 weeks that I had to put in hours for, but it was actually a bit longer because I took 4 or 5 days off in the middle to hang out with my friend in Canada, so it was really more like 8 weeks. The program was pretty relaxed.

14. The amount of time in in truck training varied a lot. Back when I started it was 6 weeks regardless unless you had experience, and then you could be reduced a week or two. Now it's an hour thing. You have to put in so many hours where you are driving, when your mentor is driving. And if your mentor feels confident, you are a little more independent and they allow you to drive longer. But how much time you drive really depends on whether the mentor feels confident and comfortable with you driving.

15. During my in truck training program, I got $350 a week for 2 weeks, $450 a week for 2 weeks, and $550 a week for 2 weeks. Even at the lowest it was definitely above minimum wage.

16. The hours I worked in in truck training per week varied a lot depending on how confident my mentor was in my driving. For my training it wasn't an hourly thing. We just had 6 weeks. For example, one of the weeks I only worked about 20 hours.

17. We were on a Fedex route in my in truck training program. We were driving mostly up and down the I-5, up and down California and Oregon, but we did not go back to Washington much. We also went to Albequerque, New Mexico, Denver, Colorado. I think we may have gone to Montana. We went to Salt Lake City. My mentor was on the FedEx routes, so we did a lot of the Western states.

18.     My mileage rate has changed based on my experience. I started at about $0.25 per mile, and a bit different on the east coast. The pay has changed, because the economy tanked. Our pay goes up. I'm now being paid $0.41 per mile. But the pay is different in other states, and if you pick up and deliver east of the Mississippi, the pay is different. There you get some hazard pay driving in the east coast.

19.     We also receive a quarterly bonus based on performance. This program is called "the more you run, the more you make." With my mileage, it's like I get an extra week's pay every quarter.

20.     I am sometimes paid by the hour for local work. For example, if someone t-called a load and you have to go do something in the area. That pays $13-$16 an hour depending on what you're doing. Sometimes the planners will get you to do these local runs so they don't have to pay you layover pay. The local runs take you less than 2 hours, so that comes out to a little over $30, but if I were sitting there doing nothing and getting layover pay, they would have to pay you $50. One of the biggest places that does this is Lancaster, Texas. The planners there will tell me that the only way I can get a load out of there is to do a local load. Some people choose to do the local load and some others choose to get the layover pay instead. I usually try to pick up several of the local loads at once. So I am essentially get paid by the hour.

21.     When I am paid by the hour, I am also sometimes paid by the mile as well. It depends. The planners or terminal managers have discretion on what to offer you to do local work. Usually I negotiate these loads in Lancaster, Texas.

22.     For example, I had to wait 18 hours once to get Owens Corning to make insulation and load it on my trailer. Then, I was paid detention pay at $16 an hour. Detention pay continues for up to 9 hours. I also got extra money, because they told me I had to stay there, so I also got layover pay in addition.

23.     There have been quite a few times that I've been paid detention pay and layover pay at the same time. I was under the impression that it was the CSR (the customer service representative from Swift) who was giving me more pay do perform these additional tasks because

1  they wanted to make the customer happy. Sometimes they're not very organized, and they don't
2  make the appointments at the right times, so they have to give me this additional pay.

3      24.   I am also sometimes paid flat rates for certain tasks. For example, I am paid a flat
4  rate for moving trailers. I once did two trailers in 40 minutes, and I was paid about $10 - $15 a
5  trailer. The amount of pay for these flat rates are not set. They are determined at the discretion of
6  the terminal manager wherever you are.

7      25.   However, sometimes the flat rate tasks take much longer to do. Additional loads
8  pay flat rates, but it depends on the customer how long this will take. I'm not sure exactly how
9  much these get paid; it's however the terminal manager or the CSR decides to pay you. I usually
10 know which customers are the ones I do not want to do flat rate tasks for because they are
11 customers that will make you wait a long time. The customers I don't want to do flat rate tasks for
12 are: Fred Meyer in Puyallup, WA and Safeway in Auburn, WA. They just make you wait forever.
13 I'm friends with several local drivers in Sumner who say they definitely don't want to go there. I
14 just hope they packed a lunch and a pillow to take a nap.

15     26.   I have also been paid border crossing pay when I go into Canada. I think that's $35,
16 and I did that for about a month. It was gorgeous and it was in April, so it wasn't too bad.

17     27.   We also get breakdown pay at $50 a day. Layover pay is also $50 a day.

18     28.   We also used to get paid for sweeping up trailers and picking up parts, but a few
19 terminal managers have cut this off. It is a company policy that we are supposed to get paid, but it
20 really depends on the terminal manager, who will decide how much we are paid.

21     29.   Some of our customers don't employ yard jockeys, so sometimes we are asked to
22 pull loaded trailers out and put empty trailers in for the customer. I moved 4 trailers for a
23 customer once, and the customer paid me directly with Wendy's gift cards.

24     30.   How many hours I am driving is very different each week. There have been weeks
25 when I have driven 13 or 14 hours in a week before, and that takes me about 2 days. The reason I
26 drove so few hours in those weeks was because they did not have a load for me. If there is no load
27 for a while, I don't drive as many hours.

28

31. Normally I do about 10,000 to 12,000 miles a month as a solo driver. As a team driver, we do up to 23,000 miles per month.

32. I am not part of the per diem program. I was offered to be paid at the per diem rate, but I decided not to participate.

33. I don't think dedicated drivers can represent a class including over the road drivers because they are paid differently and on different scales than we are.

34. I am providing this declaration freely and voluntarily. Swift's attorneys have told me that I do not have to provide this declaration and whether I choose to do so or not, the decision will not affect my employment status. I have had the opportunity to review the contents of this declaration and to make any changes I believe necessary so that it is accurate. I understand that Swift will use this declaration in *Slack v. Swift Transportation Co.*, a case already described to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 25, 2013 at Phoenix, Arizona.

By _____
SUSANN WOOSLEY

## VOLUNTARY INTERVIEW CONSENT FORM

1.     I am an attorney representing Swift Transportation Co. of Arizona, LLC ("Swift"), in a lawsuit brought by current and former employee drivers who claim primarily that they and other drivers were not properly paid minimum wage and overtime in connection with orientation and in-truck training, their mileage rate did not include overtime under Washington law, they had their wages unlawfully deducted under Swift's per diem program, and they were not properly paid upon termination. The lawsuit is entitled *Troy Slack et,. al. v. Swift Transportation Co.* Plaintiff is seeking unpaid wages, penalties and other monetary damages and equitable relief for these alleged wrongs. This case is brought not only on behalf of the Plaintiffs, but also on behalf of a class of "similarly situated" Washington-based drivers who have worked for Swift after July 18, 2008. As a result, at some point, you may be eligible to join the class action lawsuit and, if the lawsuit is successful, collect some money. I want you to know this so that you can make an informed decision about whether you want to talk to me or not.

2.     Before we talk, I need to know if you have a lawyer regarding any matters involving Swift. If you are represented by, or consulting with, an attorney in any matter involving Swift please tell me. If that is the case, the rules of professional ethics for attorneys do not allow me to interview you today. I simply want to confirm that you are not presently represented by counsel in any type of a legal action involving Swift.

3.     Because you are not currently represented by a lawyer, I want to talk to you about the orientation period you went through at Swift, any in-truck training you may have undertaken at Swift (also known as the student-mentor program), your types and rates of pay and Swift's per diem program, as well as the lawsuit generally. We are gathering these facts so that we can effectively prepare Swift's defenses to the claims in the lawsuit. The information may be used to defend against the lawsuit.

4.     It is important, at the outset, that you understand that as a lawyer for Swift, I represent Swift and not you. I am not your lawyer and I do not represent your interests. Because I represent Swift and not you, I also cannot give you any legal advice about any questions or concerns that you may have about any claims you may believe you have or your relationships with Swift.

5.     Also, because I represent Swift and not you, and because there is a lawsuit that is a potential class action and you are a potential class member, information you share with me may be shared with Swift and used in the lawsuit in a way that could adversely affect any potential claim that you might have against Swift, and may limit your potential recovery.

6.     This interview is entirely voluntary. You do not have to talk to me. If you do talk to me and answer my questions, it is entirely voluntary on your part. You can also choose to answer just some of the questions that I ask, or just part of them. It is entirely up to you. You can also end our discussion at any time you want; you simply need to tell me that you want to end the interview and it will end. Regardless of whether you decide to participate in the interview or not, Swift assures you that the services you perform will not be affected in any way;

you will not suffer any harm if you do or do not talk to me and you will not receive any benefits of any kind if you do or do not talk to me.

7. If you do agree to talk to me, Swift will not penalize, discriminate or retaliate against you in any way based on the answers you give me. Swift will not subject you to any adverse actions, retaliation, harassment, threats, coercion or duress because of anything you say during the interview. Similarly, you will not receive any benefit from Swift of any kind based on the answers that you give.

8. We intend to compile the information you provide to me with information from other interviews. We will then use it to provide legal advice to Swift, including the preparation of its defense in the lawsuit. If you are contacted by an attorney representing the individuals who brought the lawsuit and asked by him or her to provide information about your work for Swift, you are free to do so, and you can also refuse to do so. Again, just like this interview, the choice to be interviewed is entirely yours.

9. After the interview, I may ask you to sign a statement that describes or summarizes some or all of what you have told me about your experiences with Swift's orientation program, the in-truck training, your types and rates of pay, the per diem program, the lawsuit or your other experiences as a Swift driver. Like your interview, providing this statement is completely voluntary. If you do decide to provide a statement, it is very important that anything you sign be entirely accurate, so please make sure that you correct any information that is not correct in the statement. By signing the statement, you should understand that you may be affecting your rights in the lawsuit, including waiving your right to participate in the class action or receive any money as a result of it. The statement may be used in the lawsuit to defend Swift against the drivers' claims.

10. If you decide to answer my questions, I want to emphasize that I only want to know the truth from you. There are no right or wrong answers. We only want to hear your honest, candid responses. Please do not give me an answer that you think Swift, or I would like to hear. Just tell me the exact truth whether or not you think that Swift or I would like it.

## WITNESS ACKNOWLEDGMENT

I have read this Voluntary Interview Consent Form and I understand it. I acknowledge and understand that I am a potential member of the class that the named Plaintiffs in *Slack et. al. v. Swift Transportation Co.* are seeking to represent. I confirm that I am not currently speaking to, or represented by, a lawyer regarding my employment with Swift, or any other claim that I believe I might have against Swift. I agree to be interviewed regarding the topics described above, and I fully understand that my answers may be used by Swift in a way that may adversely affect any claim I might pursue against them, and may limit my potential recovery. I agree to answer all questions truthfully and acknowledge that I am participating in this interview entirely of my own free choice and without any threats, intimidation, coercion or promises of benefits to me. If I provide a statement I understand that it might be used to defend Swift in the lawsuit.

Signature: *Susann Woosley*  Print Name: Susann R. Woosley  Dated: 7/25/13